UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA,

     v.                                      Case No.: 1:20-cv-23278-MGC

REAL PROPERTY LOCATED AT 7505 AND 7171
FOREST LANE, **DALLAS, TEXAS** 75230, etc.

       Defendant.

_____/

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                     Case No.: 1:20-cv-25313-MGC

REAL PROPERTY LOCATED AT 55 PUBLIC SQUARE,
**CLEVELAND, OHIO**, etc.,

       Defendant,

_____/

### CLAIMANTS OPTIMA VENTURES, LLC, OPTIMA 7171, LLC, OPTIMA 55 PUBLIC SQUARE LLC, KORF AND LABER'S REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION

The United States' Opposition to Motions to Compel Arbitration, (ECF#54) (the "Opposition") first attacks the Claimants by engaging in a multi-page recitation of self-serving allegations that are irrelevant to the underlying legal issues regarding arbitrability. The Opposition then demands discovery pursuant to Rule G, while also seeking, yet again, a stay of the proceedings. The Opposition concludes with a flawed analysis of bilateral investment

treaties which finds no support in case law or legal authority. In fact, in the entire Opposition, the United States cites only <u>one</u> arbitration related federal case.[1]

The reason that the United States avoids relevant legal authorities is because the law clearly demonstrates that the claims in this civil forfeiture action are arbitrable pursuant to a number of key provisions contained within the applicable treaties and laws:

*First*, as the letter of transmittal to the U.S.-Ukraine BIT makes clear, it is the "investor or investment[ ]" that has the "freedom to choose to resolve disputes with the host government through international arbitration."ECF#36-1:2 (emphasis added).

Second, when an agreement to arbitrate is entered into, the courts must compel arbitration. Article II(3) of the New York Convention provides that courts, "when seized of

---

[1] The only arbitration related federal case cited by the United States is an inapposite case from the Northern District of California, which has nothing to do with a bilateral investment treaty such as the U.S.-Ukraine BIT and which also has nothing to do with the New York Convention, also an international treaty. *See* ECF#54:17 (citing *Breazeale v. Victim Servs., Inc.*, 198 F. Supp. 3d 1070, 1076 (N.D. Cal. 2016)). *Breazeale* involved interpretation of the domestic Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1, *et seq.*, and the exercise of <u>state</u> criminal police powers. One of the key issues in *Breazeale* was the intrusion of the FAA into the "exercise of the state's police power," which is a classic federalism concern. That federalism concern is not present here, because it is the federal government that seeks to expropriate Claimants' investments in the United States. And unlike the domestic FAA, the New York Convention is an international treaty incorporated by statute in 9 U.S.C. § 201, *et seq.* Pursuant to 9 U.S.C. § 201, "[t]he Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter." The FAA only applies to the New York Convention "to the extent that [the FAA] is not in conflict with [9 U.S.C. § 201, et seq.] or the [New York] Convention as ratified by the United States." 9 U.S.C. § 208. In other words, the FAA applies only " '*to the extent that [the FAA] is not in conflict*' with the Convention Act [9 U.S.C. § 201, *et seq.*] or the New York Convention." *Escobar v. Celebration Cruise Operator, Inc.*, 805 F.3d 1279, 1285 (11th Cir. 2015) (quoting *Bautista v. Star Cruises*, 396 F.3d 1289, 1299 (11th Cir. 2005)). The only other arbitration case cited by the United States is a state court case from the Supreme Court of California, which, again, related only to the domestic FAA and state police powers, not the New York Convention, bilateral investment treaties, and the federal government. *See* ECF#54:17 (citing *Iskanian v. CLS Transportation Los Angeles, LLC*, 327 P.3d 129, 150 (Cal. 2014)). To the extent that the Claimants referred to the New York Convention Act, (9 U.S.C. § 201, *et seq.*), as the "FAA" in their motions to compel arbitration that reference was a misnomer. The FAA is set forth in 9 U.S.C. § 1, et seq., and the New York Convention Act, 9 U.S.C. § 201, et seq, is only subject to the FAA to the extent that the FAA is not in conflict with the New York Convention.  *See* 9 U.S.C. § 208; *Escobar*, 805 F.3d at 1285.

an action in a matter in respect of which the parties have made an agreement within the meaning of this article, *shall*, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed."

*Third*, Article 26 of the International Centre for Settlement of Investment Disputes ("ICSID") Convention states that a party's consent to arbitrate under ICSID "<u>shall</u>, unless otherwise stated, <u>be deemed consent to such arbitration</u> **to the exclusion of any other remedy**."

