# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No.: 1:20-cv-23279-MGC

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ALL RIGHT TO AND INTEREST IN PNC
CORPORATE PLAZA HOLDINGS LLC HELD,
CONTROLLED, OR ACQUIRED, DIRECTLY OR
INDIRECTLY, BY OPTIMA CBD INVESTMENTS
LLC AND/OR CBD 500 LLC, INCLUDING ANY
INTEREST HELD IN OR SECURED BY THE REAL
PROPERTY AND APPURTENANCES LOCATED
AT 500 WEST JEFFERSON STREET, LOUISVILLE,
KY 40202, et al.,

        Defendant.

_____/

## CLAIMANTS' MOTION TO DISMISS THE VERIFIED COMPLAINT

Claimants Mordechai Korf, Uriel Laber, Optima CBD Investments LLC, and CBD 500, LLC ("Claimants") respectfully submit this memorandum of law in support of their motion to dismiss the Verified Complaint filed by plaintiff the United States of America ("Plaintiff" or the "United States"), dated August 6, 2020 (the "Verified Complaint" or "Compl.").[1]

### PRELIMINARY STATEMENT

The Verified Complaint should be dismissed with prejudice because: (1) the doctrine of international comity requires abstention; and (2) the Verified Complaint fails to state a claim sufficient to meet the heightened pleading standards necessary to justify the drastic remedy of *in rem* forfeiture.

First, the Court should abstain from jurisdiction over this case based on the doctrine of international comity. All of the wrongful conduct alleged in the Verified Complaint occurred in

---

[1] Citations to "Paul Decl." refer to the February 5, 2021 Declaration of Joshua N. Paul. Citations to "Ex." refer to the exhibits to the Paul. Decl., and all page citations to the exhibits refer to the page numbers of the as-filed PDFs. Citations to "Marchukov Aff." refer to the February 5, 2021 Declaration of Dmytro Marchukov. Citations to "Dkt." refer to the docket in this action.

Ukraine, purportedly at the direction of two Ukrainian nationals, and purportedly to the detriment of a Ukrainian bank located in Ukraine.  Critically, however, authorities in Ukraine have not brought any charges arising from such purported misconduct.  In fact, no Ukrainian criminal court – the body exclusively vested by the laws and Constitution of Ukraine with the power to determine whether the alleged conduct is criminal – has determined that any misconduct occurred.  To the contrary, decisions have already been issued by Ukrainian courts finding that the loans at issue were valid, emphatically refuting the allegations in the Verified Complaint.  Those decisions were handed down in lawsuits in Ukraine initiated by two Ukrainian borrowers addressing the propriety of the same loan funds the Verified Complaint contends were transferred to the United States to effectuate the purchase 500 West Jefferson Street, Louisville KY 40202 ("PNC Plaza").  Notwithstanding that Ukrainian authorities have not brought any charges concerning the loans at issue, that no Ukrainian criminal court has determined any wrongdoing occurred, and that Ukrainian courts have in fact validated the loans at issue as legitimate and not fraudulent, the United States nevertheless seeks to exercise its power under U.S. forfeiture statutes predicated on allegations of misconduct in the Ukraine.  In the process, the United States bizarrely has anointed itself the arbiter and interpreter of the Criminal Code of Ukraine, whose own prosecuting authorities have charged no one with a crime, whose own courts have convicted no one of a crime, and whose judges have already held that the loans at issue were entirely proper and valid.  Such overreach is patently inappropriate, violates international comity, and constitutes a misguided effort by the United States to wrongfully insinuate itself in the sovereign affairs of another country by attempting to regulate conduct occurring in Ukraine, well beyond the reach of U.S. authorities.

Second, the Verified Complaint fails to state a claim.  As a threshold matter, the Verified Complaint fails to trace the funds used for the purchase of PNC Plaza in 2011 to the specified unlawful activity in Ukraine, as is required, and ignores that PNC Plaza nevertheless was repurchased in 2018 using funds the United States does not even allege were tainted.  In addition, the United States fails to identify a cognizable *in rem* defendant.  Finally, the United States' claims are time-barred under the one-year statute of limitations for forfeiture claims.

All of these fatal defects with the Verified Complaint are detailed below, and mandate dismissal of this action with prejudice.

## FACTUAL BACKGROUND

### A.    Ukrainian Nationals – Kolomoisky and Boholiubov – Invest in PNC Plaza

The lynchpin of every allegation of misconduct in the Verified Complaint is purported wrongdoing that occurred in Ukraine; at the direction of two Ukrainian nationals who reside in Ukraine; and to the detriment of a Ukrainian bank located in Ukraine.  Specifically, the Verified Complaint alleges that Ihor Kolomoisky is "a billionaire Ukrainian oligarch" who "controls businesses in many sectors of the Ukrainian economy, including metals, energy, and media" and was the co-owner of PrivatBank, "one of the largest banks in Ukraine."  Compl. ¶¶ 10-11.  The Verified Complaint further alleges that Gennadiy Boholiubov is a "Ukrainian oligarch" who was "the second major shareholder of PrivatBank along with Kolomoisky" and the owner of "40% of PrivatBank" prior to its nationalization by the Ukrainian government in the year 2016.  *Id.* at ¶¶ 12, 19.  According to the Verified Complaint, these two Ukrainian nationals used "their control of PrivatBank to steal billions of dollars of the bank's funds," which they then invested in real estate in the United States.

The Verified Complaint also identifies Mordechai Korf, also known as "Motti," as a "Miami-based business associate of Kolomoisky and Boholiubov" who, along with his longtime friend Uriel Laber, another "Miami-based business associate of Kolomoisky and Boholiubov," helped manage Kolomoisky and Boholiubov's investments in the United States "under the 'Optima' umbrella of companies."  *Id.* at ¶¶ 13-14, 19-21.  Critically, the United States does not – and cannot – assert any allegations of criminal charges brought by Ukraine against Kolomoisky, Boholiubov, Korf, or Laber arising from the purported misconduct concerning PrivatBank described in the Verified Complaint.