*Fourth*, Article 25(4) of the ICSID Convention states a party may, "at the time of ratification, acceptance or approval of this Convention or at any time thereafter, notify the Centre of the class or classes of disputes which it would or *would not* consider submitting to the jurisdiction of the Centre," which the United States has not done. "[2]

*Fifth*, the U.S.-Ukraine BIT does not require the "exhaustion of local administrative or judicial remedies as a condition of [the United States'] consent to arbitration under this Convention." *See BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 32 (2014) (noting that certain BITs require "exhaustion of local remedies" prior to arbitration, but "[t]he question is whether the parties intended to give courts or arbitrators primary authority to interpret and apply a threshold provision in an arbitration contract," and holding that "the parties (even if they are sovereigns) intended to give that authority to the arbitrators."). In fact, the U.S.-Ukraine BIT provides the option of submitting to the courts of the United States <u>or</u>, alternatively, to binding arbitration. *See* U.S.-Ukraine BIT, Art. VI(2) ("… the national or company concerned may choose to submit the dispute for resolution:  . . . to the courts or administrative tribunals of the Party that in a Party to the dispute; or . . . . to the submission of the dispute for settlement by binding arbitration[.]"). Here, Claimants have elected to pursue their claims through binding arbitration before ICSID and the United States has consented to arbitration pursuant to the U.S.-Ukraine BIT and the ICSID Convention.

Accordingly, pursuant to Article II(3) of the New York Convention, the Court must therefore "refer the parties to arbitration." That is especially so where, as here, the U.S.-

---

[2] *See* https://icsid.worldbank.org/about/member-states/database-of-member-states/member-state-details?state=ST181

Ukraine BIT and the ICSID Convention delegate questions of arbitrability to the arbitrators. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 527 (2019) ("before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists . . . . But if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue."); *BG Grp., PLC v. Republic of Argentina*, 572 U.S. 25, 29 (2014) ("In our view, the matter is for the arbitrators, and courts must review their determinations with deference.").

### ARGUMENT

The arguments set forth in the United States' Opposition, and addressed *seriatim* below, are entirely without merit. Claimants' claims are arbitrable under clear, unequivocal and controlling arbitration law. The Court should thus direct the United States to arbitration.

*First*, the United States fundamentally misunderstands or otherwise obfuscates the purpose of the U.S.-Ukraine BIT and the nature of the claims subject to arbitration. The U.S.-Ukraine BIT provides a number of rights to Ukrainians who invest in the United States. Among those rights is the obligation that "[i]nvestment shall at all times be accorded fair and equitable treatment, shall enjoy full protection and security and shall in no case be accorded treatment less than that required by international law." U.S.-Ukraine BIT, Art. II (3)(a). In Claimants' Notice of Arbitration, Claimants explain that Article 62 of the Ukrainian Constitution provides that "a person shall be deemed innocent of committing a crime and shall not be subjected to a criminal punishment unless his/her guilt has been proven through a legal procedure and established by a court verdict of guilty." 20-cv-23278, ECF#36-2:8; 20-cv-25313, ECF#26-2:8. "The Ukrainian Constitution further provides the Ukrainian Prosecutor's Office is exclusively empowered to initiate criminal charges." *Id.* "Ukrainian civil and commercial courts therefore uniformly hold that they lack authority to conclude or find that conduct violates the Criminal Code of Ukraine in the absence of criminal charges filed by the Ukrainian Prosecutor's Office and a finding of violations of the Criminal Code of the Ukraine by a Ukrainian criminal court." *Id.* The Ukrainian Supreme Court has held that:

> In accordance with Article 62 of the Constitution of Ukraine, Article 6 of the
> Convention for the Protection of Human Rights and Fundamental Freedoms,
> a person is considered innocent of committing a crime, as well as cannot be

4

subjected to criminal punishment, until his guilt is proven through legal procedure and established by a court verdict of guilty.

[…] The treatment of a person whose guilt in the commission of a criminal offense has not been established by a court sentence that has entered into legal force must be consistent with the treatment of an innocent person. The presumption of innocence must be viewed in general legal and procedural senses. As a general legal requirement, it determines the position of the individual in society. Although this principle is formulated as a principle of criminal procedure, its effect goes beyond the scope of the criminal process.

The presumption of innocence is an objective legal provision. This is a requirement of the law, addressed to all citizens, officials, state and public organizations, to public thought in general.

20-cv-23278, ECF#36-2:89-90; 20-cv-25313, ECF#26-2:87-88.

There can be no money laundering without an underlying crime. *See United States v. Christo*, 129 F.3d 578, 579–80 (11th Cir. 1997) (holding that it is only after a "predicate crime becomes 'a completed offense' " that "money laundering can occur."). The money laundering charges in this case are all predicated on the occurrence of crimes in Ukraine, yet in Ukraine there have been no such criminal charges let alone convictions. The United States asks the Court to find that Claimants' owners are criminals in their own land, where they are now innocent under their own laws, so that the United States can then take all of their investments. *See generally* 20-cv-23278, ECF#36-2:76-100; 20-cv-25313, ECF#26-2:73-137 (Declaration of Dmytro Marchukov describing relevant Ukrainian law). The U.S.-Ukraine BIT provides Claimants with the right to have their investments treated in accordance with international law. Claimants allege in their Notices of Arbitration that the initiation of these forfeiture actions violate international law insofar as the United States' conduct both violates customary international law's "limitations on a nation's exercise of its jurisdiction to prescribe," *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 815 (1993) (Scalia, J., dissenting),[3] and unlawfully interferes with Ukrainian sovereignty and jurisdiction to enforce its own laws, in accordance with its own procedures and Constitutional requirements, within its own territory. 20-cv-23278, ECF#36-2:25; 20-cv-25313, ECF#26-2:2-26. In other words, Claimants maintain in