The Verified Complaint alleges that "[i]n 2011, [Korf, Laber, Kolomoisky and Boholiubov] purchased the building known as PNC Plaza" and that "[t]he money used to purchase PNC Plaza was directly traceable to two loans obtained from PrivatBank by Kolomoisky and Boholiubov, [] was the proceeds of embezzlement, misappropriation, and fraud," and derivative of "violat[ions] [of] numerous provisions of the Ukrainian Criminal Code."  *Id.* at ¶¶ 22, 67-76.  According to the Verified Complaint, in September 2011, PNC Plaza was purchased for $77,050,000.  *Id.* at ¶ 103.  The purchase allegedly required a deposit of $3.5 million, followed by the transfer of $13,151,167.17 at closing, which covered the remainder of the purchase price as

well as closing costs and fees.[2]  *Id.* at ¶¶ 104-106.  The $13,151,167.17 used to complete the purchase of PNC Plaza allegedly was misappropriated from PrivatBank via two fraudulent loans issued in Ukraine.  *Id.* at ¶ 107.  One loan, which formed "the bulk of the funds used for the purchase of PNC Plaza," was issued to Nikopol Ferroalloy Plant ("NZF") on September 19, 2011 ("NZF Loan").  *Id.* at ¶¶ 116-24.  The other, smaller loan was issued to Zaporozhye Ferroalloy Plant ("ZFZ") on November 30, 2010 ("ZFZ Loan").  *Id.* at ¶¶ 108-15.  On September 22, 2011, a portion of the proceeds from these two loans allegedly was transferred to the United States from a PrivatBank Cyprus account.  *Id.* at ¶ 130.  The Verified Complaint does not identify or trace any other money used to purchase PNC Plaza to specified unlawful activity.

**B.    The Foreclosure and Repurchase of PNC Plaza in 2018**

In 2018, seven years after PNC Plaza was purchased using allegedly tainted funds from Ukraine, PNC Plaza faced a foreclosure.  Compl. ¶¶ 135-36.  "On January 31, 2018, U.S. Bank, as a trustee for the mortgage holders, filed a foreclosure action in the courts for the Commonwealth of Kentucky" and "[a] receiver . . . was appointed by the court on February 5, 2018 to manage the property during the foreclosure proceedings."  *Id.* at ¶¶ 137-38.  According to the Verified Complaint, "Korf and Laber entered negotiations with a third-party investment firm, Firm A . . . [and] they agreed to enter a joint venture that altered the ownership structure of PNC Plaza."  *Id.* at ¶ 139.  "Firm A was an unrelated third-party investor, which, on information and belief, had no connection to the Optima Family of companies or Kolomoisky and Boholiubov's misappropriation scheme from PrivatBank."  *Id.* at ¶ 139 n.10.  The United States does not seek the forfeiture of any interest owned by "Firm A."  *See id.* at ¶ 143 n.11.  Thereafter, in 2018, Korf, Laber and "Firm A" repurchased the property and received transfer of a Deed in Lieu of Foreclosure, for approximately $27 million, "which extinguished the original promissory note."  *Id.* at ¶¶ 146-149.  The $27 million repurchase in 2018 was funded in two parts: (1) a loan of approximately $17 million from a third-party lender; and (2) contributions of $10 million from "Firm A," and $9.5 million from Korf and Laber via Claimant Optima CBD Investments, LLC, using funds derived from Felman Trading Americas Inc. ("Felman").  *Id.* at ¶¶ 150-51.

---

[2]   The outstanding mortgage on the property, which was $65,700,000, was assumed, and a total of $16,651,167.17, ($3.5 million, plus $13,151,167.17), was expended for the purchase.  *See* Dkt. 1 at ¶¶ 104-06.

The United States does not – and cannot – allege that the funds from Felman were derived from funds misappropriated from PrivatBank, nor does it attempt to trace Felman's funding to any of the unlawful activity in Ukraine. To the contrary, as the Verified Complaint concedes, Felman was involved in shipments of manganese ore, and, "[f]rom 2008-2014, received almost $7 million from, and transferred almost $400 million to, Kolomoisky and Boholiubov-related entities via PrivatBank." *Id.* at ¶¶ 152, 155 n.3.

## C.     Parallel Ukrainian Proceedings

In 2020, lawsuits addressing the validity and propriety of the NZF Loan and ZFZ Loan described in the Verified Complaint were filed in Ukraine.[3] Specifically, NZF filed at least 30 actions seeking declarations that the loans obtained from PrivatBank, including the NZF Loan, properly were performed, and that PrivatBank had no right to demand repayment of those loans. On January 22, 2021, two different judges of the Economic Court of Kyiv, Ukraine, issued decisions declaring the validity of the NZF Loan, among others. In one decision, a Ukrainian judge held that NZF's obligations on the loan ***directly at issue in this case***, Loan No. 4N11415D, were terminated in full "due to proper performance." Paul Decl., Ex. 1 (Decision, *Joint Stock Co. Nikopol Ferroalloy Plant v. Joint Stock Co. Comm. Bank PrivatBank*, No. 910/13313/20 (Kyiv Econ. Ct. Jan. 22, 2021) ("NZF Decision"), at 4). The NZF Decision also determined that a number of other loans the Verified Complaint identified as examples of allegedly fraudulent loans were in fact properly performed, including Loan Nos. 4N10122D, 4N10221D, 4N10224D, 4N10220D, and 4N10263D. *Id.* at 4-5; Compl. ¶ 39.

In the other decision, a different Ukrainian judge refuted the Verified Complaint's allegation that Loan No. 4N09129D was the product of "fraudulent activity" (Compl. ¶ 50). *See* Paul Decl., Ex. 2 (Decision, *Joint Stock Co. Nikopol Ferroalloy Plant v. Joint Stock Co. Comm. Bank PrivatBank*, No. 910/14224/20 (Kyiv Econ. Ct. Jan. 22, 2021)). To the contrary, the court found that this loan was "made at the expense of funds received by [NZF] from its business

---

[3] It is well-settled that a "court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citation and quotation marks omitted).

activities, at the expense of the Guarantor and not at the expense of other loan funds, which were received by [NZF] under other loan agreements." *Id.* at 25.