---

[3] *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 165 (2004); *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for S. Dist. of Iowa*, 482 U.S. 522, 544 (1987).

the arbitration that the United States attempt *via* this civil forfeiture action to declare the Ukrainians criminals in their own land, where they are now innocent under their own laws, violates customary international law and, therefore, violates Article II(3)(a)-(b) of the U.S.-Ukraine BIT.[4] Put bluntly, the question is whether international law allows the United States to bring this civil forfeiture case in the first place. That is a question which Claimants have submitted to arbitration and which is not otherwise capable of being adjudicated piecemeal.[5]

*Second*, the United States claims that the Claimants are improperly seeking to divest this Court of jurisdiction. Not so. Claimants are seeking to enforce the binding arbitration agreement that the United States entered into when it signed the U.S.-Ukraine BIT. In all instances the Court must properly have jurisdiction in order to compel arbitration. *See generally Jain v. de Mere*, 51 F.3d 686, 690 (7th Cir. 1995). It is true that 28 U.S.C. § 1355(a) provides

---

[4]  Imagine if Ukraine were to initiate a Ukrainian court action seeking to deprive a United States' investor of its investment in Ukraine, based on Ukraine's unilateral interpretation and application of the United States' laws, to conduct and losses occurring entirely in the United States. For instance, imagine that Ukraine were to allege that JPMorgan Chase & Co. committed bank fraud under U.S. law by participating in a conspiracy to lend funds to homeowners who it knew or should have known could not afford mortgages. Ukraine claims that this conspiracy led to the 2008 financial crisis and was criminal under U.S. law. Therefore, Ukraine claims that all of JPMorgan's money is traceable to a criminal bank fraud pursuant to U.S. law, and Ukraine asserts that it may take any and all investments traceable to JPMorgan, even though the United States never criminally charged JPMorgan or its owners and instead bailed them out. Query what position the United States government would take as to the applicability of the U.S.-Ukraine BIT.

[5] In fact, pursuant to the U.S.-Ukraine BIT, Claimants could have made this argument based on the U.S.-Ukraine BIT and international law to this Court in a motion to dismiss, but elected instead to proceed through arbitration pursuant to Article VI of the U.S.-Ukraine BIT. *See* U.S.-Ukraine BIT, Art. II(7) ("Each Party shall provide effective means of asserting claims and enforcing rights with respect to investment, investment agreements, and investment authorizations.");  Art. III(2) ("A national, or company of either Party that asserts that all or part of its investment has been expropriated shall have a right to prompt review by the appropriate judicial or administrative authorities of the other Party to determine whether any such expropriation has occurred and, if so, whether such expropriation, and any associated compensation, conforms to the principles of international law."); Art. VI(2)(" In the event of an investment dispute, the parties to the dispute should initially seek a resolution through consultation and negotiation. If the dispute cannot be settled amicably, the national or company concerned may choose to submit the dispute for resolution: . . . to the courts or administrative tribunals of the Party that in a Party to the dispute; or . . . to the submission of the dispute for settlement by binding arbitration[.]").

that, "The district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress . . ."). That this Court has subject matter jurisdiction is well and good, because the Court may then compel arbitration pursuant to Article II(3) of the New York Convention, which requires that a court properly "seized of an action . . . shall, at the request of one of the parties, refer the parties to arbitration." 9 U.S.C. § 206 likewise provides that, "A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." (emphasis added).

By way of illustrative example, the federal courts have exclusive jurisdiction over admiralty claims, yet such claims are routinely subject to binding arbitration. *Compare* 28 U.S.C. § 1333 ("The district courts shall have original jurisdiction, exclusive of the courts of the States, of: . . .  Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled.") *with Martinez v. Carnival Corp.*, 744 F.3d 1240, 1245–47 (11th Cir. 2014) (holding that cruise ship worker who sustained a back injury while working on the ship brought action against owner of cruise ship was required to arbitrate pursuant to New York Convention); *Isanto v. Royal Caribbean Cruises, Ltd.*, No. 20-CV-23715, 2020 WL 6262981, at *6 (S.D. Fla. Oct. 23, 2020) *and Wells Fargo Bank Int'l Corp. v. London Steam-Ship Owners' Mut. Ins. Ass'n, Ltd.*, 408 F. Supp. 626, 630 (S.D.N.Y. 1976) ("A dispute arising under a contract of maritime insurance, such as the one involved here, is within the admiralty and maritime jurisdiction of this court pursuant to 28 U.S.C. s 1333. . . . That this action may be an appropriate one for a stay pending arbitration under 9 U.S.C. s 3 does not vitiate that jurisdiction.").