ZFZ likewise filed at least four similar actions in Ukraine seeking declarations that its loans were properly performed.  Each of those actions concern loans nearly identical to the ZFZ Loan identified in the Verified Complaint, and expressly reference this case.  *See, e.g.*, Paul Decl., Ex. 3 (Statement of Claim, *Joint Stock Co. Zaporizhzhia Ferroalloy Plant v. Joint Stock Co. Comm. Bank PrivatBank*, No. 18-180/282 (Kyiv Econ. Ct. Dec. 3, 2020), at 21) (noting that on August 6, 2020, two actions were filed by the United States DOJ in this Court, including an action against all rights and interests in PNC Plaza).[4]  One action addresses Loan No. 4Z10282D, which the Verified Complaint identifies as an example of an allegedly fraudulent loan.  *Id.*; Compl. ¶ 40. The actions remain active and pending.

### D.   The Ukrainian Prosecutor's Office Has Not Charged Kolomoisky or Boholiubov With Any Crimes in Ukraine.

Article 62 of the Ukrainian Constitution provides that "a person shall be deemed innocent of committing a crime and shall not be subjected to a criminal punishment unless his/her guilt has been proven through a legal procedure and established by a court verdict of guilty."  Marchukov Aff. ¶¶ 16, 31 n.19.  The Ukrainian Constitution further provides that the Ukrainian Prosecutor's Office is exclusively empowered to initiate criminal charges.  *Id.* ¶¶ 11, 19-24.  Ukrainian civil and commercial courts therefore uniformly hold that – in the absence of criminal charges filed by the Ukrainian Prosecutor's Office and a finding of violations of Ukraine's Criminal Code by a Ukrainian criminal court – they lack authority to conclude or find that conduct violates Ukraine's Criminal Code.  *Id.* ¶¶ 11-12, 24, 34.

---

[4]   *Accord id.* Ex. 4 (Statement of Claim, *Joint Stock Co. Zaporizhzhia Ferroalloy Plant v. Joint Stock Co. Comm. Bank PrivatBank*, No. 18-183/328 (Kyiv Econ. Ct. Dec. 3, 2020), at 21); *id.* Ex. 5 (Statement of Claim, *Joint Stock Co. Zaporizhzhia Ferroalloy Plant v. Joint Stock Co. Comm. Bank PrivatBank*, No. 18-188/341 (Kyiv Econ. Ct. Dec. 3, 2020), at 21); *id.* Ex. 5 (Statement of Claim, *Joint Stock Co. Zaporizhzhia Ferroalloy Plant v. Joint Stock Co. Comm. Bank PrivatBank*, No. 18-189/342 (Kyiv Econ. Ct. Dec. 3, 2020), at 21).

**ARGUMENT**

**I.    INTERNATIONAL COMITY REQUIRES ABSTENTION**

International comity is an abstention doctrine that accords deference to the decisions of foreign sovereigns. *See Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237-38 (11th Cir. 2004). As this Court has held, it is "prudent and just" for a federal court to abstain from jurisdiction in deference to concurrent proceedings in another jurisdiction. *Curran v. Hindu Credit Union Co-Op Soc'y Ltd.*, 2011 WL 1131107, at *3 (S.D. Fla. Mar. 25, 2011) (Cooke, J.) (citations omitted); *accord Daewoo Motor Am., Inc. v. Gen. Motors Corp.*, 459 F.3d 1249, 1257-58 (11th Cir. 2006) (affirming dismissal on comity grounds); *ITL Int'l, Inc. v. Walton & Post, Inc.*, 741 F. Supp. 2d 1313, 1317 (S.D. Fla. 2010) (dismissing on comity grounds).

The Eleventh Circuit applies a three-factor test to determine whether abstention is warranted:  (1) whether international comity applies; (2) fairness to litigants; and (3) efficient use of scarce judicial resources. *See Turner Entertainment Co. v. Degeto Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994); *Rivera de Chavon Dev. Grp. SRL v. Diaz*, 2011 WL 5825770, at *3 (S.D. Fla. Nov. 17, 2011); *ITL Int'l, Inc.*, 741 F. Supp. 2d at 1316.

**A.    The Doctrine of Comity Applies**

      i.    Retrospective Comity Compels Deference to
          Parallel Ukrainian Proceedings

In the Eleventh Circuit, international comity may be applied either retrospectively or prospectively. *Curran*, 2011 WL 1131107, at *2; *Ungaro-Benages*, 379 F.3d at 1238; *St. Martinus Univ., NV v. Caribbean Health Holding, LLC*, 2020 WL 956301, at *7 (S.D. Fla. Feb. 27, 2020), *appeal dismissed sub nom. St. Martinus Univ. v. Caribbean Health Holding, LLC*, 2020 WL 7018197 (11th Cir. Sept. 28, 2020).

In this case, retrospective comity is the proper framework for analysis for several reasons. *See Ungaro-Benages*, 379 F.3d at 1238 (for retrospective comity, courts consider "whether to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings"). A Ukrainian court has issued a judgment in a parallel action that upheld the validity of the primary loan at issue in the Verified Complaint (Loan No. 4N11415D). In addition, Ukrainian courts are in the process of deciding a host of parallel actions addressing the validity of loans substantially similar to other loans at issue in Verified Complaint (Loan No. 4Z10330D). *See AAR Int'l, Inc. v.*

*Nimelias Enterprises S.A.*, 250 F.3d 510, 518 (7th Cir. 2001) (suits are parallel if "substantially the same parties are litigating substantially the same issues simultaneously in two fora").