Likewise, in the context of claims brought under the Securities Exchange Act, "[t]he district courts of the United States  . . . shall have exclusive jurisdiction of violations of this chapter or the rules and regulations thereunder, and of all suits in equity and actions at law brought  . . . ." 15 U.S.C. § 78aa. Yet "[e]ven U.S. statutory claims are amenable to arbitral resolution—even U.S. statutory claims containing anti-waiver provisions, such as the U.S. securities law barring any provision that requires a security buyer to waive compliance with the Securities Exchange Act of 1934." *Lindo v. NCL (Bahamas), Ltd.*, 652 F.3d 1257, 1264–65

(11th Cir. 2011) (citing *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 513 (1974)). "[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals" should inhibit enforcement of the Act " 'in controversies based on statutes.' " *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985).

     ***Third***, the United States argues that, if it is forced to honor its obligations pursuant to the bilateral investment treaties that it signed, then "purported investors from Albania to Uruguay could evade the jurisdiction of the federal courts in exchange for arbitration under the BITs," which the United States argues would then make it more difficult to commandeer those foreign investors' investments for the United States' own purposes. The United States also argues that "[a]ny other approach would be chaotic and unworkable" because the United States' domestic courts' "[e]xclusivity is necessary to prevent the 'inefficient and piecemeal litigation' that would result if a court or arbitration tribunal presiding over a competing action sought to adjudicate legal rights to the same property." Not only do all of these hypothetical policy arguments fail of their own weight, they are also expressly excluded from the Court's analysis at the motion to compel stage. "[T]he [New York] Convention Act creates two causes of action in federal court for a party seeking to enforce an arbitration agreement that falls under the New York Convention: a motion to *compel* arbitration 'in accordance with the agreement,' 9 U.S.C. § 206; and a motion to '*confirm*' an arbitral award, *id.* § 207." *Suazo v. NCL (Bahamas), Ltd.*, 822 F.3d 543, 546 (11th Cir. 2016). Whether the arbitration would be against public policy is not to be resolved on a motion to compel arbitration "at the initial arbitration-enforcement stage" but rather should be "resolved *at the arbitral award-enforcement stage.*" *Lindo*, 652 F.3d at 1267 (emphasis in original). The "public policy defense applies at the award-enforcement stage, not the initial arbitration-enforcement stage." *Id.* The United States "cannot raise" any "public policy defense at this initial arbitration-enforcement stage." *Lindo*, 652 F.3d at 1282; *see Mitsubishi*, 473 U.S. at 639 n.21 ("The utility of the Convention in promoting the process of international commercial arbitration depends upon the willingness of national courts to let go of matters they normally would think of as their own.").

     The Supreme Court has "rejected . . . insistence that 'American standards of fairness' must govern the controversy, commenting that such judicial obstinacy 'demeans the standards of justice elsewhere in the world, and unnecessarily exalts the primacy of United

States law over the laws of other countries.'" *Lindo*, 652 F.3d at 1265 (quoting *Scherk*, 417 U.S. at 517 n.11). "If the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements." *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Re*efer, 515 U.S. 528, 539 (1995). "That concern counsels against construing [statutes] to nullify foreign arbitration clauses because of inconvenience to the plaintiff or insular distrust of the ability of foreign arbitrators to apply the law." *Id.* As the Supreme Court observed in *Scherk*:

> [T]he delegates to the Convention voiced frequent concern that courts of signatory countries in which an agreement to arbitrate is sought to be enforced should not be permitted to decline enforcement of such agreements on the basis of parochial views of their desirability or in a manner that would diminish the mutually binding nature of the agreements.

417 U.S. at 520 n.15. If the New York Convention could be read to "impl[y] that arbitration agreements are invalid ab initio whenever the application of foreign law may displace a U.S. statutory claim—the public policy exception would swallow the rule that signatory nations 'shall recognize' arbitration agreements." *Id.* (citing New York Convention, art. II(1)). In sum, public policy defenses are not to be resolved at the initial arbitration-enforcement stage

But even if the law permitted consideration of public policy at this stage, public policy favors the enforcement of a valid agreement to arbitrate contained in a bilateral investment treaty, the enforcement of which is mandated by the New York Convention. Contrary to the United States' contention that piecemeal litigation would result if arbitration were ordered, piecemeal litigation would in fact result if Claimants were forced to arbitrate whether this civil forfeiture action is illegal under international law before an arbitral tribunal, while at the same time proceeding in this civil forfeiture to litigate through to a trial. That is why Article VI of the U.S.-Ukraine BIT provides the option of submitting a claim either to the U.S. courts <u>or</u> to binding arbitration. Having selected the latter, piecemeal litigation will only follow if Claimants' case proceeds in Court while the legality of this forfeiture action under international law is being arbitrated.