When comity is applied retrospectively, courts consider whether: (1) the foreign court was competent and used proceedings "consistent with civilized jurisprudence," (2) the foreign judgment was rendered by fraud, and (3) the foreign judgment is prejudicial because it is "repugnant to fundamental principles of what is decent and just." *Ungaro-Benages*, 379 F.3d at 1238.  Courts also consider whether the central issue in a dispute is a matter of foreign law and whether there is a prospect of conflicting judgments. *See Turner*, 25 F.3d at 1521.  Abstention is warranted here under each factor in the retrospective comity analysis.

*First*, the United States cannot plausibly contest that the Ukrainian judicial system, as a whole, is "competent" and "civilized."  Federal courts have rejected any notion that "Ukrainian courts are so lacking in impartiality, due process, or procedural fairness" that their decisions should be disregarded by a U.S. court.  *Universal Trading & Inv. Co. v. Kiritchenko*, 2007 WL 2669841, at *15 (N.D. Cal. Sept. 7, 2007), *aff'd sub nom. Universal Trading & Inv. Co. v. Kiritchenko*, 346 F. App'x 232 (9th Cir. 2009).  Indeed, both this Court and the Eleventh Circuit have held that court systems in nations as diverse as Brazil, the Dominican Republic, Egypt, Trinidad and Tobago, and Belize are sufficient to meet the comity standard.  *See, e.g.*, *EGI-VSR, LLC v. Coderch Mitjans*, 963 F.3d 1112, 1121 (11th Cir. 2020) (Brazil), *cert. denied sub nom. Mitjans v. EGI-VSR, LLC*, 2021 WL 78221 (U.S. Jan. 11, 2021); *ITL Int'l*, 741 F. Supp. 2d at 1317 (Dominican Republic); *Societe Nationale D'Industries Nutritive, S.A.E. v. Coca-Cola Co.*, 410 F. App'x 179, 179 (11th Cir. 2010) (Egypt); *Curran*, 2011 WL 1131107, at *4 (Trinidad and Tobago); *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1306 (11th Cir. 2008) (Belize).  There is no basis to conclude that Ukraine's court system does not meet the comity standard.

*Second*, there is no basis to believe that the judgment in the NZF action was procured by fraud.  Doing so would run counter to prior comity decisions, which have declined "to pass value judgments on the adequacy of justice and the integrity of Ukraine's judicial system."  *In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 499 (2d Cir. 2002) (citation omitted); *see also Base Metal Trading Ltd. v. Russian Aluminum*, 98 Fed. Appx. 47, 50 (2d Cir. 2004) ("considerations of comity preclude a court from adversely judging the quality of [Russia's] justice system absent a showing of inadequate procedural safeguards").

*Third*, there is no basis to conclude that the judgment in the NZF action was "repugnant to fundamental principles of what is decent and just." As the NZF Decision reflects, an "open court hearing" was held on NZF's action. NZF Decision at 4. Both parties in the action had legal representation. *Id.* The ruling expressly states that it was "[g]uided by Articles 129, 233, 236-38, 240, and 241 of the Commercial and Procedural Code of Ukraine, Economic Court of Kyiv." *Id.* And the ruling notifies defendant PrivatBank of its appellate rights and sets forth the process by which it can appeal. *Id.* at 5.

*Finally*, the central issues in the dispute are governed by foreign law, creating the risk of conflicting judgments if this action were to proceed. The forfeiture claims are based on predicate violations of money laundering (18 U.S.C. § 1956(c)(7)(B)(iii)) and the transport and receipt of stolen goods (18 U.S.C. §§ 2314-2315), both of which require an unlawful (indeed, criminal) act under Ukrainian law. *See United States v. Lazarenko*, 2003 U.S. Dist. LEXIS 25940, *11, 31-32 (N.D. Cal. Sept. 10, 2003) (money laundering "requires that the defendant know that the proceeds were from some activity that is a crime – a felony – under [Ukrainian] law," while the transfer of stolen goods requires the government to prove "under Ukrainian law that the property in question was not owned by [defendant]"). But dozens of Ukrainian courts have decided, or are in the process of deciding, this precise issue – the legality and validity of the allegedly unlawful loans. The decisions of those Ukrainian courts are dispositive on the claims in the Verified Complaint. Allowing this case to proceed in tandem with parallel actions in Ukraine carries an impermissibly high risk of inconsistent judgments. *See Turner*, 25 F.3d at 1521 (failure to defer to foreign judgment has "serious implication for the concerns of international comity.").

        ii.    Alternatively, Prospective Comity Compels Deference to <u>Ukraine's Overriding Sovereign Interests</u>

Even assuming that retrospective comity did not apply (and it does), abstention is still warranted under prospective comity. *See Ungaro-Benages*, 379 F.3d at 1238 (courts applying prospective comity grapple with the relative interests of the United States government, the foreign government, and the international community). When comity is applied prospectively, courts evaluate: (i) the strength of the United States' interest in using a federal forum, (ii) the strength of the foreign nation's interests, and (iii) the adequacy of the alternative forum, a factor dictated by *forum non conveniens* analysis. *Id.*; *Curran*, 2011 WL 1131107, at *2. All three factors are easily met here.

*First*, as the Verified Complaint makes clear, Ukraine's interests predominate over this action.  The United States' entire case rests on an expansive web of alleged conduct that was conceived, directed, and executed in Ukraine by Ukrainian oligarchs, bank agents, and corporate borrower entities.  The Verified Complaint alleges that two Ukrainian nationals, Kolomoisky and Boholiubov, misappropriated assets from PrivatBank, "a Ukrainian financial institution located in Ukraine."  Compl. ¶¶ 12, 13, 17.  It alleges that Kolomoisky and Boholiubov caused PrivatBank to issue loans to companies they owned or controlled, naming three such companies – NZF, ZFZ, and OGZK – all of which are based in Ukraine.  *Id.* ¶¶ 36-57.  It alleges that Kolomoisky and Boholiubov established a de facto "credit committee" at PrivatBank, consisting of PrivatBank employees, to approve the allegedly unlawful loans.  *Id.* ¶¶ 58-64.  It alleges that Kolomoisky and Boholiubov laundered the loan proceeds through a network of shell companies, which they created and controlled, at a PrivatBank branch "controlled by PrivatBank in Ukraine."  *Id.* ¶¶ 77-83.  And it alleges that the losses primarily impacted PrivatBank in Ukraine.  *Id.* ¶¶ 84-86.  The four corners of the pleadings leave no doubt that the nexus of the alleged scheme was rooted in Ukraine, which has an overriding interest in prosecuting and regulating allegedly criminal conduct in its own borders.  Abstention is thus appropriate.  *See In re Maxwell Communications Corp.*, 93 F.3d 1036, 1051 (2d Cir. 1996) (abstaining, where "England has a much closer connection to these disputes than does the United States").