The United States' desire to avoid the obligations of the treaties that it entered into, because honoring the treaties will allegedly make it more difficult to deprive foreign investors

of their assets is no reason to find that the matter should not be arbitrated. *See Vimar*, 515 U.S. at 539. With respect to the (rather condescending) statement that "[a]rbitrators who are not United States judges—who have no obligation to uphold United States laws, to afford the procedural rights of the Supplemental Rules or the Federal Rules of Civil Procedure, or to follow the precedent of the United States courts—would be charged with deciding fundamental issues of American law and controlling the exercise of the government's police powers," this sort of claim is exactly what the Supreme Court anticipated when it stated that, "[i]f the United States is to be able to gain the benefits of international accords and have a role as a trusted partner in multilateral endeavors, its courts should be most cautious before interpreting its domestic legislation in such manner as to violate international agreements[,]" which "counsels against construing [statutes] to nullify foreign arbitration clauses because of inconvenience to the plaintiff or insular distrust of the ability of foreign arbitrators to apply the law." *Id.* at 539. An international arbitral tribunal is in as good a position as anyone to interpret the Ukrainian constitution and the Ukrainian Criminal Code, which this civil forfeiture action places directly at issue. *Compare* 20-cv-23278, ECF#1, ¶¶ 64-73 *and* 20-cv-25313, ECF#1, ¶¶ 63-71 (alleging violations of the Ukrainian Criminal Code) *with Christo*, 129 F.3d at 579–80 (holding that it is only after a "predicate crime becomes 'a completed offense' " that "money laundering can occur."). And that is why there is no "public policy" defense with respect to a motion to compel arbitration pursuant to 9 U.S.C. § 206. The United States may "not raise any public policy defense" at the motion to compel stage because the public policy defenses "appl[y] only at the arbitral award-enforcement stage and not at the arbitration-enforcement stage."*Suazo*, 822 F.3d at 552. Contrary to the United States' argument that "[n]owhere in the Treaty does the United States—or, for that matter, Ukraine—surrender its sovereign authority to enforce its laws against foreign investors," the U.S.-Ukraine BIT expressly provides Claimants with the right to arbitrate the legality of this forfeiture action under international law, whether the treaty permits such a claim is for the arbitrators, and "the parties (even if they are sovereigns) intended to give that authority to the arbitrators." *BG Grp.*, 572 U.S. at 43.

**_Fourth_**, the United States inexplicably splits hairs, claiming that this case is about whether the United States can obtain "title" to the property, not whether it can take the

pecuniary value of the property. What the United States seeks to do is to deposit all of the money derived from the sale of the properties with the U.S. Marshals Service.[6] Then the United States seeks to forfeit that money permanently. In the arbitration, Claimants argue that the United States is required to pay that money back because it was obtained in violation of international law. But Claimants also ask the Tribunal to "DECLARE that the United States has breached its obligations acquired under the U.S.-Ukraine BIT." 20-cv-23278, ECF#36-2:44; 20-cv-25313, ECF#26-2:40. The United States asserts that "[g]enerally speaking, the ICSID Convention provides only for the enforceability of pecuniary remedies (i.e., monetary damages)." ECF#54:15. That is simply false.[7] "An examination of the powers of international courts and tribunals to order measures concerning performance or injunction and of the ample practice that is available in this respect, leaves this Tribunal in no doubt about the fact that these [non-pecuniary] powers are indeed available . . . . [I]n addition to declaratory powers, it has the power to order measures involving performance or injunction of certain acts. Jurisdiction is therefore also affirmed on this ground." *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3,  January 14, 2004, Decision on Jurisdiction, ¶¶ 76-81 (collecting cases). "An obligation imposed by an award that is expressed not in monetary terms but in terms of an obligation to perform a particular act or to refrain from a certain course of action is equally binding and gives rise to the effect of *res judicata*." Christoph Schreuer, Non-Pecuniary Remedies in ICSID Arbitration, 20 Arb. Int'l 325, 325 (2004), available at https://www.univie.ac.at/intlaw/pdf/cspubl_71.pdf. "The fact that in the cases so far published, ICSID tribunals have nearly always framed the obligations imposed by their awards in pecuniary terms is not due to a belief that they lack the power to proceed otherwise." *Id.* "Rather, the cases involved situations in which the investment relationship had broken down and the claimants have preferred to frame their demands in monetary terms." *Id.*

---

[6] In fact, the property in Case No. 20-cv-25313 (Cleveland) has already been sold and the funds are on deposit with the U.S. Marshals.

[7] *See* Christoph Schreuer, Non-Pecuniary Remedies in ICSID Arbitration, 20 Arb. Int'l 325, 325 (2004), *available at* https://www.univie.ac.at/intlaw/pdf/cspubl_71.pdf

Claimants may arbitrate whether the United States' attempt to take title to their property is unlawful under international law and the notion that monetary damages versus "title" makes a difference is simply an attempt obfuscate what is otherwise a clearly on point arbitration agreement. In fact, pursuant to the U.S.-Ukraine BIT " 'investment' means every kind of investment in the territory of one Party owned or controlled directly or indirectly by nationals or companies of the other Party, such as equity, debt, and service and investment contracts; and includes: (i) tangible and intangible property, including rights, such as mortgages, liens and pledges[.]" 20-cv-23278, ECF#36-1:10; 20-cv-25313, ECF#26-1:10. Plainly, the kinds of investments covered by the U.S.-Ukraine BIT include title to real property and where, as here, Claimants allege that the forfeiture action with respect to their investments violates international law,[8] their dispute as to the legality of this forfeiture action under international law may clearly be submitted to binding arbitration pursuant to the U.S.-Ukraine BIT.