*Second*, Ukraine's interests eclipse those of the United States.  The sole conduct alleged in the United States is the after-the-fact use of the allegedly unlawful proceeds to purchase real estate in Kentucky.  However, none of the downstream conduct would be unlawful but for the allegations of wrongdoing in Ukraine.

More fundamentally, to permit the United States to pursue claims that require U.S. courts to determine the legality of conduct in Ukraine runs contrary to the United States' interests in respecting Ukraine's judicial process, sovereign rights, and Constitution.  *See Mujica v. AirScan Inc.*, 771 F.3d 580, 615 (9th Cir. 2014) ("the strength of the U.S. government's interest in respecting Colombia's judicial process" weighs in favor of dismissal).  Article 62 of the Constitution of Ukraine grants the Ukrainian criminal court exclusive authority to determine and establish that a crime has been committed.  Marchukov Aff. ¶¶ 16, 31 at n.19.  Likewise, Article 124 of the Constitution of Ukraine provides that only Ukrainian courts are entitled to administer justice in Ukraine, and that no other body or authority can exercise or usurp the functions of the

court.  *Id.* ¶¶ 23, 29.  Therefore, the Constitution of Ukraine dictates that the judgment of the Ukrainian court is the exclusive mechanism to determine and establish that a crime has occurred and that a certain person has committed the crime.  *Id.* ¶¶ 11-12, 24, 34.  In the absence of such ruling by a Ukrainian criminal court, any finding in a U.S. court concerning the legality of conduct in Ukraine would invade Ukraine's sovereignty and its longstanding Constitutional principles.  *See Republic of Philippines v. Pimentel*, 553 U.S. 851, 852-53 (2008) (a foreign state has a comity interest in using its own courts, and its "dignity is not enhanced if other nations bypass its courts without right or good cause"); *Bi v. Union Carbide Chems. & Plastics Co.*, 984 F.2d 582 (2d Cir.1993) (dismissing the claims of Indian nationals injured by a chemical plant explosion in Bhopal based on Indian legislation granting the Indian government exclusive standing to represent all victims); *Ungaro-Benages*, 379 F.3d at 1239 (dismissing claims of heir to German corporation where "the German government has a significant interest in having the Foundation be the exclusive forum for these claims").  Nevertheless, the United States – unable to refer to a single criminal investigation or charge levied against any defendant in the Ukraine concerning the management of PrivatBank – relies on its own interpretation and application of Ukrainian criminal law to conduct occurring in Ukraine, for which Ukraine itself has not brought any such charges.

*Finally*, Ukraine is an adequate alternative forum.  As discussed above, courts have routinely reached this conclusion.  *See, e.g.*, *In re Arbitration between Monegasque De Reassurances S.A.M.*, 311 F.3d at 499; *Universal Trading*, 2007 WL 2669841, at *15; *see also Curran*, 2011 WL 1131107, at *4 (an alternative forum "need not be a perfect forum," but instead is "adequate" so long as "it offers at least some relief") (citing *Leon v. Million Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001)).  If anything, Ukraine "will be far more adept at applying the law of its own forum, particularly where it is already entertaining lawsuits involving the same subject matter."  *Banco Latino v. Gomez Lopez*, 17 F. Supp. 2d 1327, 1332 (S.D. Fla. 1998).

## B.    Fairness Considerations Warrant Abstention

In addition to determining whether international comity applies, the Eleventh Circuit considers fairness to the litigants in deciding whether abstention is warranted.  *See Turne*r, 25 F.3d at 1521-22.  Relevant considerations include: (1) the order in which the suits were filed, (2) the more convenient forum; and (3) the possibility of prejudice to parties resulting from abstention.

*See id.* (citation omitted); *St. Martinus Univ.*, 2020 WL 956301, at \*16 (referencing *forum non conveniens* analysis in assessing fairness).

Fairness militates strongly in favor of deference to the Ukrainian proceedings.  While the order in which the suits were filed is a neutral factor, as the NZF and ZFZ actions were filed simultaneously or within a few months of this case, *see Turner*, 25 F.3d at 1522, the availability of highly critical witnesses and the ability to obtain relevant documentary evidence render Ukraine a significantly more convenient forum than the United States.  The overwhelming majority of the evidence is located in Ukraine and will be extremely difficult, if not impossible, to obtain.  Such evidence concerns, among other things, the origination of purportedly fraudulent loans by a Ukranian bank to Ukrainian entities (Compl. ¶¶ 36-76); the transfer of such funds both within and outside Ukraine, including through PrivatBank accounts allegedly located in numerous other foreign nations (*id.* ¶¶ 77-84); the organization and activities of the purported "electronic" credit committee at PrivatBank (*id.* ¶¶ 58-63); and information concerning the routing of funds through PrivatBank Cyprus (*id.* ¶¶ 82-84).  As set forth in the Marchukov Declaration, Ukraine and the United States are both signatories to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters ("Evidence Convention"), which applies to requests for documents or deposition testimony.  Marchukov Aff. ¶¶ 45-46.  Ukraine, however, has issued a reservation to the Evidence Convention that effectively precludes pre-trial discovery of documentary evidence, declaration it "will not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents as known in common law countries."  *Id.* ¶¶ 52, 72 (explaining that Ukraine's reservation is "broad and unqalified").  *See Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1331 (11th Cir. 2011) (affirming dismissal by this Court, where "the vast majority [of evidence] appears to be in Brazil and France").