The United States also ignores that the U.S.-Ukraine BIT "authorizes the use of international arbitration associations, the rules of which provide that arbitrators shall have the authority to interpret provisions of this kind . . . .[*see*] ICSID Convention, Regulations and Rules, Art. 41(1) (2006 ed.) ('Tribunal shall be the judge of its own competence')." *BG Grp.*, 572 U.S. at 40; *see also Henry Schein*, 139 S. Ct. at 527; *WasteCare Corp. v. Harmony Enterprises, Inc.*, 822 F. App'x 892, 895 (11th Cir. 2020). It is for the arbitrators, not the Court, to determine whether Claimants' claims fall within the scope of the U.S.-Ukraine BIT pursuant to its plain language.

***Fifth***, the United States claims that only rights "conferred or created by the Treaty" are subject to arbitration. The United States concedes that such rights include "an obligation on behalf of each 'Party' to the Treaty—i.e., the United States and Ukraine—to accord to investments of 'nationals or companies' of the other Party certain treatment, including 'fair and equitable treatment,' as defined by international law." And Claimants have submitted to arbitration their claim that the initiation and prosecution of this civil forfeiture action violates

---

[8] The United States itself recognizes that Ukrainians were investing in the United States and that these properties are the subject of Ukrainian investment. *See* 20-cv-23278, ECF#1, ¶¶ 19, 28 n.3, 84; 20-cv-25313, ECF#1, ¶¶ 18, 25 n.3, 80.

the limitations imposed by international law on, *inter alia*, the United States' jurisdiction to prescribe. 20-cv-23278, ECF#36-2:16-25; 20-cv-25313, ECF#26-2:17-26. *See F. Hoffmann-La Roche*, 542 U.S. at 165 ("But why is it reasonable to apply those laws to foreign conduct *insofar as that conduct causes independent foreign harm and that foreign harm alone gives rise to the plaintiff's claim?* . . . . Why should American law supplant, for example, Canada's or Great Britain's or Japan's own determination about how best to protect Canadian or British or Japanese customers from anticompetitive conduct engaged in significant part by Canadian or British or Japanese or other foreign companies?") (emphasis in original); *Hartford*, 509 U.S. at 815 ("Under the Restatement [of Foreign Relations Law], a nation having some 'basis' for jurisdiction to prescribe law should nonetheless refrain from exercising that jurisdiction 'with respect to a person or activity having connections with another state when the exercise of such jurisdiction is unreasonable.'") (Scalia, J., dissenting); *Societe Nationale*, 482 U.S. at 543 n. 27 (" '[N]othing would be more convenient in the promiscuous intercourse and practice of mankind, than that what was valid by the laws of one place, should be rendered of no effect elsewhere, by a diversity of law[.]'"). Textually, the U.S.-Ukraine BIT provides Claimants with the right to challenge whether this civil forfeiture action's treatment of investments violates international law. Claimants have exercised that right and these claims must now be arbitrated.

In fact, pursuant to the U.S.-Ukraine BIT, Claimants could have made this argument based on international law to this Court in a motion to dismiss, but elected instead to proceed through arbitration pursuant to Article VI of the U.S.-Ukraine BIT. *See* Footnote 5, *supra*. Here, the Claimants have elected to submit their claims to arbitration – instead of Court – which the plain language of the U.S.-Ukraine BIT clearly allows.

Perhaps most significantly, the United States <u>again</u> ignores that the U.S.-Ukraine BIT "delegates the arbitrability question to an arbitrator"[.]" *WasteCare*, 822 F. App'x at 895; *see BG Grp.*, 572 U.S. at 40; *Henry Schein*, 139 S. Ct. at 527. It is for the arbitrators, not the Court, to determine whether Claimants' claims fall within the scope of the U.S.-Ukraine BIT pursuant to its plain language.