Claimants also will not be able to compel the testimony of any witness who refuses to testify voluntarily.  *See, e.g.*, *Ericson v. Wyndham Worldwide Corp.*, 2014 WL 11822749, at \*5 (S.D. Fla. Feb. 28, 2014) (Cooke, J.) (lack of compulsory process for the attendance of unwilling foreign witnesses "strongly" favors dismissal); *Tazoe*, 631 F.3d at 1332 (same); *Rosen v. Execujet Servs. LLC*, 241 F. Supp. 3d 1303, 1309-12 (S.D. Fla. 2017) (same).  A request for testimony through the Evidence Convention will still be dependent on the witnesses's willingness to cooperate with such a request (as Ukrainian authorities do not, in practice, seriously enforce foreign requests for judicial assistance), and even such voluntary testimony will take at least eight

to nine months per witness, the minimum time it takes to schedule a hearing in a Ukrainian court to obtain witness testimony.  Marchukov Aff. ¶¶ 57-62.  Once a hearing is set, however, success in obtaining testimony still depends on the witnesses' willingness to cooperate because, if witnesses fail to do so, Ukrainian courts will not compel them, and the letter of request for testimony likely will be returned unexecuted.  *Id.* ¶ 61.  Claimaints' expert, Marchukov, was unable to identify a single instance in which a Ukrainian court compelled an unwilling witness to cooperate with a foreign request for pre-trial testimony.  *Id.* ¶ 62.  Thus, if a Ukrainian witness refuses to cooperate, Claimants – as well as Plaintiff – will have no recourse.  *Id.* ¶ 71.

Even assuming Claimants (or Plaintiff) find a cooperative witness, any hearing may consist of a Ukrainian judicial officer reading written questions from the letter of request.  Marchukov Aff. ¶ 60.  Claimants' counsel cannot be assured they will be provided the opportunity to question the witness directly, or explore, clarify, challenge, or impeach the responses of an adverse witness through cross-examination.  *Id.*  The end result of this laborious, expensive, and time-consuming process, which "may take well over a year" (*id.* ¶ 65), would be of little probative value and possibly inadmissible.  Claimants' lack of access to pre-trial documents and limited testimony render proceeding with this action highly impractical  In the face of such extraordiary evidence-gathering obstacles, Claimants would sufferoverwhelming and prejudicial hardship in formulating and presenting a defense.

Beyond the glaring problems Claimants will confront in obtaining pre-trial discovery, Claimants also will endure overwhelming hardship presenting key witnesses at trial.  Trials turn on witnesses.  But a trial in this District will leave Claimants unable to ensure the testimony of, *inter alia*:  (i) persons involved in the applications for the purportedly fraudulent loans submitted in Ukraine, (ii) Ukrainian employees of Plaintiff, including members of the "electronic" credit committee involved in issuing those loans, (iii) employees of PrivatBank Cyprus involved in the purportedly fraudulent transfer of loan proceeds, (iv) employees of non-party foreign entities who allegedly participated in disbursing funds, or (v) persons involved in the lawful acquisition of U.S. assets outside of the United States.  These witnesses are outside the Court's subpoena power, and Claimants have no means of compelling the appearance of any who decline voluntarily to travel to this District (or the United States at large) from around the world.  *See Ericson*, 2014 WL 11822749, at *5 (dismissing, where "Defendants have identified important witnesses that are outside this Court's compulsory process"); *Tazoe*, 631 F.3d at 1332 (dismissing because the

"Southern District of Florida lacks the authority to compel certain witnesses to attend proceedings"); *Rosen v. Execujet Servs. LLC*, 241 F. Supp. 3d 1303, 1309-12 (S.D. Fla. 2017) (dismissal "heavily" favored where "majority of the material witnesses in this action . . . would not be subject to compulsory process").

Moreover, the United States would suffer no discernible prejudice from a dismissal based on abstention.  As discussed above, the United States has an acute interest in avoiding infringement on Ukrainian sovereignty and preserving amicable foreign relations with Ukraine.  *Supra*, at 10-11.  And the United States cannot come close to establishing that the Ukrainian proceedings are incapable of producing a "fair and just result."  *Rivera de Chavon Dev. Grp. SRL v. Diaz*, 2011 WL 5825770, at *3 (S.D. Fla. Nov. 17, 2011); *supra*, at 8-9.

### C.    Abstention Furthers the Efficient Use of Scarce Judicial Resources

Lastly, the efficient use of scarce judicial resources militates in favor of deferring to the Ukrainian proceedings.  Criteria relevant to efficiency include (1) the inconvenience of the federal forum; (2) the desirability of avoiding piecemeal litigation; (3) whether the actions have parties and issues in common; and (4) whether the alternative forum is likely to render a prompt disposition.  *See Turne*r, 25 F.3d at 1522.

As shown above, Ukraine is the appropriate forum to determine the validity and legality of the loans identified in the Verified Complaint, and the actions pending in Ukraine involve substantially the same parties and issues.  *Supra*, at 5-6, 7-8.  Further, Ukrainian courts are as likely as the American forum to render a prompt disposition.  Although the NZF and ZFZ actions were filed around the same time or a few months later than this case, some have already resulted in judgments on the merits.  *Supra*, at 5-6.  Finally, dismissal of this case would avoid unnecessary problems with piecemeal litigation.  "If both proceedings continued, the courts' calendars would have to be synchronized and the litigation would have to move back and forth across the Atlantic."  *Turne*r, 25 F.3d at 1522.  "The Southern District of Florida is a very busy district," and the issues to be resolved are simply too similar for the Court to "justify expending its resources to manage a case clearly suited for the [Ukrainian] courts."  *ITL Int'l, Inc.*, 741 F. Supp. 2d at 1317.[5]

---

[5]  Abstention is further required by the doctrine of prescriptive comity, which obligates courts to "construe statutes to avoid unreasonable interference with other nations' sovereign authority where