<u>**Sixth**</u>, the United States argues that the U.S.-Ukraine BIT does not "surrender [the United States'] sovereign authority to enforce its laws against foreign investors" and also

13

argues that the U.S.-Ukraine BIT does not "otherwise suspend the normal operation of either country's laws or divest its courts of jurisdiction to adjudicate those laws against a foreign investor." Those arguments are directly contradicted by the letter of transmittal submitted to President Clinton by Secretary of State Warren Christopher. *See* 20-cv-23278, ECF#36-1:5; 20-cv-25313, ECF#26-1:5 ("In paragraph 3(c), each Party pledges to respect any obligations it may have entered into with respect to investments. Thus, in dispute settlement under Articles VI or VII, a Party would be foreclosed from arguing, on the basis of sovereignty, that it may unilaterally ignore its obligations to such investments."). Indeed, the U.S.-Ukraine BIT also expressly places limits on the exercise of "police power" to expropriate investments. "If public purpose automatically immunizes the measure from being found to be expropriatory, then there would never be a compensable taking for a public purpose." 20-cv-23278, ECF#36-2:33, ¶ 69; 20-cv-25313, ECF#26-2:32, ¶ 70 (quoting *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award of 20 August 2007, at ¶ 7.5.21);. When countries like Venezuela take foreign investors property they often do so under color of "police power," but that does not exclude countries like Venezuela from liability pursuant to bilateral investment treaties.  As set forth in the Notices of Arbitration, just because there is a public purpose does not mean that there is no liability under the treaty. *See* 20-cv-23278, ECF#36-2:32-35, ¶¶ 64-73; 20-cv-25313, ECF#26-2:31-34, ¶¶ 65-73; *see also* 20-cv-23278, ECF#36-2:17-25, ¶¶ 21-44; 20-cv-25313, ECF#26-2:18-28, ¶¶ 27-50. And these treaties are <u>bilateral</u> meaning that the United States cannot take investments *carte blanche* by refencing "police power" and thereby escape the scope of the obligations entered into *via* the bilateral investment treaties that the United States promotes all around the world and, in this case, signed. *See* 20-cv-23278, ECF#36-2:32, ¶ 66 n.53; 20-cv-25313, ECF#26-2:31, ¶ 67 n.52 (citing International Law Commission's (ILC) Draft Articles on State Responsibility, Art. 25 ("Necessity may not be invoked by the State as a ground for precluding the wrongfulness of an act not in conformity with an international obligation of that State unless the act: (a) Is the only way for the State to safeguard an essential interest against a grave and imminent peril; (b) Does not seriously impair an essential interest of the State or States towards which the obligation exists, or of the international community as a whole.").

Moreover, pursuant to Article 25(4) of the ICSID Convention:

14

> Any Contracting State may, at the time of ratification, acceptance or approval of this Convention or at any time thereafter, notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre.

The United States has not notified ICSID of any "class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre."[9]

On the contrary, the United States has signed the ICSID Convention which contains the subheading "Jurisdiction of the Centre" and provides that "[c]onsent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy." ICSID Convention, Art. 26. "The object of this provision is not in doubt.  It is to ensure that an ICSID Tribunal, duly constituted, has exclusive jurisdiction over any dispute of which it is seized." *Perenco Ecuador Limited v. Republic of Ecuador and Empresa Estatal Petróleos del Ecuador*, ICSID Case No. ARB/08/6, Decision on Provisional Measures, May 8, 2009, ¶ 61. "The claims which the [United States] [is] invoking the legal process of the domestic courts to enforce are the claims which [Claimants] ha[ve] brought this arbitration to challenge." *Id.* The United States' insistence on persisting with this domestic civil forfeiture "process violates Article 26." *Id.* Claimants "would violate the Article if [they] were, in the domestic courts of [the United States], to advance the arguments which [they will rely on in th[e] arbitration[.]" *Id.* "Unless and until the Tribunal rules that it has no jurisdiction to entertain this dispute, if its jurisdiction is hereafter challenged, or the Tribunal delivers a final award on the merits, none of the parties may resort to the domestic courts of [the United States] to enforce or resist any claim or right which forms part of the subject matter of this arbitration." *Id.*  "Among the rights that may be protected by provisional measures is the right guaranteed by Article 26 to have the ICSID arbitration be the exclusive remedy for the dispute to the exclusion of any other remedy, whether domestic or international, judicial or administrative." *Tokios Tokelés v. Ukraine*, ICSID Case No. ARB/02/18, Jan. 18, 2005, Procedural Order No. 3, ¶ 7.

---

[9] https://icsid.worldbank.org/about/member-states/database-of-member-states/member-state-details?state=ST181

Perhaps most significantly, (again at risk of repetition), the United States again ignores that the U.S.-Ukraine BIT "delegates the arbitrability question to an arbitrator[.]." *WasteCare*, 822 F. App'x at 895; *see BG Grp.*, 572 U.S. at 40; *Henry Schein*, 139 S. Ct. at 527. It is for the arbitrators, not the Court, to determine whether Claimants' claims fall within the scope of the U.S.-Ukraine BIT pursuant to its plain language and whether the U.S. Ukraine BIT is otherwise subject to a "police powers" exception.