## II.     The Verified Complaint Fails To State A Claim

### A.     Legal Standard

Civil forfeiture complaints are governed by the heightened *in rem* forfeiture pleading standards set forth in the Supplemental Rules for Certain Admiralty or Maritime Claims & Asset Forfeitures ("Supplemental Rules"). *See United States v. Fifty Seven Thousand, Four Hundred & Forty-Three Dollars*, 42 F. Supp. 2d 1293, 1303 (S.D. Fla. 1999), *aff'd sub nom. United States v. Fifty-Seven Thousand, Four Hundred*, 240 F.3d 1077 (11th Cir. 2000). Due to the "drastic nature of forfeiture actions," the standard is "more stringent . . . than the liberal provisions of Fed. R. Civ. P. 8." *United States v. Certain Accounts, Together with All Monies, etc.*, 795 F. Supp. 391, 394 (S.D. Fla. 1992). Supplemental Rule E(2) requires that "[t]he complaint shall state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 369 (S.D.N.Y. 2008). The rule "contains no exceptions to this requirement." *United States v. $38,000 in United States Currency*, 816 F.2d 1538, 1548 (11th Cir. 1987) (dismissing complaint under Rule E(2)). Further, Supplemental Rule G(2) requires that a forfeiture complaint "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial" – namely, a preponderance of the evidence. *See United States v. $1,370,851.62 in United States Currency, Seized From Total Bank Account No. XXXXXXXXXX*, 2009 WL 10712511, at *1 (S.D. Fla. Aug. 13, 2009) (dismissing forfeiture complaint for lack of "sufficiently detailed facts"); 8 U.S.C. § 983(c)(1) (increasing burden of proof from probable cause to a preponderance standard).

---

possible." *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2107 n.9 (2016); *In re Maxwell Commc'n Corp. plc by Homan*, 93 F.3d 1036, 1047 (2d Cir. 1996) ("[I]nternational comity . . . as a canon of construction . . . might shorten the reach of a statute."). As shown above, under the Ukrainian Constitution, a conviction by a Ukrainian court is the sole mechanism for establishing that a crime occurred. *Supra*, at 6, 10-11. But the Ukrainian government has not initiated a single investigation or brought a single charge against any person or corporate entity related to the Ukrainian loan scheme alleged by the United States. The total absence of any criminal charges against anyone in Ukraine, let alone criminal convictions, necessitates abstention. *See RJR Nabisco*, 136 S. Ct. at 2107 n.9 (the courts of the United States "construe[] statutes to avoid unreasonable interference with other nations' sovereign authority where possible.").

**B.     The Verified Complaint Fails to Trace Funds Invested In PNC Plaza Are Derived From Criminal Conduct In Ukraine**

To state a forfeiture claim, the United States must plead "sufficiently detailed facts" that a "substantial connection" exists between the property and alleged offense.  18 U.S.C. § 983(c)(3); *$38,00 in Currency*, 816 F.2d at 1548 (dismissal under Rule E(2)(a) for failure to allege substantial connection); *see also United States v. Ayika*, 837 F.3d 460, 471 (5th Cir. 2016).[6]  To meet this "demanding" burden, the Government must establish that current, identifiable monies are likely derived from the criminal offense.  *Ayika*, 837 F.3d at 472, 474; *see also In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1211 (11th Cir. 2013) (characterizing tracing requirement as proof that, more likely than not, the property at issue constitutes traceable proceeds).  This requires a determination whether *any* of the remaining monies are themselves traceable to the prior offense.

The United States fails to satisfy its burden of pleading facts that meet the tracing requirements under the forfeiture statute.[7]  The gravamen of the Verified Complaint is that $13 million of the $77 million purchase price of PNC Plaza in 2011 was derived from a "foreign bank fraud" by the two then-majority shareholders of PrivatBank.  However, the United States makes no effort to trace the alleged specified unlawful Ukrainian bank funding (*i.e.*, the $13 million from 2011) into any bank account, much less into any bank account associated with the ownership of PNC Plaza, either at the time of the 2011 acquisition, or at the time of the 2018 and 2020 resales.  There is no legal or factual assertion in the Verified Complaint that the 2018 and 2020 ownership

---

[6]   The specific forfeiture authority invoked for Count 1 of the Verified Complaint, 18 U.S.C. § 981(a)(1)(C), subjects to forfeiture "any property, real or personal, *which constitutes or is derived from proceeds traceable* to a violation of" these specific unlawful offenses. (emphasis added). Claims 2 through 8 allege forfeiture under 18 U.S.C. § 981(a)(1)(A), which makes forfeitable any property "involved in a transaction or attempted transaction in violation of" the money laundering laws "or any property traceable to such property."  For both types of forfeiture – "involved in" or traceable proceeds – a substantial connection, or nexus, must exist between the defendant property and the alleged criminal offense, and the Government must meet this burden by a preponderance of the evidence, even at the pleading stage.  18 U.S.C. §§ 983(c)(1) & (3).

[7]   As a threshold matter, the United States has failed to allege "sufficiently detailed facts" to support a reasonable belief that it will prove the existence of any underlying criminal conduct. Multiple judgments by Ukrainian courts – including on the NZF Loan, which allegedly formed the "bulk of the funds" used to purchase PNC Plaza (Compl. ¶ 116) – refute the United States' core allegations that the funds used to purchase PNC Plaza are traceable to alleged fraud or misappropriation.  *Supra*, at 5-6.

of PNC Plaza or even any related bank account is derived from, or traceable to, the specified unlawful activity in Ukraine in 2011.