*__Seventh__*, the United States argues that Rule G(6) automatically stays the obligation to respond to a motion to compel arbitration while "special interrogatories" are served and additionally argues that a stay is required under 18 U.S.C. § 981(g)(1). As set forth in ECF#56, Claimants take no issue with this action being stayed pursuant to 9 U.S.C. § 3, with an important caveat: that the Court also "direct that arbitration be held in accordance with the" U.S.-Ukraine BIT pursuant to 9 U.S.C. § 206. *See Sedco, Inc. v. Petroleos Mexicanos Mexican Nat. Oil Co. (Pemex)*, 767 F.2d 1140, 1146 (5th Cir. 1985) (noting that by reason of the incorporation of Chapter 1 into Chapter 2 pursuant to 9 U.S.C.A. § 208, both the Federal Arbitration Act and the Convention provide that a district court may stay an action upon finding that a dispute in the pending lawsuit is subject to arbitration). In consenting to the U.S.-Ukraine BIT and ICSID Convention, the United States committed to forego all other remedies, including those discovery mechanisms available in this civil forfeiture action, such as "special interrogatories" pursuant to "Rule G." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991) ("[Plaintiff] also complains that the discovery allowed in arbitration is more limited than in the federal courts . . . . Although those procedures might not be as extensive as in the federal courts, by agreeing to arbitrate, a party 'trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration.'"); *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1378 (11th Cir. 2005) ("[D]iscovery limitations are consistent with the goals of 'simplicity, informality, and expedition' touted by the Supreme Court[.]"). Discovery is now only available through ICSID, not "Rule G" which no longer has any impact on this matter subject to arbitration.[10]

---

[10] The Government's attempt to use Rule G to short circuit a motion to compel arbitration appears to conflict with Fed. R. Civ. P. 81(a)(6)(B) ("These rules, to the extent applicable,

In short, if the United States wants a stay of Case Nos. 20-cv-23278 and 20-cv-25313 in lieu of dismissal, Claimants do not oppose the United States getting what it is asking for with the caveat that the Court also "direct that arbitration be held in accordance with the" U.S.- Ukraine BIT pursuant to 9 U.S.C. § 206.

## CONCLUSION

Like any other party to a contract, the United States must honor its agreement to arbitrate. *See BG Grp.*, 572 U.S. at 37 ("As a general matter, a treaty is a contract, though between nations. Its interpretation normally is, like a contract's interpretation, a matter of determining the parties' intent."). The rule of law requires that the United States honor its obligations entered into pursuant to the U.S.-Ukraine BIT.

Based on the foregoing, the Court should stay this action <u>and</u> "direct that arbitration be held in accordance with the" U.S.- Ukraine BIT pursuant to 9 U.S.C. § 206.


Dated: March 8, 2021

                              Respectfully submitted,

                              Black, Srebnick, Kornspan & Stumpf, P.A.
                              201 South Biscayne Blvd., Suite 1300
                              Miami, FL 33131
                              Tel: (305) 371-6421
                              Fax: (305) 371-6322

---

govern proceedings under the following laws, except as these laws provide other procedures: . . . . [including] 9 U.S.C., relating to arbitration"). Rule G, in turn, states that "[t]o the extent that this rule does not address an issue, Supplemental Rules C and E and the Federal Rules of Civil Procedure also apply," (emphasis added), which necessarily includes Fed. R. Civ. P. 81(a)(6). Although a motion to compel arbitration is sometimes construed as a Rule 12(b)(1) motion to dismiss, it is actually governed by its own statutory framework. *See* 9 U.S.C. §§ 1 *et seq.* (the "Federal Arbitration Act" or "FAA"); 9 U.S.C. § 201, *et seq.* (the "New York Convention"). Rule G and other Federal Rules of Civil Procedure do not apply to procedures relating to arbitration to the extent that the FAA and New York Convention provide different procedures. *See* Fed. R. Civ. P. 81(a)(6) ("These rules, to the extent applicable, govern proceedings under the following laws, except as these laws provide other procedures: . . . .9 U.S.C., relating to arbitration"). The United States' interpretation of Rule G conflicts with the procedures set forth in the FAA and New York Convention, and therefore the procedures set forth in the FAA and New York Convention apply.

By:     */s/ Howard M. Srebnick*
        Howard M. Srebnick
        Florida Bar No. 919063
        Robert T. Dunlap
        Florida Bar No. 11950
        HSrebnick@RoyBlack.com
        RDunlap@RoyBlack.com

        *Attorneys for Claimants Korf and the*
        *Corporate Entities*

        Kasowitz Benson Torres LLP
        1633 Broadway
        New York, New York 10019
        (212) 506-1700
        Marc E. Kasowitz
        Mark P. Ressler
        Ronald R. Rossi
        Sarmad M. Khojasteh
        Joshua Paul
        *Pro Hac Vice Anticipated*
        MKasowitz@kasowitz.com
        MRessler@kasowitz.com
        RRossi@kasowitz.com
        SKhojasteh@kasowitz.com
        JPaul@kasowitz.com

        *Attorneys for Claimants Korf and the*
        *Corporate Entities*

        */s/ Scott A. Srebnick*
        Scott A. Srebnick, P.A.
        201 South Biscayne Boulevard
        Suite 1210
        Miami, FL 33131
        Telephone: (305) 285-9019
        Facsimile: (305) 377-9937
        Scott@srebnicklaw.com

        *Attorney for Claimant Laber*

18

19