To the contrary, the Verified Complaint alleges that, in 2018, the original financing of the PNC Plaza acquisition from 2011 was "extinguished" as part of foreclosure proceedings in Kentucky state court.  Dkt. 1 at ¶¶ 138, 149.  At that time, the "promissory note" was purchased by "Firm A."  *Id.* at ¶ 146.  The Complaint expressly disavows any connection between Firm A and the prior Ukrainian financing.  *Id.* at ¶ 139 n.10 (admitting that Firm A is an "unrelated third-party investor, which, on information and belief, had no connection to the Optima Family of companies or Kolomoisky and Boholiubov's misappropriation scheme from PrivatBank.").  Thus, as of 2018, the original financing was "extinguished" in foreclosure proceedings, which was accomplished by a purchase by a new entity, Firm A, wholly unrelated to PrivatBank.  *Id.* at ¶¶ 138, 149.  The extinguishment of the original alleged Ukrainian financing was further compounded by Firm A's agreement in late 2019, implemented in 2020, to buy PNC Plaza in its entirety using its own monies.  *Id.* at ¶ 157.  Moreover, though the Verified Complaint alleges that certain funds used to repurchase the property out of foreclosure in 2018 are derived from Felman, it does not – and cannot – allege that such funds are derived from misappropriated PrivatBank funds, let alone traceable to the original 2011 PrivatBank funds identified as being derived from specified unlawful activity.

Because the Government cannot establish that the financing of the transactions involving PNC Plaza in 2018 or 2020 originated from the alleged specified unlawful PrivatBank proceeds in 2011, there is no substantial connection between the property and alleged offense.  The failure to trace ownership of PNC Plaza to funds derived from specified unlawful activity and the failure to demonstrate a substantial connection to specified unlawful activity is fatal to any Government tracing claim.[8]

---

[8]   The Verified Complaint also fails to plead a substantial connection between the alleged loans issued in Ukraine in 2010 and 2011 and the rights and interests of Optima CBD Investments LLC and CBD 500 LLC in PNC Corporate Plaza Holdings LLC.  Neither Optima CBD Investments LLC, CBD 500 LLC, nor PNC Corporate Plaza Holdings LLC existed in 2011.  The funds used by Optima CBD Investments LLC, CBD 500 LLC, and PNC Corporate Plaza Holdings LLC to purchase PNC Plaza out of foreclosure came from separate money, *i.e.*, from Felman.  None of the money provided by Felman is alleged to be traceable to the 2010 and 2011 loans.  The failure to

### C.      The United States Fails to Identify a Cognizable *In Rem* Defendant

In civil forfeiture actions, "a federal court must also have *in rem* jurisdiction over the defendant property." *United States v. $389,820 in U.S. Currency*, 2020 WL 5946645, *490 (11th Cir. Oct. 7, 2020).  "The suit is brought not against a person or corporation, but against defendant property that allegedly has been involved in criminal activity."  *United States v. All Funds Distributed to Weiss*, 345 F.3d 49, 55 (2d Cir. 2003).  "It is the property which is proceeded against, and, by resort to a legal fiction, held guilty and condemned as though it were conscious instead of inanimate and insentient."  *Waterloo Distilling Corp. v. United States*, 282 U.S. 577, 581 (1931) (distinguishing an *in rem* civil forfeiture proceeding from an *in personam* criminal proceeding against a defendant person).  Individuals and legal entities (which have legal rights) are not themselves subject to civil forfeiture.

The Verified Complaint fails to name any *in rem* defendant.  Instead, the Verified Complaint names, as the "Defendant Asset," the "rights" of one Delaware limited liability company (CBD 500 LLC) within another Delaware limited liability company (PNC Corporate Plaza Holdings LLC).  Dkt. 1, 1 at ¶¶ 3, 10.  This is impermissibly ambiguous and requires dismissal.

### D.      The Forfeiture Claims Are Barred by the Statute of Limitations

Under 18 U.S.C. § 984(c), "[n]o action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense."  This one-year limitations period is mandatory and applies to "any forfeiture action in rem in which the subject property is cash, monetary instruments in bearer form, funds deposited in an account in a financial institution . . . , or other fungible property."  *Id*. § 984(b)(1).

The Verified Complaint alleges that the two Ukrainian bank loans, and the transmission of their proceeds into the United States, took place in 2011, nearly *nine years prior* to the filing of

---

connect or trace Optima CBD Investments LLC, CBD 500 LLC, and PNC Corporate Plaza Holdings LLC to the alleged specified unlawful 2010 and 2011 loans in Ukraine fails to meet the requirement of "a substantial connection between the property and the offense," let alone of "stating sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial."  Supplemental Rule G(2).

this lawsuit in 2020.  Verified Complaint, ¶ 106.  The United States' claims are therefore time-barred.

## CONCLUSION

For the foregoing reasons, the Verified Complaint should be dismissed in its entirety and with prejudice.

Dated: February 5, 2021

Respectfully submitted,

Black, Srebnick, Kornspan & Stumpf, P.A.
201 South Biscayne Blvd., Suite 1300
Miami, FL 33131
Tel: (305) 371-6421
Fax: (305) 371-6322

By:  /s/ *Howard M. Srebnick*
Howard M. Srebnick
Florida Bar No. 919063
Robert T. Dunlap
Florida Bar No. 11950
HSrebnick@RoyBlack.com
RDunlap@RoyBlack.com

*Attorneys for Claimants Korf and the Corporate Entities*

Kasowitz Benson Torres LLP
1633 Broadway
New York, New York 10019
(212) 506-1700
Marc E. Kasowitz
Mark P. Ressler
Ronald R. Rossi
Sarmad M. Khojasteh
Joshua Paul
*Pro Hac Vice Anticipated*
MKasowitz@kasowitz.com
MRessler@kasowitz.com
RRossi@kasowitz.com
SKhojasteh@kasowitz.com
JPaul@kasowitz.com

*Attorneys for Claimants Korf and the
Corporate Entities*

<u>/s/ *Scott A. Srebnick*</u>
Scott A. Srebnick, P.A.
201 South Biscayne Boulevard
Suite 1210
Miami, FL 33131
Telephone: (305) 285-9019
Facsimile: (305) 377-9937
Scott@srebnicklaw.com

*Attorney for Claimant Laber*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 5, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those parties who are not authorized to receive Notices of Filing electronically.

*/s/ Howard M. Srebnick*
Howard M. Srebnick
