UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 20-cv-23278-GAYLES/GOODMAN

UNITED STATES OF AMERICA,

     Plaintiff,

v.

ALL RIGHT TO AND INTEREST IN PNC
CORPORATE PLAZA HOLDINGS LLC HELD,
CONTROLLED, OR ACQUIRED, DIRECTLY OR
INDIRECTLY, BY OPTIMA CBD INVESTMENTS
LLC AND/OR CBD 500 LLC, INCLUDING ANY
INTEREST HELD IN OR SECURED BY THE REAL
PROPERTY AND APPURTENANCES LOCATED
AT 500 WEST JEFFERSON STREET, LOUSIVILLE,
KY 40202, et al.,

     Defendants.

_____/

REPORT AND RECOMMENDATIONS ON
CLAIMANTS' MOTION TO DISMISS (OR ABSTAIN FROM)
GOVERNMENT'S VERIFIED CIVIL FORFEITURE COMPLAINT

The Claimants in this *in rem* civil forfeiture action have asked this Court to dismiss

the Verified Complaint filed by the United States (or to abstain from proceeding with the

lawsuit) because, they say: (1) the doctrine of international comity requires abstention;

and (2) the Verified Complaint fails to state a claim. In their motion [ECF No. 78],

Claimants (Mordechai Korf, Uriel Laber, Optima CBD Investments LLC, and CBD 500,

LLC) note that the purported fraud outlined in the Verified Complaint occurred in

Ukraine -- but then emphasize that Ukrainian courts have now issued post-filing decisions finding the purportedly questionable loans at issue to be *valid*.[1] Because these judicial decisions refute the allegations in the Verified Complaint, Claimants argue, international comity mandates dismissal or abstention.

In related arguments, Claimants say that "fairness" considerations justify abstention, which they contend would also promote the efficient use of scarce judicial resources.

Claimants also attack the substance of the Verified Complaint, arguing that it did not sufficiently trace the funds used to purchase the real estate at issue to the specified unlawful activity in Ukraine. They also say that (1) the Verified Complaint ignores that the real estate was repurchased in 2018 with funds the United States does not allege were tainted; (2) the United States failed to identify a cognizable *in rem* defendant; and (3) the claims are time-barred under the one-year statute of limitations for forfeiture claims.

For the reasons outlined below, the Undersigned **respectfully recommends** that United States District Judge Darrin P. Gayles **deny the motion in part** and **grant the motion in part**.[2]

---

[1]     The Ukrainian judgments are available on the Ukrainian government's official online registry of court decisions (https://reyestr.court.gov.ua/). *See* [ECF No. 163].

[2]     The United States has advised that it plans to renew its motion to stay this case under 18 U.S.C. § 981(g)(1) if the Court denies the motion to dismiss or abstain. The stated reason [ECF No. 161, p. 9] for the possible stay motion foreshadowed by the United States is to avoid having this civil lawsuit affect an ongoing criminal investigation. In a May 13,

By way of summary, though, the Undersigned acknowledges that the parties spent a substantial amount of their legal arguments on the international comity theory. But the Undersigned concludes that international comity principles do not compel dismissal here, where the United States *itself* is the plaintiff and has already determined that pursuing this lawsuit is in the national interest and would not jeopardize our country's relationship with Ukraine.

Moreover, the issue of whether the United States named the correct property to be forfeited generates problematic issues which justify a dismissal, though without prejudice, to give the United States an opportunity to file an amended complaint.

This issue involves some odd and arguably inconsistent steps by the United States. This includes a written representation in this case that the sale was a private transaction "without the involvement of the United States" -- even though government counsel (1) approved in writing (through his signature) the closing statement; (2) reviewed emails between attorneys for the buyer, seller, and lender; and (3) directed the participants not to use certain proceeds to pay attorney's fees and to change language in the closing statement.

Contrary to Claimants' argument [ECF No. 155, p. 3], the *United States* itself did not sell the real estate, nor did the Court. Instead, the sale of real estate was conducted by

---

2021 Order, the Court denied [ECF No. 75] the United States' earlier-filed motion to stay [ECF No. 46]. That part of the ruling, which was part of a two-page Omnibus Order addressing five matters, was succinct.

private parties after the United States obtained an Order permitting the consummation of a purchase and sale agreement for real estate which was entered into before the forfeiture complaint was filed. The proceeds of that sale are now held in escrow.

So the United States was surely **involved** in the interlocutory sale, but not as a seller or buyer or custodian. But the named *in rem* Defendant appears to be an unavailable defendant in this civil forfeiture lawsuit. More on this later.

However, the Undersigned also finds that one of the other arguments raised by Claimants -- whether the United States has adequately established a substantial enough connection between the property and the offense -- appears to have some merit but I conclude that the issue is best handled at a later stage, after the United States files an amended complaint naming a different *in rem* defendant.

**Procedural and Factual Background**

The United States filed [ECF No. 1] its Verified Complaint for Forfeiture in Rem on August 6, 2020. Verified by an FBI Special Agent, the lawsuit at issue was designated as Case No. 20-cv-23279 and assigned to United States District Judge Robert N. Scola, Jr. but was then transferred [ECF No. 23] to United States District Judge Marcia G. Cooke, who had an earlier-filed action (No. 20-cv-23278) involving similar facts and issues. The two cases were consolidated with another civil forfeiture action (No. 20-cv-25313) and the two higher-numbered actions were administratively closed. [ECF No. 49]. As of the February 24, 2021 consolidation, all future filings were to be made only in 20-cv-23278.

Claimants filed their motion to dismiss [ECF No. 78] on May 24, 2021. The United States filed its substantive response to the motion on April 8, **2022**. [ECF No. 119]. Judge Cooke recused herself and the case was reassigned to Judge Gayles on April 25, 2022. [ECF No. 125]. Claimants filed their reply on April 25, 2022 [ECF No. 12] and Judge Gayles referred the dismissal motion to me on May 25, 2022. [ECF No. 132].

The Undersigned held a three-hour hearing on July 8, 2022 [ECF No. 142] and issued a post-hearing Order requiring additional briefing on myriad topics [ECF No. 143]. Over the course of the next month and a half, the parties filed numerous submissions in compliance with the Order for additional memoranda [ECF Nos. 146-156]. The most-recent submissions are the Government's September 7, 2022 Supplemental Response [ECF No. 161] and Claimants' September 14, 2022 Supplemental Response [ECF No. 162].

The Verified Complaint, which includes a jury trial demand, concerns real property in Louisville, Kentucky (i.e., a building known as PNC Plaza, located at 500 West Jefferson Street).

<u>Government Summary of the Complaint (from its opposition to the dismissal motion)</u>

The Verified Complaint is lengthy (44 pages) and factually complex, so the Undersigned deems it appropriate to use the Government's summary of its own lawsuit. The summary is found at pages 2-3 of ECF No. 119:

The United States seeks to forfeit all right to and interest in PNC Corporate Plaza Holdings LLC held, controlled, or acquired, directly or indirectly, by Optima CBD

Investments LLC and CBD 500 LLC (the "Defendant Asset"). Complaint, [ECF No. 1, ¶ 3]. The United States seeks forfeiture of the Defendant Asset pursuant to: (1) 18 U.S.C. § 981(a)(1)(C), because it is traceable to violations of United States law and specified unlawful activity, including violations of 18 U.S.C. §§ 1956, 1957, 2314, and 2315; and (2) 18 U.S.C. § 981(a)(1)(A), because it was involved in and facilitated one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957. *Id*. ¶¶ 4-6.

Ihor Kolomoisky and Gennadiy Boholiubov used their ownership and control of PrivatBank to misappropriate more than $5 billion from the bank via fraudulent loans. *Id*. ¶ 17. They then laundered the loan proceeds through a vast network of accounts at PrivatBank's Cyprus branch in a series of transactions designed to disguise the nature, source, ownership, and control of the funds. *Id*. ¶ 19. The funds were then transferred to the United States for the purchase of assets, safekeeping, and further laundering. *Id.* ¶¶ 20-21.

Concerning PNC Plaza, Kolomoisky and Boholiubov obtained two lines of credit to companies owned by them, including: (1) Loan No. 4Z10330D for $9,300,000 to Zaporozhye Ferroalloy Plant ("ZFZ"), a metal processing plant, purportedly for the purpose of funding the ferroalloy production operations of that company; and (2) Loan No. 4N11415D for $13,500,000 to Nikopol Ferroalloy Plant ("NZF"), also a metal processing plant, for the same purported purpose of funding its ferroalloy production operations. *Id.* ¶¶ 108-24. The loan applications were submitted and approved, and the

funds disbursed to ZFZ's and NZF's respective accounts, just two weeks after Optima CBD Investments LLC made the initial deposit to purchase PNC Plaza, in the case of the loan to ZFZ, and only ten days before Optima acquired the property, in the case of the loan to NZF. *Id*. ¶¶ 108, 116.

Kolomoisky and Boholiubov laundered the fraudulent loan proceeds by transferring a portion of the funds from NZF and ZFZ's accounts through a convoluted web of related business entities that they controlled. *Id*. ¶¶ 125-32. Eventually, the funds were transferred to companies in the United States that were established by their associates Mordechai Korf and Uriel Laber. *Id.*

Korf and Laber used those entities to further launder the misappropriated PrivatBank funds by acquiring properties and businesses in the United States, including PNC Plaza in 2011. *Id.* ¶¶ 126-29. In 2016, PrivatBank was nationalized amidst staggering losses exceeding $5 billion. *Id.* ¶ 11.

<u>Claimants' Description of the Complaint (from their motion to dismiss)</u>

Claimants' view of the Verified Complaint emphasizes the Ukraine-focused nature of the allegations and notes that the United States does not make certain allegations. Their summary (provided below) is from pages 3-5 of their dismissal motion:

The lynchpin of every allegation of misconduct in the Verified Complaint is purported wrongdoing that occurred in Ukraine; at the direction of two Ukrainian nationals who reside in Ukraine; and to the detriment of a Ukrainian bank located in

Ukraine. Specifically, the Verified Complaint alleges that Ihor Kolomoisky is "a billionaire Ukrainian oligarch" who "controls businesses in many sectors of the Ukrainian economy, including metals, energy, and media" and was the co-owner of PrivatBank, "one of the largest banks in Ukraine." Compl. ¶¶ 10-11.

The Verified Complaint further alleges that Gennadiy Boholiubov is a "Ukrainian oligarch" who was "the second major shareholder of PrivatBank along with Kolomoisky" and the owner of "40% of PrivatBank" prior to its nationalization by the Ukrainian government in the year 2016. *Id*. at ¶¶ 12, 19. According to the Verified Complaint, these two Ukrainian nationals used "their control of PrivatBank to steal billions of dollars of the bank's funds," which they then invested in real estate in the United States.

The Verified Complaint also identifies Mordechai Korf, also known as "Motti," as a "Miami-based business associate of Kolomoisky and Boholiubov" who, along with his longtime friend Uriel Laber, another "Miami-based business associate of Kolomoisky and Boholiubov," helped manage Kolomoisky and Boholiubov's investments in the United States "under the 'Optima' umbrella of companies." *Id*. at ¶¶ 13-14, 19-21. Critically, the United States does not -- and cannot -- assert any allegations of criminal charges brought by Ukraine against Kolomoisky, Boholiubov, Korf, or Laber arising from the purported misconduct concerning PrivatBank described in the Verified Complaint.

The Verified Complaint alleges that "[i]n 2011, [Korf, Laber, Kolomoisky and Boholiubov] purchased the building known as PNC Plaza" and that "[t]he money used

to purchase PNC Plaza was directly traceable to two loans obtained from PrivatBank by Kolomoisky and Boholiubov, . . . was the proceeds of embezzlement, misappropriation, and fraud," and derivative of "violat[ions] [of] numerous provisions of the Ukrainian Criminal Code." *Id*. at ¶¶ 22, 67-76.

According to the Verified Complaint, in September 2011, PNC Plaza was purchased for $77,050,000. *Id*. at ¶ 103. The purchase allegedly required a deposit of $3.5 million, followed by the transfer of $13,151,167.17 at closing, which covered the remainder of the purchase price as well as closing costs and fees. *Id*. at ¶¶ 104-106.[3] The $13,151,167.17 used to complete the purchase of PNC Plaza allegedly was misappropriated from PrivatBank via two fraudulent loans issued in Ukraine. *Id*. at ¶ 107. One loan, which formed "the bulk of the funds used for the purchase of PNC Plaza," was issued to Nikopol Ferroalloy Plant ("NZF") on September 19, 2011 ("NZF Loan"). *Id*. at ¶¶ 116-24. The other, smaller loan was issued to Zaporozhye Ferroalloy Plant ("ZFZ") on November 30, 2010 ("ZFZ Loan"). *Id*. at ¶¶ 108-15.

On September 22, 2011, a portion of the proceeds from these two loans allegedly was transferred to the United States from a PrivatBank Cyprus account. *Id*. at ¶ 130. The Verified Complaint does not identify or trace any other money used to purchase PNC Plaza to specified unlawful activity.

---

[3]     The outstanding mortgage on the property, which was $65,700,000, was assumed, and a total of $16,651,167.17, ($3.5 million, plus $13,151,167.17), was expended for the purchase. *See* [ECF No. 1 at ¶¶ 104-06].

[Claimant's version continues with a discussion of 2018 events]:

In 2018, seven years after PNC Plaza was purchased using allegedly tainted funds from Ukraine, PNC Plaza faced a foreclosure. Compl. ¶¶ 135-36. "On January 31, 2018, U.S. Bank, as a trustee for the mortgage holders, filed a foreclosure action in the courts for the Commonwealth of Kentucky" and "[a] receiver . . . was appointed by the court on February 5, 2018 to manage the property during the foreclosure proceedings." *Id.* at ¶¶ 137-38.

According to the Verified Complaint, "Korf and Laber entered negotiations with a third-party investment firm, Firm A . . . [and] they agreed to enter a joint venture that altered the ownership structure of PNC Plaza." *Id.* at ¶ 139. "Firm A was an unrelated third-party investor, which, on information and belief, had no connection to the Optima Family of companies or Kolomoisky and Boholiubov's misappropriation scheme from PrivatBank." *Id*. at ¶ 139 n.10.

The United States does not seek the forfeiture of any interest owned by "Firm A." *See id*. at ¶ 143 n.11. Thereafter, in 2018, Korf, Laber and "Firm A" repurchased the property and received transfer of a Deed in Lieu of Foreclosure, for approximately $27 million, "which extinguished the original promissory note." *Id.* at ¶¶ 146-149. The $27 million repurchase in 2018 was funded in two parts: (1) a loan of approximately $17 million from a third-party lender; and (2) contributions of $10 million from "Firm A," and $9.5 million from Korf and Laber via Claimant Optima CBD Investments, LLC, using

funds derived from Felman Trading Americas Inc. ("Felman"). *Id.* at ¶¶ 150-51.

The United States does not -- and cannot -- allege that the funds from Felman were derived from funds misappropriated from PrivatBank, nor does it attempt to trace Felman's funding to any of the unlawful activity in Ukraine. To the contrary, as the Verified Complaint concedes, Felman was involved in shipments of manganese ore, and, "[f]rom 2008-2014, received almost $7 million from, and transferred almost $400 million to, Kolomoisky and Boholiubov-related entities via PrivatBank." *Id.* at ¶¶ 152, 155 n.3.

The Sale of the Property at Issue

Although the forfeiture complaint is a civil *in rem* action against property (i.e., the property itself is the defendant, and Claimants have intervened to challenge the requested forfeiture), the property no longer exists in its former form. Instead, the real estate was sold in a private transaction, with the proceeds held in escrow pending the outcome of this lawsuit.[4] The United States explained the procedural history surrounding the sale in a memorandum [ECF No. 150]:

When the United States filed this action against Optima CBD Investments LLC's and CBD 500 LLC's ownership interests in PNC Corporate Plaza Holdings LLC, to include any interest in the real property at 500 West Jefferson Street, Louisville, KY ("PNC Plaza"), PNC Plaza was wholly owned by PNC Corporate Plaza Holdings LLC. *See* [20-

---

[4]      Technically, the real estate itself is not the named defendant. But, as explained in greater detail later in this Report and Recommendations, the real estate *is* in fact exactly what was actually sold in the sale in which the United States was involved.

cv-23279, ECF No. 1 at ¶ 3]. PNC Corporate Plaza Holdings LLC was in turn owned 95% by CBD 500 LLC, and 5% by a third-party investor. *See id.* at ¶ 144; [ECF No. 81-1 at 2].

PNC Corporate Plaza Holdings LLC, under the direction of 95% owner CBD 500 LLC, had entered into an agreement with the third-party investor to sell PNC Plaza to the third-party investor. [ECF No. 1 at 157-158]. Under the sales contract, PNC Corporate Plaza Holdings LLC would receive the proceeds of the sale, and CBD 500 LLC would have received 95% of those proceeds. [ECF Nos. 81 at 9-10; 81-2].

When the United States filed this action, it asked the Court for a restraining order that would, among other things, protect the value of the Defendant Asset, Optima CBD Investments LLC and CBD 500 LLC's interest in PNC Corporate Plaza Holdings LLC. [20-cv-23279, ECF No. 4]. Specifically, to protect the value they would receive from the contracted for and pending sale, the United States asked the Court to order that Claimants not interfere with the sale that they had voluntarily contracted for before the filing of this action -- in essence, for Claimants not to cause PNC Corporate Plaza Holdings LLC to breach its contract with the third-party investor.

The Court entered such an order, [20-cv-23279, ECF No. 5], the sale was consummated, and the funds that would have flowed from PNC Corporate Plaza Holdings LLC to CBD 500 LLC instead were restrained by the U.S. Marshals Service. The purchase price listed in the Purchase and Sale Agreement is $25 million. [ECF No. 150-2, p. 9 of 59]. A summary of the outgoing wires for the November 17, 2020 settlement of the

transaction shows a $22.25 million purchase price, however. [ECF No. 150-1].

Additional Submissions

To support their theory that international comity abstention or dismissal is warranted because of decisions by Ukrainian courts, Claimants submitted several exhibits:

1. The Declaration of attorney Joshua N. Paul [ECF No. 78-1];

2. Kyiv Economic Court Opinions [ECF Nos. 78-2, 78-3, 118-1 and 137-1];

3. Kyiv Economic Court Filings [ECF Nos. 78-4, 78-5, 78-6 and 78-7];

4. First Declaration of Dmytro Marchukov (opining on several topics, including Ukrainian law and reforms to the Ukrainian judiciary) [ECF No. 78-8];

5. (37) Exhibits Attached to the First Marchukov Declaration [ECF No. 78-9];

6. Delaware Chancery Court Filings [ECF Nos. 126-1, 139-1, 140-1 and 140-2]; and

7. 68-page "Powerpoint" presentation used by Claimants at hearing [ECF No. 146-1].

The documents listed above in all seven categories include purported court opinions from Ukrainian judges, translations, statements of claim in actions filed in Ukrainian courts seeking declarations that loans were properly performed, a legal opinion on Ukrainian law, news articles, a website listing Marchukov's credentials, public filings in Delaware Chancery Court (a memorandum opinion concerning a motion to stay, the Third Declaration of Marchukov, exhibits to the third Marchukov declaration

and the United States-filed declaration of Oleksandr Chernykh).[5]

Parties' Contentions About the Supplemental Submissions

The Undersigned required [ECF No. 143] each side to file a memorandum advising the Court, on an exhibit-by-exhibit basis, its position on whether the Court can consider the specific exhibit at the motion to dismiss stage. Basically, the United States urged the Court [ECF No. 148] to not consider most of the exhibits, including the Ukrainian court decisions, while Claimants encouraged me [ECF No. 147] to take judicial notice of the rulings by the Ukrainian court (and to consider the other exhibits).

Should the Court Consider, or Take Judicial Notice of, the Supplemental Exhibits?

When deciding a motion to dismiss, a court's review is typically "limited to the four corners of the complaint." *St. George v. Pinellas Cnty.*, 285 F.3d 1334, 1337 (11th Cir. 2002). Generally, if a court considers extraneous materials, it must convert the motion to one for summary judgment. Fed. R. Civ. P. 12(d). There are two relevant exceptions.

First, a court may consider "a document attached to a motion to dismiss" if it is: "(1) central to the plaintiff's claim; and (2) undisputed." *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002) (citation omitted).

A document is "central" if "'the plaintiff would have to offer [it] to prove his case.' Documents that are relevant to the defendant's affirmative defenses, rather than the

---

[5]     The United States filed Chernykh's Declaration in the Delaware Chancery Court, not in the instant forfeiture case pending in the Southern District of Florida.

plaintiff's claim, will fail to meet the centrality requirement." *Miranda v. Ocwen Loan Serv., LLC,* 148 F. Supp. 3d 1349, 1353 (S.D. Fla. 2015). A document is "undisputed" if its "authenticity . . . is not challenged." *Horsley*, 304 F.3d at 1134.

Second, a court "may take judicial notice of certain facts" without converting a motion to dismiss into a motion for summary judgment. *Horne v. Potter*, 392 F. App'x 800, 802 (11th Cir. 2010). Courts can take judicial notice of a fact "that is not subject to reasonable dispute" because it is "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).[6]

"In order for a fact to be judicially noticed under Rule 201(b), indisputability is a prerequisite." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citation omitted) (vacating and remanding summary judgment because, among other errors, the trial judge improperly took judicial notice of that district court's findings of fact in a previous lawsuit). Further, "[a] court may take notice of another court's order only for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation." *Id*. It may not, by contrast, take judicial notice of the factual findings of another court: "If it were permissible for a court to take judicial notice of a fact merely

---

[6]      The United States challenges the authenticity of many Claimant-submitted exhibits and says it has "identified a series of material omissions and errors in the English translation of the Kyiv Economic Court's opinion" which "raise serious doubts about the reliability of that copy of the decision or, at a minimum, the translation of it." [ECF No. 148, p. 3].

because it has been found to be true in some other action, the doctrine of collateral estoppel would be superfluous." *Id*.

If foreign language documents (such as the ones submitted by Claimants) contain inconsistencies, printing errors, illogical text or other defects, courts have discretion to not rely on them. *See Sabeniano v. Citibank, N.A. New York*, No. 12 Civ.1928, 2013 WL 1164891, at *3 (S.D.N.Y. Mar. 20, 2013) (refusing to recognize a foreign judgment that contained "inconsistencies and non sequiturs"); *see generally Rote v. Zel Custom Mftg., LLC*, 383 F. Supp. 3d 779, 786 (S.D. Ohio 2019) ("Accuracy . . . is the proper test of a translated document.").

On the other hand, a court may take judicial notice of another court's orders for the limited purpose of "establish[ing] the fact of such litigation and related filings." *United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (citing with approval, *inter alia*, *United States v. Garland*, 991 F.2d 328, 332 (6th Cir. 1993) (taking judicial notice of Ghanian judgment -- but **not** judicially noticing the truth of the statements in the judgment "because some of these facts may remain in dispute")).

And in considering "the sufficiency of the complaint," the Court may consider "matters judicially noticed." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004); *see Jackson v. JPay Corp.*, No. 19-20341-CIV, 2020 WL 5264514, at *1 (S.D. Fla. July 27, 2020), *aff'd sub nom. Jackson v. JPay, Inc.*, 851 F. App'x 171 (11th Cir. 2021) (same).

Claimants are correct that, when analyzing motions to dismiss based on abstention, courts may consider materials beyond the four corners of the complaint. *See, e.g.*, *St. Martinus Univ., NV v. Caribbean Health Holding, LLC*, No. 19-22278-CIV, 2020 WL 956301, at *12 (S.D. Fla. Feb. 27, 2020) (conducting a review of "voluminous Curacao proceedings" in order to decide motion to dismiss based on international comity) ; *see also ITL Int'l, Inc. v. Walton & Post, Inc.*, 741 F. Supp. 2d 1313, 1317 (S.D. Fla. 2010) (granting motion to dismiss on abstention where complaint raised issue decided by a foreign judgment in the Dominican Republic).

Thus, to the extent that this Court considers abstention arguments to be within the purview of Federal Rule of Civil Procedure 12(b)(1), consideration of materials beyond the four corners of the complaint is permitted. *See Cave v. Stone*, No. 20-61955-CIV, 2021 WL 4427451, at *1, *14 n.27 (S.D. Fla. Sept. 27, 2021) (noting "some debate as to whether [certain abstention arguments] should be considered under Rule 12(b)(1) or Rule 12(b)(6)" and considering facts outside the pleadings, including dockets in state-court cases and documents filed on those dockets, when assessing a factual challenge to jurisdiction and *Younger* abstention argument); *Thompson v. Fla. Bar*, 526 F. Supp. 2d 1264, 1271 (S.D. Fla. 2007) ("[E]vidence outside the four corners of the complaint can be considered when addressing *Younger/Middlesex* abstention.").

17

Finally, to the extent that the Verified Complaint places Ukrainian law at issue, Claimants contend that the Court, pursuant to Fed. R. Civ. P. 44.1,[7] may consider Ukrainian "judicial opinions," such as decisions purportedly made here by a Ukrainian court, in evaluating the foreign law. *In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, No. 08-MD-01916-KAM, 2020 WL 7388944, at *9 (S.D. Fla. Sept. 30, 2020) (considering expert reports and "other sources of foreign law" to determine whether action was untimely under Colombian law); *see also Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, No. 04-20073-CIV, 2005 WL 5955701, at *6 (S.D. Fla. Aug. 17, 2005) ("Rule 44.1 allows the introduction of any evidence to be brought before the court as long as the evidence 1) is relevant and 2) relates to a determination of foreign law.").

So there are myriad rules, legal principles, policy considerations and themes underlying a potential exhibit-by-exhibit ruling on whether to consider, or judicially notice, any of the beyond-the-four-corners-of-the-Complaint submissions. Given the Undersigned's recommendation (discussed below) concerning international comity and abstention, there is no need to grapple with these nuances. That is because I will, for the sake of discussion only, consider (and/or judicially notice) *all* the submissions. Because

---

[7]     Rule 44.1, entitled "Determining Foreign Law," provides that a court "may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence," when determining foreign law.

my ruling is to recommend that dismissal or abstention based on international comity (and other grounds) is unwarranted here even with all the submissions considered,[8] further analysis of the issue of *which* submissions (if any) are properly before the Court is superfluous.

**Should This Court Dismiss or Abstain?**

Internatonal Comity

This analysis is based on an assessment of all the filings submitted by the parties, including the purported decisions by Ukrainian courts finding that the loans which the United States alleges to be fraudulent were actually valid.

It may seem logical to some for this Court to invoke international comity as a ground to dismiss or abstain. After all, Ukrainian law enforcement authorities have not brought any charges concerning the loans at issue, no Ukrainian criminal court has determined any wrongdoing occurred, and Ukrainian courts have apparently validated the loans at issue as legitimate and not fraudulent.

But, despite this legal reality, the United States (to use Claimants' colorful phrasing) "nevertheless seeks to exercise its power under U.S. forfeiture statutes predicated on allegations of misconduct in the Ukraine." In the process, Claimants continue, "the United States bizarrely has anointed itself the arbiter and interpreter of the

---

[8]      "Considering" a source does not necessarily mean that I deem it to be persuasive or meritorious. Instead, it simply means that the source will be *evaluated* for whatever weight is appropriate, which may well be none.

Criminal Code of Ukraine, whose own prosecuting authorities have charged no one with a crime, whose own courts have convicted no one of a crime, and whose judges have already held that the loans at issue were entirely proper and valid." [ECF No. 78, p. 2].

According to Claimants' motion, "such overreach is patently inappropriate, violates international comity, and constitutes a misguided effort by the United States to wrongfully insinuate itself in the sovereign affairs of another country by attempting to regulate conduct occurring in Ukraine, well beyond the reach of U.S. authorities." *Id.*

So it may at first blush sound wrong for the United States to pursue this civil forfeiture action in the midst of the scenario described above. "The law, however, sometimes has a funny way of making hard what would otherwise seem intuitively simple, and that is the case with the" international comity and abstention arguments advanced here. *Carlson v. Fedex Ground Package Sys., Inc.,* 787 F.3d 1313, 1316 (11th Cir. 2015) (affirming in part and reversing in part orders concerning the issue of whether Florida FedEx drivers are employees or independent contractors).

Let's start with the basics.

Federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," and abstention from the exercise of that jurisdiction "is the exception, not the rule." *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 813, 817 (1976) (abstention is "an extraordinary and narrow exception" to a court's "duty" to "adjudicate a controversy properly before it"); *see also Turner Ent. Co. v. Degeto*

*Film GmbH*, 25 F.3d 1512, 1518 (11th Cir. 1994) (reviewing principles guiding approaches to international abstention).

International comity is one such narrow exception: it is a "doctrine of deference based on respect for the decisions of foreign sovereigns," which "provides that a U.S. court should give full effect to a foreign judgment that has been rendered with impartiality and due process." *One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 10 (D.D.C. 2013).

Abstention can be applied either retrospectively, where the United States court defers to "the judgment of a foreign tribunal or . . . parallel foreign proceedings," or prospectively, where the United States court stays or dismisses an action "based on the interests of our government, the foreign government and the international community in resolving the dispute in a foreign forum." *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004).

"Abstention doctrines are prudential doctrines and this court is **not obligated** under American statutory law to defer to foreign courts." *Ungaro-Benages*, 379 F.3d at 1239 n.13 (citation omitted) (emphasis added); *see also Royal & Sun All. Ins. Co. of Canada v. Century Int'l Arms, Inc.* ("*Royal & Sun*"), 466 F.3d 88, 92 (2d Cir. 2006) (noting that the doctrine's boundaries are "amorphous" and "fuzzy," pointing out that its application is "imprecise" and emphasizing that "even where the doctrine clearly applies it 'is not an imperative obligation of courts but rather is a discretionary rule of 'practice, convenience,

21

and expediency'" (citation omitted)).

Far from being mandatory, the "decision to invoke the international abstention doctrine falls within the *sound discretion* of the district court." *Hale v. Fr. LURSSEN WERFT GmbH & Co. KG*, No. 09-23787, 2010 WL 11601558, at *2 (S.D. Fla. Apr. 26, 2010) (citing *Seguros del Estado, S.A. v. Scientific Games, Inc.*, 262 F.3d 1164, 1169 (11th Cir. 2001)) (emphasis supplied).

The Eleventh Circuit's perspective is hardly unique, as other circuits follow a similar approach. In *Royal & Sun*, the Second Circuit held that "even where the doctrine [of international comity abstention] clearly applies[,] it is not an imperative obligation of courts but rather is a discretionary rule of practice, convenience, and expediency." 466 F.3d 88, 92 (2d Cir. 2006) (internal quotation marks and citations omitted); *see also United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 8 (1st Cir. 1997) ("Comity is more an aspiration than a fixed rule, more a matter of grace than a matter of obligation."). Indeed, the Ninth Circuit has described adjudicative comity as a "discretionary act of deference." *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 566 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 1735 (2021).

International comity embodies the policy of "good neighborliness, common courtesy and mutual respect between those who labor in adjoining judicial vineyards." *Cooper*, 960 F.3d at 566.

When deciding whether to abstain on comity grounds, courts consider: (1) whether principles of international comity apply; (2) fairness to litigants; and (3) efficient use of judicial resources. *Turner Ent.*, 25 F.3d at 1518.

With respect to the first factor,

> [g]eneral comity concerns include: (1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (3) whether the foreign judgment is prejudicial, in the sense of violating American public policy because it is repugnant to fundamental principles of what is decent and just.

*Id.* at 1519 (citations omitted).[9]

Although rare, a district court can be reversed for denying a motion to dismiss or abstain on international comity grounds. A common thread in such cases is a direct conflict between U.S. and foreign legal systems. For instance, in *In Re: Vitamin C Antitrust Litig.*, 8 F.4th 136, 144-45, 162 (2d Cir. 2021), the Second Circuit reversed a district court's decision not to abstain in an antitrust action in part because compliance with both U.S. and Chinese antitrust law was impossible. In *Turner Ent.*, the Eleventh Circuit reversed a decision not to abstain where there was a serious likelihood of conflicting judgments that would lead to "dueling courts" in later enforcement actions. 25 F.3d at 1521. Neither of

---

[9]     The *Ungaro-Benages* Court identified four factors: the competency of the foreign court, whether the foreign judgment was obtained by fraud, whether the "central issue in dispute is a matter of foreign law," and "whether there is a prospect of conflicting judgments." 379 F.3d at 1238.

those concerns are present in this case, and the United States was not the plaintiff in either of those cases.[10]

A court can, of course, also be reversed for granting a motion to dismiss based on international comity. The standard of review on such an appeal is whether the trial court abused its discretion in granting or denying dismissal based on abstention. *See Daewoo Motor Am., Inc.*, 459 F.3d at 1256 ("While we ordinarily review the grant of motions to dismiss or summary judgment de novo, a district court's decision to abstain will only be reversed upon a showing of abuse of discretion."); *In re Neves*, 783 F. App'x 995, 996 (11th Cir. 2019) ("We review a court's grant or denial of comity for abuse of discretion."); *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1308–09 (11th Cir. 2008) ("This Court also reviews a district court's grant or denial of comity to a foreign judgment for abuse of discretion.").

"A court abuses its discretion if it applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous." *Neves*, 783 F. App'x at 996; *see also Belize Telecom*, 528 F.3d at 1303 ("A district court abuses its discretion when the court fails to apply the proper

---

[10]     As we will see shortly, the involvement of the United States as a plaintiff here is of huge significance. In fact, Claimants have been unable to find any legal authority where a case was dismissed (or a district court abstained on comity grounds) when the United States was a party plaintiff.

legal standard or to follow proper procedures in making its determination.").[11]

In their Court-required memorandum [ECF No. 156], Claimants contend that abstention based on international comity in a civil action brought by the United States is "consistent with the law and appropriate in this action." [ECF No. 156, p. 1]. However, they have not cited one case in which that actually happened.

Confronted by a lack of precedent for its view that international comity is still appropriate even when the United States is a party, Claimants say the United States has not cited any cases where a court has unequivocally held that international comity cannot ever apply in civil actions brought by the United States. Phrased differently, Claimants note that none of the courts in cases relied upon by the United States held "that the United States' status as plaintiff, on its own, **bars** the application of comity **as a matter of law**." [ECF No. 156, p. 6 (emphasis supplied)].

---

[11]     In its Court-required memorandum [ECF No. 152, p. 4, n.1], the United States contends that an "unusually rigorous abuse-of-discretion standard" applies if a court abstains based on comity. But the United States does not cite to any Eleventh Circuit law to support this argument. Instead, it cites a Second Circuit opinion: *In re Picard, Tr. for Liquidation of Bernard L. Madoff Inv. Sec. LLC*, 917 F.3d 85, 101 n.7 (2d Cir. 2019). It also cites *Royal & Sun*, 466 F.3d at 92 ("[B]ecause we are reviewing a court's decision to abstain from exercising jurisdiction, our review is 'more rigorous' than that which is generally employed under the abuse-of-discretion standard. 'In review of decisions to abstain, there is little practical distinction between review for abuse of discretion and review de novo.'" (citing *Hachamovitch v. DeBuono*, 159 F.3d 687, 693 (2d Cir. 1998))).

The Undersigned sees no reason to ignore the Eleventh Circuit's standard of review articulated in *In Re Neves* and *Daewoo Motor*. If the United States had law from our Eleventh Circuit to support its theory that the standard of review is "unusually rigorous," then, the Undersigned assumes, it would have cited it.

While technically correct, this point overlooks the reality that courts have analyzed the application of international comity in a comparatively strict way when the United States is a plaintiff -- and refused to dismiss the case or abstain.

As phrased by the United States, it is "difficult to conceive of any instance in which it would be appropriate for a court to abstain under principles of international comity when the United States is a plaintiff." The reason: comity is a **"balancing of U.S, foreign policy interests."** [ECF No. 152, p. 4 (emphasis supplied)].

As the Court explained in *United States v. All Assets Held at Bank Julius Baer & Co.*, "[a] case in which the United States is the plaintiff would seem a **particularly** unsuitable candidate for abstention on international comity grounds. Where, as here, the executive branch has decided that a forfeiture action is in the interests of the United States, declining jurisdiction out of deference to the interests of a foreign nation would be inappropriate." 772 F. Supp. 2d 205, 210 (D.D.C. 2011) (emphasis supplied).

The reasoning is not limited to civil forfeiture lawsuits. It is improper for a court to "second-guess the [E]xecutive [B]ranch's judgment as to the proper role of comity concerns," because the Executive Branch "has already done the balancing in deciding to bring the case in the first place." *One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d at 10.

The Constitution and Congress charge the Executive with conducting foreign relations, so a decision by the United States to pursue a civil action reflects its balancing of foreign and domestic interests. *See Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918)

("The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative -- 'the political' -- departments of the [G]overnment[.]"); *see also United States v. Time Warner, Inc.*, No. MISC.A. 94-338 (HHG), 1997 WL 118413, at *6 (D.D.C. Jan. 22, 1997) ("The Executive Branch, of which the Justice Department is a part, is charged with determining whether the importance of antitrust enforcement outweighs any relevant foreign policy concerns. . . . To that end, the Court **defers** to the executive branch's judgment as to comity and **declines to halt** an on-going investigation." (internal quotation marks omitted) (emphasis added)).

Courts have distinguished between applying comity where the United States is and is not a party. For instance, in *Turner Ent.*, the Eleventh Circuit held that despite the federal courts' "virtually unflagging obligation" to exercise their jurisdiction, "in some **private** international disputes the prudent and just action for a federal court is to abstain from the exercise of jurisdiction." 25 F.3d at 1518 (emphasis added).

The D.C. Circuit was even clearer in *United States v. Baker Hughes Inc.*:

[W]hatever the relevance of comity concerns in antitrust disputes between *private* parties, they are not a factor here. The State Department has considered Finland's position, and the United States has decided to go ahead with the case. **It is not the Court's role to <u>second-guess the executive branch's judgment</u> as to the proper role of comity concerns under these circumstances.**

731 F. Supp. 3, 6 (D.D.C.), *aff'd*, 908 F.2d 981 (D.C. Cir. 1990) (citation omitted) (emphasis added).

The international comity doctrine asks a court to determine whether the foreign policy interests of the United States would be so harmed by particular litigation that it should divest itself of jurisdiction. But where the United States is the initiator of the litigation, that question has already been answered.

To be sure, it is certainly *conceivable* that abstention based on international comity principles might be appropriate when the United States is a plaintiff. But Claimants have not found one case where it has occurred. Moreover, concerning the nature of the instant litigation, Claimants cannot avoid the reality that every single court to consider abstention in a case where the United States sought to civilly forfeit property in the United States has rejected abstention or dismissal under international comity principles.

Moreover, the United States has advised, in response to a specific question from the Undersigned, that it has brought civil forfeiture actions despite a foreign acquittal or foreign determination not to bring criminal charges. The United States provided the following four reported cases as illustrations, along with a succinct summary of the relevant circumstances:

1. *United States v. Real Prop. known as 2291 Ferndown Lane, Keswick VA 22947-9195*, No. 3:10-CV-0037, 2011 WL 2441254 (W.D. Va. June 14, 2011). A Taiwanese court *acquitted* the Taiwanese president and members of his family of charges relating to a bribery scheme and *ruled* that the payment in question had *not been shown to be a bribe* under Taiwanese law. *Id.* at *3. Nevertheless, the United States still sought civil forfeiture of

28

proceeds of that bribery scheme.

2. *United States v. Real Prop. Known as Unit 5B of Onyx Chelsea Condo.*, No. 10 Civ. 5390, 2012 WL 1883371 (S.D.N.Y. May 21, 2012). The United States brought an additional forfeiture action against property arising from the same scheme identified in *2291 Ferndown*. The court denied the claimant's request for a stay and held: "While the outcome of the Taiwan criminal prosecution will be instructive for this Court, the Court is competent to interpret Taiwan law to determine whether the Government has established a violation of 18 U.S.C. § 1956(c)(7)(B)(iv)." *Id.* at *7 (citing Fed. R. Civ. P. 44.1).

3. *United States v. All Funds on Deposit at Sun Secured Advantage, Acct. No. *XXXX,* 864 F.3d 374 (5th Cir. 2017). The claimant, a Mexican mayor, relying on principles of international comity, argued that several official decrees, certifications, and other documents from Mexican authorities -- including a state elections council, the state congress, a national tax secretary, and the state attorney general -- "*unambiguously indicate[d]* that, in Mexico's view, he did *not violate Mexican law*." *Id.* at 377-78 & n.3. Nevertheless, the United States sought civil forfeiture of proceeds of the mayor's Mexican fraud scheme.

4. *United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212 (D.D.C. 2017). Afghan Authorities -- including the Office of the Attorney General and the Legal and Judicial Committee -- *cleared an Afghan contractor of defrauding* the United States under Afghan law and *declared* that U.S. *accusations* of fraud were "*illegal and baseless*." *Id.* at 217 (emphasis

added). Nevertheless, the United States sought civil forfeiture of funds connected to the fraud scheme.

Claimants contend that these four cases are all distinguishable because they did not involve scenarios where the United States pursued civil forfeiture claims in the face of conflicting judgments (which directly contradict the United States' allegations) **already issued** by foreign courts.

To the extent that this distinction is one which has legal significance, Claimants do not dispute that they know of no lawsuit brought by the United States which was dismissed or subject to an abstention Order when the United States did not agree to a decision to defer to the foreign court's ruling. Claimants' effort to distinguish these cases implicates the doctrine of retrospective comity -- a foreign decision already rendered or in process; it results in abstention "to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings." *Ungaro-Benages*, 379 F.3d at 1238.

In the four cases cited by the United States, there were foreign proceedings in which the *result* (regardless of whether it involved an actual judgment) was contrary to the allegations being made by the United States but the United States decided to proceed here with the litigation anyway -- a result which is contrary to a defer-to-the-foreign-country decision under retrospective comity principles.

In determining whether to apply retrospective comity, courts focus on the competency of the foreign court, whether the foreign judgment was obtained by fraud,

whether the foreign judgment was prejudicial because it violated American policy notions of what is decent and just, whether the "central issue in dispute is a matter of foreign law," and "whether there is a prospect of conflicting judgments." *Ungaro-Benages*, 379 F.3d at 1278.

The United States points out that the Ukrainian decisions Claimants attempt to rely on were commenced after PrivatBank had sued Kolomoisky and Boholiubov in the United States, [ECF No. 78-3 at 21], and after this *in rem* civil forfeiture action was filed. In fact, Claimants even refer to it. *See, e.g.,* [ECF No. 78-4 at 22]. Moreover, **the Ukrainian decisions purport to reach conclusions about the claims in this case.** *See* [ECF No. 118-1 at 37 (purporting to "examine[] the text of the American claims" and finding that "the USA claims filed with the US District Court of the Southern District of Florida . . . contain references, including references to loan agreements, that are being considered by the court in this case")].

To add context to the procedural history, after these cases were filed in the United States, Kolomoisky and Boholiubov began pursuing litigation in Ukrainian courts -- actions which the United States contends is a "campaign of strategic litigation in Ukraine specifically designed to thwart that U.S. litigation, and the Ukrainian court obliged by ruling on the claims in these cases." [ECF No. 119, p. 12].

According to the United States, Claimants' motion pursues "the notion of deferring to later-filed foreign actions that claim to decide earlier-filed U.S. cases" and

therefore "flips the doctrine of 'retrospective comity' on its head." *Id.*

Regardless of whether the United States' rhetorical description is accurate, there are myriad grounds to reject Claimants' international comity basis to dismiss the lawsuit or to abstain. Rather than relying on procedural grounds (e.g., not considering the myriad materials submitted outside the four corners of the Complaint), the Undersigned focuses on the merits. Having already discussed the substantial hurdle Claimants face because the United States is itself the plaintiff, the Undersigned turns to the other factors.

Retrospective comity requires a parallel action (in order to support the conflicting foreign litigation). "For two actions to be considered parallel, the parties . . . must be substantially the same, litigating substantially the same issues in both actions." *Royal & Sun*, 466 F.3d at 94 (reversing order granting motion to dismiss, noting that no exceptional circumstances supported abstention and citing *Dittmer v. Cnty. of Suffolk*, 146 F.3d 113, 118 (2d Cir. 1998)); *see also Schneider Nat'l Carriers, Inc. v. Carr*, 903 F.2d 1154, 1156 (7th Cir. 1990) ("Suits are parallel if substantially the same parties are litigating substantially the same issues simultaneously in two fora."); *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 518 (7th Cir. 2001) (applying same general principles concerning parallel proceedings in a state or federal court to a foreign court when evaluating international comity and reversing order granting abstention motion because proceedings in federal court and Greek courts were not parallel proceedings).

The United States and Claimants are not parties to the Ukrainian actions which Claimants rely on for their international comity theory. Instead, the Ukrainian actions are between two Ukrainian entities owned and controlled by Kolomoisky (NZF and ZFZ), and PrivatBank. Neither NZF, ZFZ, nor PrivatBank has an identity of interest with the United States or any of the Claimants. Moreover, because this is an *in rem* civil forfeiture action, the defendant is property located in the United States, and it is certainly not a party to the Ukrainian actions.

Furthermore, the Ukrainian decisions do not reach decisions about whether the loan proceeds were ultimately used to purchase PNC Plaza. Similarly, they do not reach any conclusions about whether the money used to pay back the loan ultimately came from other loans issued by PrivatBank. And the decisions do not indicate if the transactions were part of a larger scheme to misappropriate funds from PrivatBank or if the documentation used to demonstrate financial propriety was false or fraudulent.

Thus, as flagged by the United States, "[i]t is unsurprising that sophisticated money launderers would obtain and present pieces of paper that suggest that a legitimate transaction occurred; that is a predictable feature of such a criminal scheme." [ECF No. 119, p. 13].

The United States also argues (convincingly, in my view) that the instant civil forfeiture action involves factual issues not resolved by the Ukrainian courts: "(1) whether the loans were part of a fraudulent scheme to misappropriate money from

PrivatBank, [ECF No. 1 at 108-24, 133]; (2) whether the misappropriated funds were laundered into the United States, *id*. ¶¶ 125-31; (3) whether they were used to acquire PNC Plaza, *id.* ¶ 132; and (4) whether the Defendant Asset is subject to forfeiture, *id*. ¶¶ 159-80. And, because the allegation is that both loans were part of a broader scheme, this Court will have to address not just whether the loans at issue were repaid on paper, but whether the funds for that repayment came from other loans issued by PrivatBank. *See id*. ¶ 114 ("$7.8 million was paid off using three other fraudulently obtained loans.").[12]

Continuing on with this theme, the United States notes that the Complaint also alleges that "[r]ather than ZFZ putting money back into PrivatBank, the bank's own money was moved from one account to another to disguise the hole in the bank's books." *Id.* ¶ 123.

Furthermore, this Court will also need to consider (unlike the Ukrainian court) the critical issue of what happened to the loan funds *after* they were issued.

Claimants have not demonstrated that the same litigants and legal issues are involved in both the instant civil lawsuit and the Ukrainian legal proceedings. This

---

[12]     Nevertheless, Claimants are still correct when they say that (1) the United States must, in order to prevail in this civil forfeiture lawsuit, establish that Ukrainian companies violated Ukrainian law when they obtained loans from a Ukrainian bank; (2) the Ukrainian borrowers accused by the United States of violating Ukrainian law filed lawsuits in Ukrainian courts against the Ukrainian bank from which they allegedly stole funds by fraud; (3) the Ukrainian borrowers sought judgments that the allegations are false (and that the loans at issue were not fraudulent); (4) the Ukrainian courts ruled in favor of the borrowers, finding the loans valid; and (5) the Ukrainian judgments (now on appeal) were based on much of the evidence which will be at issue in the instant lawsuit.

omission significantly undermines their motion. *Compare Turner Ent.*, 25 F.3d at 1518, n.6 (affording comity to concurrent German proceedings where "[a]ll of the parties to the American litigation are parties in the German litigation" and "the central issue is the same in both cases") *with AAR Int'l, Inc.*, 250 F.3d at 519-20 (declining to afford comity because it did "not seem substantially likely that the Greek actions will dispose of all the claims presented in the federal suit" where some of the plaintiff's claims were "not currently before the Greek courts," "and it [did] not seem likely that any of the Greek courts [would] resolve the legal and factual issues supporting those claims in deciding the claims actually before them"); *cf. ITL Int'l, Inc. v. Walton & Post, Inc.*, 741 F. Supp. 2d 1313, 1317 (S.D. Fla. 2010) (affording comity where "the parties and the issues are virtually identical," finding that the same issues were present "in both the Dominican actions and this action" and the plaintiffs' claim that the suit was "separate and distinct from the Dominican action [was] without merit").

The United States argues that it would be "unprecedented" for a United States court to "prevent the Executive Branch from litigating a case in the United States based on violations of U.S. law and seeking to forfeit property in the United States in deference to a foreign decision involving different parties and different legal issues." [ECF No. 119, p. 15]. This point is convincing, as Claimants have not cited a published case where a court in a case involving the United States as a plaintiff abstained in deference to a foreign action involving different litigants and legal issues.

Concerning the prospective comity type of abstention, courts focus on "the strength of the United States' interest in using a foreign forum, the strength of the foreign governments' interests, and the adequacy of the alternative forum." *Ungaro-Benages*, 379 F.3d at 1238.

The United States is the plaintiff here, so it has a strong and obvious interest in enforcing its own anti-money laundering laws against a real estate transaction occurring on its own soil. Although Ukraine may have an interest in having its courts adjudicate matters of Ukrainian law, the United States' decision to file this *in rem* civil forfeiture lawsuit here is a clear and real indication that it decided that a United States court should adjudicate and preside over this lawsuit.

Moreover, there is no adequate alternative forum to adjudicate the issues in this action. The key issue is whether the defendant property is subject to forfeiture, which is an issue that can be decided only by a U.S. court -- and it requires interpretation of United States law. *See Biver v. Nicholas Fin., Inc.*, No. 8:14-CV-250-T-33TGW, 2014 WL 2441891, at *6-7 (M.D. Fla. May 30, 2014) (evaluating *forum non conveniens* and international comity arguments and holding that Canadian court was "not an adequate alternative forum to adjudicate all the claims brought by Plaintiffs" where "the remedy sought by Plaintiffs involves the interpretation of United States law, not Canadian law") (citing *SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1101 (11th Cir. 2004)).

36

The United States also highlights the reality that abstaining on the basis of prospective comity is exceedingly rare: courts have deferred under this framework only once, under exceptional circumstances, where the United States and the foreign government affirmatively expressed a preference for a foreign tribunal. *See Ungaro-Benages*, 379 F.3d at 1229 (abstaining where the United States and German governments entered an agreement for certain claims of American citizens to be adjudicated by a foreign tribunal); *see also GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1030–31 (11th Cir. 2014) ("**Only once** has this Court ever sustained the dismissal of a lawsuit based on a prospective application of international comity," where there were "extensive negotiations" between President Clinton and the German government, and the United States "consistently supported the [foreign forum] as the exclusive forum") (emphasis added).

Needless to say, the United States is not supporting Claimants' request that the Ukrainian courts determine[13] the issues involved in this forfeiture lawsuit.

---

[13]     The Ukrainian decisions which Claimants rely on are on appeal. This weakens Claimants' argument. *See Turner Ent.*, 25 F.3d at 1523 (declining to dismiss pending foreign appeal); *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1224 (11th Cir. 1999) (same).

The parties had not expressly addressed the reality that Ukraine is currently in a months-long war with Russia, which generates the possibility that resolution of the appeal will be delayed, perhaps even for a significant amount of time, or that the taking of evidence in Ukraine might be delayed, as well.

In response to a question flagged by the Undersigned, the United States posited [ECF No. 161, p. 9] that it would be inappropriate for it (or Claimants) to speculate on

At bottom, the United States has filed suit to forfeit an asset allegedly involved in, and traceable to, money laundering transactions in the United States stemming from violations of foreign law, in violation of 18 U.S.C. §§ 1956 and 1957. The United States is well aware that Ukrainian courts have issued judgments finding the loans at issue to be valid, which is inconsistent with the allegations made here in the forfeiture lawsuit.

It is not my role (or Judge Gayles' role) to "second-guess the executive branch's judgment as to the proper role of comity concerns" when "the United States has decided to go ahead with the case." *United States v. Baker Hughes Inc.*, 731 F. Supp. 3, 6 n.5 (D.D.C. 1990).

The Undersigned therefore recommends that Judge Gayles reject the international comity argument advanced by Claimants and deny that portion of the motion to dismiss or abstain.

---

these potential war-influenced consequences. In response [ECF No. 162, p. 5, n.5] to the same Court-initiated discussion, Claimants say the war "will clearly hinder the parties' ability to gather evidence and witnesses from Ukraine" but conclude that "the war has not made the Ukrainian courts an inconvenient forum." According to Claimants, the trial and appellate courts of Ukraine "continue to function" and Claimants say they do not believe the war has any impact on the comity analysis.

Given Claimants' position that the war should not be part of the comity analysis and the United States' position that discussion of the war's impact would be inappropriate speculation, the Undersigned will not factor the war into the comity inquiry.

**Claimants' Other Equitable Grounds for Abstention**

Although it is difficult to discern with certainty whether Claimants assert (a) fairness and (b) the efficient use of judicial resources as separate grounds for abstention or as part of the international comity argument,[14] their motion advances these two concepts, as well. The United States did not separately discuss these two additional grounds in its original Opposition memorandum. The Undersigned required [ECF No. 159] the United States to submit a supplemental memorandum addressing these arguments. It did so [ECF No. 161], and Claimants submitted [ECF No. 162] a Court-required response.

Fairness

Holding that abstention is appropriate only if it is "fair to litigants," *Turner Ent.* designates three factors as relevant to this fairness evaluation: (1) the order in which the suits were filed; (2) the more convenient forum; and (3) the possibility of prejudice to

---

[14]

    [C]ourts have sought to fashion principles that will promote three readily identifiable goals in the area of concurrent international jurisdiction: (1) a proper level of respect for the acts of our fellow sovereign nations—a rather vague concept referred to in American jurisprudence as international comity; (2) fairness to litigants; and (3) efficient use of scarce judicial resources.

*Turner Ent.*, 25 F.3d at 1518; *see also Med-X Global, LLC v. SunMed Int'l, LLC,* No. 19-20722, 2019 WL 3752619, at *2 (S.D. Fla. Aug. 8, 2019) (citing the three topics as factors used in determining whether a Court should exercise its discretion and abstain from a case pending the conclusion of parallel international litigation).

39

parties resulting from abstention. 25 F.3d at 1521-22.

<u>The Order in Which the Suits Were Filed</u>

Claimants describe the order in which the suits were filed as a "neutral" factor, saying that the NZF and ZFZ actions were filed in the Ukraine simultaneously **or** "within a few months" of this civil forfeiture action. (emphasis added). But the United States notes that this civil forfeiture lawsuit was indisputably filed **before** the relevant Ukrainian actions were filed. In fact, it notes that Claimants concede this, as their motion points out that the actions filed by ZFZ "expressly reference this case." [ECF No. 78, p. 5].

Moreover, the United States criticizes Claimants' view that the Ukrainian actions "were filed simultaneously or within a few months of this case" and that this factor is therefore "neutral." As correctly and logically noted by the United States, there's a significant difference between something happening before or after, even if the after is only a few months after. Significantly, every one of the Ukrainian actions was filed *after* the filing of the instant forfeiture lawsuit, which means that the timing factor is most assuredly not "neutral." Instead, it favors the United States' opposition to abstention and undermines Claimants' arguments for abstention.

Emphasizing that nearly 150 actions were filed in the Ukraine, the United States contends that "the sole apparent purpose of those actions . . . was to obtain judgments that could be raised as a shield in this and the related civil forfeiture cases" (and the Delaware litigation). In support of this theory, the Government notes that the Ukrainian

actions do not seek or award damages or injunctive relief; instead, they consist of declaratory judgments that the loans were "proper[ly] perform[ed]."

Thus, according to the United States' perspective on the Ukrainian judicial decisions, "[t]here is no benefit to those judgments beyond bolstering Claimants' efforts to stymie the US actions." [ECF No. 161, p. 3].

This civil forfeiture lawsuit was filed first, so this factor favors the United States.

The More-Convenient Forum

According to Claimants, the availability of highly critical witnesses and the ability to obtain relevant documentary evidence render Ukraine a significantly more-convenient forum than the United States. They say the overwhelming majority of the evidence is located in Ukraine and will be extremely difficult, if not impossible, to obtain.

Claimants link this difficult-to-obtain evidence to specific allegations in the Complaint: (1) the origination of purportedly fraudulent loans by a Ukrainian bank to Ukrainian entities (Compl. ¶¶ 36-76); (2) the transfer of such funds both within and outside Ukraine, including through PrivatBank accounts allegedly located in numerous other foreign nations (*id*. ¶¶ 77-84); (3) the organization and activities of the purported "electronic" credit committee at PrivatBank (*id*. ¶¶ 58-63); and (4) information concerning the routing of funds through PrivatBank Cyprus (*id*. ¶¶ 82-84).

Moreover, Claimants point out that Ukraine has issued a reservation to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial

Matters.[15] Specifically, Claimants contend that this reservation effectively precludes pre-trial discovery of documentary evidence, as the reservation says that Ukraine "will not execute letters of request issued for the purpose of obtaining pre-trial discovery of documents as known in common law countries."

Claimants also argue that they will not be able to compel the testimony of witnesses who refuse to voluntarily testify. In particular, they say a request for testimony through the Evidence Convention will still be dependent on the witness' willingness to cooperate with such a request (as Ukrainian authorities do not, in practice, seriously enforce foreign requests for judicial assistance), and even such voluntary testimony will take at least eight to nine months per witness, the minimum time it takes to schedule a hearing in a Ukrainian court to obtain witness testimony.

They argue that this factor supports their view that fairness justifies abstention or dismissal. *See, e.g., Ericson v. Wyndham Worldwide Corp.*, No. 12-20103, 2014 WL 11822749, at *5 (S.D. Fla. Feb. 28, 2014) (lack of compulsory process for the attendance of unwilling foreign witnesses "strongly" favors dismissal under the *forum non conveniens* doctrine); *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1332 (11th Cir. 2011) (factor favors dismissal); *Rosen*

---

[15]   Claimants rely on the declaration of Dmytro Marchukov, [ECF No. 78-8], to provide legal support for their arguments about obtaining evidence from Ukrainian witnesses and similar topics. His declaration (which also discusses other topics) describes him as a Partner and Head of Cross-Border Litigation at Integrites law firm in Kyiv. Marchukov's declaration explains that he is fluent in English and that the bulk of his practice is conducted in English. It also notes that Russian is his native language and that he is also fluent in Ukrainian.

*v. Execujet Servs. LLC*, 241 F. Supp. 3d 1303, 1309-12 (S.D. Fla. 2017) (favoring dismissal).

Moreover, Claimants explain, once a hearing is set, success in obtaining testimony still depends on the witnesses' willingness to cooperate because, if witnesses fail to do so, Ukrainian courts will not compel them, and the letter of request for testimony likely will be returned unexecuted. Claimants' expert, Marchukov, was unable to identify a single instance in which a Ukrainian court compelled an unwilling witness to cooperate with a foreign request for pre-trial testimony. Therefore, Claimants note, if a Ukrainian witness refuses to cooperate, then Claimants -- as well as Plaintiff -- will have no recourse.

There are other consequences which Claimants portray as unfair. For example, even if Claimants (or even the United States, for that matter) find a cooperative witness, any hearing may consist of a Ukrainian judicial officer reading written questions from the letter of request. Claimants say that their counsel cannot be assured they will be provided the opportunity to question the witness directly, or explore, clarify, challenge, or impeach the responses of an adverse witness through cross-examination. The end result of this laborious, expensive, and time-consuming process, which "may take well over a year," would (according to Claimants) be of little probative value and possibly inadmissible.

Claimants additionally contend that lack of access to pre-trial documents and limited testimony render proceeding with this lawsuit here in the Southern District of Florida highly impractical. As phrased by Claimants, in the face of such extraordinary

evidence-gathering obstacles, they would suffer overwhelming and prejudicial hardship in formulating and presenting a defense.

Beyond the problems Claimants say they will confront in obtaining pre-trial discovery, they also say they will endure overwhelming hardship presenting key witnesses *at trial*.

According to Claimants, a trial in this District will leave Claimants unable to ensure the testimony of, *inter alia*: (i) persons involved in the applications for the purportedly fraudulent loans submitted in Ukraine, (ii) Ukrainian employees, including members of the "electronic" credit committee involved in issuing those loans, (iii) employees of PrivatBank Cyprus involved in the purportedly fraudulent transfer of loan proceeds, (iv) employees of non-party foreign entities who allegedly participated in disbursing funds, or (v) persons involved in the lawful acquisition of U.S. assets outside of the United States.

These witnesses, Claimants note, are outside the Court's subpoena power, and Claimants have no means of compelling the appearance of any who decline voluntarily to travel to this District (or the United States at large) from around the world. *See Ericson*, 2014 WL 11822749, at *5 (dismissing, where "[the] [d]efendants have identified important witnesses that are outside this Court's compulsory process"); *Tazoe*, 631 F.3d at 1332 (dismissing because the "Southern District of Florida lacks the authority to compel certain witnesses to attend proceedings"); *Rosen v. Execujet Servs. LLC*, 241 F. Supp. 3d 1303, 1309-

12 (S.D. Fla. 2017) (dismissal "heavily" favored where "majority of the material witnesses in this action . . . would not be subject to compulsory process").

In response to Claimants' myriad illustrations concerning the convenience factor, the United States argues that the more-convenient factor is a red herring issue -- because a United States federal district court is the *only* forum in which the United States' forfeiture claims can be litigated and adjudicated.

Analogizing to the similar *forum non conveniens* doctrine, the United States points out that the initial issue in that doctrine is whether a more-convenient alternative forum is even available and adequate in the first place. *Tazoe* 631 F.3d at 1330. An alternative forum is available only if "the foreign court can assert jurisdiction over the litigation sought to be transferred." *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001).

The United States contends that *no* foreign court has jurisdiction over this action. It says that United States law unequivocally and exclusively vests the U.S. federal courts with jurisdiction over U.S. civil forfeiture actions. *See* 28 U.S.C. § 1355(a). And it argues that the United States cannot exercise its police powers, via civil forfeiture of criminal proceeds connected to U.S.-based money laundering, in any other forum.

As emphasized by the United States, the cause of action here is appropriately rooted in the United States. The money laundering offense occurred here. United States law authorizes forfeiture of the proceeds of that offense. And those proceeds are in the United States and not subject to the jurisdiction of the Economic Court *of Kyiv. See Rosen*

*v. Execujet Servs. LLC*, 241 F. Supp. 3d 1303, 1308 (S.D. Fla. 2017) ("An adequate alternative forum exists when the defendant is 'amenable to process' in the foreign forum.").

The United States stresses its view that there is no alternate forum that can adjudicate the forfeiture claims in this action, which means the "convenience" of this forum is an irrelevant and illusory factor.

Not surprisingly, Claimants disagree. They say [ECF No. 162, p. 2] the United States is "wrong in contending it must have an alternative forum in which it can pursue its claims that the NZF and ZFZ Loans were obtained illegally, as its allegations are based on purported violations of Ukrainian law, which is exclusively within the province of Ukrainian authorities and courts."

But the mere fact that Ukrainian law determines whether the loans were obtained through fraud does not necessarily mean that *only* Ukrainian courts can make those determinations in United States lawsuits involving Ukrainian law. To the contrary, United States courts regularly render decisions on foreign law. In fact, Federal Rule of Civil Procedure 44.1, entitled "Determining Foreign Law," provides, in relevant part, "[i]n determining foreign law, the court may consider any relevant material or sources, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence."

Moreover, even if a **foreign government** submits a brief on the construction of its own law, a federal court "should accord respectful consideration" to it, but it is "*not bound*

*to accord conclusive effect* to the foreign government's statements." Instead, the rule

instructs that the court's "determination must be treated as a ruling on a question of law."

*Animal Sci. Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 138 S.Ct. 1865, 1869 (2018)

(emphasis added).

In *Animal Sci. Prods.*, U.S.-based purchasers of vitamin C filed a class-action suit

against four Chinese corporations that manufacture and export the nutrient. The U.S.

purchasers alleged that the Chinese sellers had agreed to fix the price and quantity of

vitamin C exported to the United States from China, in violation of § 1 of the Sherman

Act, 15 U.S.C. § 1. More particularly, the U.S. purchasers stated that the Chinese sellers

had formed a cartel "facilitated by the efforts of their trade association," the Chamber of

Commerce of Medicines and Health Products Importers and Exporters ("Chamber").

The Chinese sellers moved to dismiss the U.S. purchasers' complaint on the

ground that Chinese law required them to fix the price and quantity of vitamin C exports.

Therefore, the Chinese sellers urged, they were shielded from liability under U.S.

antitrust law by the act of state doctrine, the foreign sovereign compulsion doctrine, and

**principles of international comity**. The Ministry of Commerce of the People's Republic

of China ("Ministry") filed a brief as *amicus curiae* in support of the Chinese sellers'

motion.

The Ministry's brief stated that the Ministry is "the highest administrative

authority in China authorized to regulate foreign trade," that the Chamber is "an entity

under the Ministry's direct and active supervision" and is authorized to regulate vitamin C exports, and that the conspiracy in restraint of trade alleged by the U.S. purchasers was in fact "a regulatory pricing regime **mandated** by the government of China."

So, not only did the Chinese Government take the position that the pricing was lawful under Chinese law, it represented that the sellers were legally required by the Chinese Government to use the challenged, allegedly illegal pricing scheme.

The Supreme Court held that the Court of Appeals erred in deeming the Chinese Government's submission binding and in not considering other relevant materials concerning the question of whether Chinese law required the Chinese sellers' conduct.

Although *Animal Sci. Prods.* is not directly on point, as the Ukrainian Government has not offered this Court opinions about the meanings of its laws through the filing of a brief or other submission here, the decision is nonetheless instructive about the broad authority which our federal Courts have to determine foreign law. The relevant takeaway is that our federal courts determine federal law and are not bound to a foreign government's submission about its own law (or, by analogy, to a foreign court's decision about that country's laws and how to interpret them in a specific factual context).

In addition, litigating this civil forfeiture lawsuit in the U.S. might be inconvenient but trying to litigate this civil forfeiture lawsuit in Ukraine is also problematic because Claimants have not established that the Court there can acquire jurisdiction over the *in rem* defendant in a civil forfeiture action.

48

Moving beyond the Government's initial argument that the Ukrainian Court cannot adjudicate this civil forfeiture claim (and that convenience therefore need not be evaluated at all), the Government's fallback position is that the United States forum *is*, in fact, convenient for Claimants. However, the United States does not make the argument that this forum is **more** convenient than Ukraine, which is the factor to be analyzed. Instead, it merely contends that a Southern District of Florida federal district court is convenient to Claimants -- without engaging in a *comparison*-type analysis which necessarily would have to be part of any determination of which forum is *more* convenient.

Nevertheless, overlooking this analytical shortfall for the moment, the Undersigned will outline the reasons asserted by the United States to support its theory that this district is convenient to Claimants.

The United States began this argument by noting that Claimants are U.S. based people and entities, which, according to the Government, makes their home forum "presumptively convenient." It cites *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981) for the proposition that, in a *forum non conveniens* analysis, "[w]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient."[16]

Its next point is to distinguish the case law authority relied upon by Claimants, noting that they "generally" involve foreign litigants. *See Tazoe*, 631 F.3d at 1321 (foreign

_____

[16]     The Court there ultimately granted dismissal on *forum non conveniens* grounds.

defendants); *Rivera de Chavon Dev. Grp. SRL v. Diaz*, No. 11-20662-CV, 2011 WL 5825770,

at *1 (S.D. Fla. Nov. 17, 2011) (plaintiff: Dominican Republic corporation).

The United States criticizes Claimants' focus on the purported logistical challenges

of discovery in Ukraine, arguing that they (or their owners) have access to the very

materials they say they need to obtain through discovery. For example, the United States

says, Optima's majority owners, Kolomoisky and Boholiubov, [20-cv-23279 ECF No. 1 ¶

89], have those documents -- they owned PrivatBank and perpetrated the fraudulent loan

scheme, *id.* ¶¶ 25-31, 36-38. Furthermore, the United States argues, they continued to own

Optima even after various reshuffling efforts. *Id.*; *see also id.* at ¶¶ 142, 152. Their

ownership of Optima is so central, in Claimants' view, that Claimants have asked the

Court to compel arbitration of the other civil forfeiture actions under the U.S.-Ukraine

Bilateral Investment Treaty ("U.S.-Ukraine BIT"). *See* [ECF No. 36 ("Kolomoisky and

Boholiubov are 66.67% beneficial owners [of Optima Ventures], thereby triggering the . .

. U.S.-Ukraine BIT.")].

The United States points to the history of the Ukrainian litigation to establish that

Claimants or their owners have access to Ukrainian documents. It notes that the actions

were filed there by Kolomoisky and Boholiubov's Ukrainian entities, NZF and ZFZ. [ECF

No. 11 at 38 ("Kolomoisky and Boholiubov . . . caused PrivatBank . . . to issue billions of

dollars in loans to companies they owned or controlled[,]" including NZF and ZFZ)].

The judgments which Claimants rely on for their abstention/dismissal motion relied on PrivatBank, NZF, and ZFZ documents submitted by Kolomoisky and Boholiubov's entities. *See, e.g.*, [ECF No. 137-1 at 40 (relying on "primary documentation provided by . . . Plaintiff to the court")]. Therefore, the United States posits, Claimants should have access to the documents they need through their owners and associates -- as Kolomoisky and Boholiubov **submitted them in the Ukrainian litigation**, and they will need them in the pending arbitration.

Thus, the United States accuses Claimants of adopting inconsistent positions. Specifically, it says, Claimants cannot, on the one hand, *benefit* from their Ukrainian collaborators' litigation in Ukraine, in which they submitted evidence, and the arbitration, in which they will submit evidence, and, on the other hand, tell this Court that they will be *inconvenienced* because they do not have access to that **same evidence** for this litigation.

Urging a practical and common-sense perspective, the United States notes [ECF No. 161, p. 6] that "most, if not all, civil forfeiture actions filed by the United States to forfeit proceeds of money laundering where the predicate crime occurred overseas … [involve] evidence (and likely substantial evidence) abroad." *See, e.g., United States v. All Assets Held at Bank Julius Baer & Co.*, 959 F. Supp. 2d 81, 84-86 (D.D.C. 2013) (seeking forfeiture of proceeds of money laundering predicated on crimes committed in Ukraine).

And, on a related note, the United States points out that United States law specifically contemplates lawsuits litigated in the United States based on crimes committed in other countries. *See* 18 U.S.C. § 1956(c)(7)(B) (criminalizing the laundering of proceeds of **foreign crime**, which will necessarily be litigated **in the United States**).

The United States' final point on the convenience factor is to argue that there is nothing unfair about inconvenience associated with discovery challenges if the challenges are borne by *both* parties. Here, both the United States and Claimants would be in the same situation -- i.e., no recourse -- if a Ukrainian witness refuses to cooperate.

On balance, the Undersigned deems this factor to be slightly in favor of the United States.

Possibility or Prejudice to Parties Caused by Abstention

Claimants take the position that the United States would suffer no discernible prejudice from a dismissal based on abstention -- a position the United States describes as "outlandish." They say the United States has an acute interest in avoiding infringement on Ukrainian sovereignty and preserving amicable foreign relations with Ukraine. And, Claimants say, the United States cannot come close to establishing that the Ukrainian proceedings are incapable of producing a "fair and just result." *Rivera de Chavon Dev. Grp. SRL v. Diaz*, No. 11-20662, 2011 WL 5825770, at *3 (S.D. Fla. Nov. 17, 2011) (dismissing lawsuit after concluding that fairness supports deference to proceedings in the Dominican Republic).

52

The United States argues that Claimants' assessment of what would and would not cause prejudice to the United States is fatally flawed because it is the United States, not Claimants, who best knows what is in the United States' interest concerning foreign affairs. The Government emphasizes that the Executive Branch is charged with conducting foreign relations, and its decision to file this civil forfeiture lawsuit is "evidence of its judgment that the delicate balance of foreign affairs would not be disturbed by the lawsuit." *One Gulfstream G-V Jet Aircraft,* 941 F. Supp. 2d at 10;[17] *see also* 3 LITIGATION OF INT'L DISPUTES IN U.S. COURTS § 15:1 (Feb. 2022 update) ("Efforts to assert comity as a defense to an action brought by the U.S. government, such as forfeiture, will normally **fail** as the executive itself has **already performed the balancing of interests analysis**." (emphasis supplied)).

As is evident from the language used, there is an overlap between the evaluation of prejudice to the parties under the fairness factor and the analysis used under the international comity doctrine.

---

[17] The Court in that *in rem* forfeiture action against a $38.5 million jet began its international comity analysis by noting that the doctrine has "no single definition," as it "summarizes in a brief word a complex and elusive concept." *Id*. at 8 (citing *Nippon Paper Indus.*, 109 F.3d at 8 ("[C]omity is more an aspiration than a fixed rule, more a matter of grace than of obligation.")). The Court rejected international comity as grounds for dismissal, noting that "the executive 'has **already done the balancing** in deciding to bring the case in the first place.'" (emphasis added) (quoting *United States v. Brodie*, 174 F. Supp. 2d 294, 306 (E.D. Pa. 2001)).

Nevertheless, without deciding whether there can *ever* be a situation where international comity or fairness can justify an abstention-based dismissal when the United States is itself the plaintiff, the Undersigned finds that abstention here under "fairness" grounds would be inappropriate because the Executive has already balanced the relevant factors when deciding as a threshold matter to bring this forfeiture lawsuit in the first place. *Cf. United States v. Portrait of Wally, a Painting By Egon Schiele*, No. 99 Civ. 9940, 2002 WL 553532, at *10 (S.D.N.Y. Apr. 12, 2002) (rejecting international comity argument in *in rem* civil forfeiture complaint after noting that the United States has a strong interest in enforcing its own laws as applied to conduct on its own soil and after further explaining the United States courts will not yield in the name of comity "if doing so conflicts with the law or policy of the United States").

In my view, the fairness factors do not outweigh the more-important reality that the United States has itself already weighted the appropriate factors and decided that it is in its best interest to pursue this civil forfeiture lawsuit and not defer to the still-on-appeal rulings made by Ukrainian courts in actions in which none of the parties in this case are parties in the actions in the Ukraine.

However, for the purposes of creating a complete record, the Undersigned finds that the first fairness factor (the order in which the actions were filed) favors the United States, as this forfeiture lawsuit was filed first.

The second fairness factor (which forum is more convenient) favors the United States because it is far from clear that a Ukrainian court can adjudicate this *in rem* civil forfeiture action, which means that it may well not be an available forum, which, in turn, means that the convenience-comparison assessment is unnecessary.

I also find that the third factor, possible prejudice caused by abstention, is not neutral (even though *both* parties would encounter similar difficulty in compelling the production of documents and trial testimony). Instead, the balance on this factor tips in favor of the United States, which would probably not have an alternate forum for adjudicating whether the *in rem* property is subject to forfeiture under U.S. law.

Although some of the Government's rhetoric could be faulted for being overly dramatic, the legal principle underlying its presentation is sound: "There can be no greater prejudice to the United States than nullifying the statutes that empower the United States to safeguard, using civil forfeiture, the integrity of the U.S. financial system from the laundering of foreign criminal proceeds in the United States." [ECF No. 161, p. 7].

Thus, the fairness factors, on balance, favor the United States.

## Judicial Efficiency

Claimants contend that the efficient use of scarce judicial resources militates in favor of deferring to the Ukrainian proceedings. Criteria relevant to efficiency include (1) the inconvenience of the federal forum; (2) the desirability of avoiding piecemeal

litigation; (3) whether the actions have parties and issues in common; and (4) whether the alternative forum is likely to render a prompt disposition. *See Turner Ent.*, 25 F.3d at 1522.

The convenience (or inconvenience) factor has already been discussed and will not be repeated.

Claimants argue that dismissal of this case would avoid problems associated with piecemeal litigation. They raise three arguments for this point: (1) based on *Turner Ent.* (25 F.3d at 1522), Claimants say that if both proceedings continued, the "courts' calendars would need to be synchronized and the litigation would have to move back and forth across the Atlantic"; (2) our district is a "very busy" one; and (3) the issues to be resolved in the cases here and in Ukraine are too similar for this Court to "justify expending its resources to manage a case clearly suited for the Ukrainian courts."

On the fourth and final factor, Claimants' motion says simply, and in a wholly conclusory way, that "Ukrainian courts are as likely as the American forum to render a prompt disposition."

Relying first on the position it articulated earlier, the United States underscores its view that there is no other available forum for this lawsuit. Moreover, it also argues that a decision by the Ukrainian courts in Claimants' favor would not *resolve* this case. Instead, the United States says, it would, at most, be *evidence* to be *considered* here during the evaluation of whether the Defendant property is subject to forfeiture.

In a related argument, the United States says the issue of whether the Ukrainian courts would issue a prompt decision is immaterial because those decisions will not dispose of this forfeiture action.

And the United States contends that there is no risk of piecemeal litigation because no other court is considering the causes of action of key legal issues involved here, such as whether there were violations of U.S. anti-money laundering laws, and whether the Defendant Asset is subject to forfeiture.

The promoting judicial efficiency theme is, in my view, when compared to the other major frameworks, relatively unconvincing. Predicting when the Ukrainian courts would adjudicate the pending appeal is, at bottom, a speculative guess. This district might be "busy," but Claimants have not submitted any statistics or other authority suggesting that the workload is so substantial that it militates in favor of abstention or dismissal of a case filed by the United States.

Furthermore, Claimants have not established that a ruling by the Ukrainian courts would be *binding* here, as opposed to being only evidence in the lawsuit.

Most significantly, at least for this final factor of preserving judicial resources, Claimants have not made a convincing argument that there is an alternative forum for this *in rem* civil forfeiture lawsuit. If there is no alternative forum, then it is illogical to weigh the inconvenience associated with a lawsuit here with the inconvenience involved in a forfeiture claim being litigated in Ukraine.

Claimants have not demonstrated how the United States can exercise its police and law enforcement powers through the civil forfeiture of proceeds associated with a U.S.-based money laundering scheme in Ukraine. United States law authorizes forfeiture of the proceeds of that alleged offense, and those proceeds (generated from the sale) are in the United States.

On balance, the judicial resources approach favors the United States' position that this *in rem* civil forfeiture lawsuit not be dismissed or subject to an abstention Order.

**Should the Complaint Be Dismissed for Failure to State a Claim?**

Applicable Pleading Standard

Civil forfeiture complaints are governed by the heightened *in rem* forfeiture pleading standards set forth in the Supplemental Rules for Certain Admiralty or Maritime Claims & Asset Forfeitures ("Supplemental Rules"). *See United States v. Fifty Seven Thousand, Four Hundred & Forty-Three Dollar*s, 42 F. Supp. 2d 1293, 1303 (S.D. Fla. 1999), *aff'd sub nom. United States v. Fifty-Seven Thousand, Four Hundred*, 240 F.3d 1077 (11th Cir. 2000).

Due to the "drastic nature of forfeiture actions," the standard is "more stringent . . . than the liberal provisions of Fed. R. Civ. P. 8." *United States v. Certain Accounts, Together with All Monies, etc.*, 795 F. Supp. 391, 394 (S.D. Fla. 1992). Supplemental Rule E(2) requires that "[t]he complaint shall state the circumstances from which the claim arises with such **particularity** that the defendant or claimant will be able, without moving for a more

definite statement, to commence an investigation of the facts and to frame a responsive pleading." *United States v. $1,399,313.74 in U.S. Currency*, 591 F. Supp. 2d 365, 369 (S.D.N.Y. 2008) (emphasis added). The rule "contains no exceptions to this requirement." *United States v. $38,000 in United States Currency*, 816 F.2d 1538, 1548 (11th Cir. 1987) (dismissing complaint without prejudice under Rule E(2)).

Further, Supplemental Rule G(2) requires that a forfeiture complaint "state sufficiently detailed facts to support a reasonable belief that the [G]overnment will be able to meet its burden of proof at trial" -- namely, a preponderance of the evidence. *See United States v. $1,370,851.62 in United States Currency, Seized From Total Bank Account No. XXXXXXXXXX*, No. 09-21277, 2009 WL 10712511, at *1 (S.D. Fla. Aug. 13, 2009) (dismissing forfeiture complaint for lack of "sufficiently detailed facts"); 8 U.S.C. § 983(c)(1) (increasing burden of proof from probable cause to a preponderance standard).

On the other hand, "there is no requirement that *all* of the facts and evidence at the [G]overnment's disposal be pled in the complaint; the [G]overnment must simply plead enough specific facts for the claimant to understand the [G]overnment's theory, file a responsive pleading that contains more than a general denial, and undertake her own investigation." *United States v. All Funds on Deposit in Dime Sav. Bank of Williamsburg Acct. No. 58-400738-1 in the Name of Ishar Abdi & Barbara Abdi*, 255 F. Supp. 2d 56, 69 (E.D.N.Y. 2003) (emphasis in original) (citation omitted); *see United States v. U.S. Currency, in Amount of $150,660.00*, 980 F.2d 1200, 1204–05 (8th Cir. 1992) ("Rule E(2)(a) does not require the

[G]overnment to meet, at the pleading stage, its ultimate trial burden.").

<u>Does The Complaint Identify a Cognizable *in Rem* Defendant?</u>

The *in rem* Defendant named in the lawsuit is the "rights" of Optima CBD Investments (a Delaware limited liability company) and/or CBD 500 LLC (a Delaware limited liability company) in PNC Corporate Plaza Holdings LLC, another Delaware limited liability company. The name of the Defendant states that the rights at issue *include* any interest "held or secured by the real property and appurtenances located at 500 West Jefferson Street, Louisville, KY 40202." Claimants argue that this is "impermissibly ambiguous and requires dismissal." They further contend that the United States is actually proceeding against the personal interests of individuals, that those interests lack a substantial connection to a crime and that the Government's strange jurisdictional approach cannot fulfill the *in rem* fiction that the Defendant property is itself guilty of a crime.

The Undersigned is not convinced that the United States' jurisdictional theory is a sound one, for reasons outlined below. Therefore, the Undersigned recommends that Judge Gayles dismiss the forfeiture complaint with leave to amend.

*In rem* civil forfeiture lawsuits typically name the real property itself as the defendant. That is the standard approach. The approach here is atypical: It seeks to forfeit the interest which an entity has in another entity which owns real property. Of course, the mere fact that this is an atypical defendant for an *in rem* forfeiture action does not

necessarily mean it is impermissible.

Given the nature of the challenge, it is appropriate to first start with a basic primer on forfeiture law.

As a threshold matter, "a federal court must also have *in rem* jurisdiction over the defendant property." *$389,820.00 in United States Currency*, 829 F. App'x 488, 490 (11th Cir. 2020). No party here has challenged the fundamental rule that "[t]he suit is brought not against a person or corporation, but against defendant property that allegedly has been involved in criminal activity." *United States v. All Funds Distributed to Weiss*, 345 F.3d 49, 55 (2d Cir. 2003).

"It is the property which is proceeded against, and, by resort to a legal fiction, held guilty and condemned as though it were conscious instead of inanimate and insentient." *Waterloo Distilling Corp. v. United States*, 282 U.S. 577, 581 (1931) (distinguishing an *in rem* civil forfeiture proceeding from an *in personam* criminal proceeding against a defendant person); *see also United States v. Ursery*, 518 U.S. 267, 275 (1996) (in an *in rem* forfeiture proceeding, "it is the property which is proceeded against") (citing *Various Items of Personal Property v. United States*, 282 U.S. 577, 581 (1931)); *United States v. $389,820.00 in United States Currency*, 829 F. App'x 488 (11th Cir. 2020) (federal court must have *in rem* jurisdiction over the defendant property); *United States v. Approximately $3,275.20 seized from Bank of America Account Number XXXXXXXXXXX*, No. 21-20614, 2022 WL 910665, at *1 (S.D. Fla. Mar. 29, 2022) ("Because an *in rem* action proceeds against property, rather

than a claimant, each claimant must 'make[ ] a valid claim that he has a legally cognizable interest in the property that will be injured if the property is forfeited to the [G]overnment.'").

18 U.S.C. § 981(a)(1)(A) authorizes forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property." Section 981(a)(1)(C) similarly authorizes forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" a range of specified unlawful activities.

Section 981(a)(2)(A) defines "proceeds" as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto."

Based on the plain statutory text, section 981 therefore authorizes forfeiture of a wide range of property.

The question, then, is whether the specific, albeit untraditionally listed property interests, named here fall within that definition.

Numerous courts have held that intangible "interests" constitute forfeitable property for purposes of an *in rem* proceeding. *See, e.g., United States v. Obaid*, 971 F.3d 1095, 1106 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 73 (2021) (shares of stock); *United States v. One-Sixth Share of James J. Bulger in all Present and Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36 (1st Cir. 2003) (an interest in as-yet-unknown lottery ticket

winnings).[18]

In *United States v. 105,800 Shares of Common Stock of FirstRock Bancorp, Inc.*, 825 F. Supp. 191, 192 (N.D. Ill. 1993), the Government sought to forfeit "shares of common stock . . . in FirstRock Bancorp, Inc. . . ., a holding company for First Federal Savings Bank." The claimants disputed the circumstances of the share issuance, challenging the legitimacy of the shares, and moved to dismiss. The court denied the motion, noting the "well-established law" that "a certificate of stock is not the stock itself," and that the intangible asset of the interest in the company could be forfeited. *Id*. at 194.

Similarly, in *United States v. Proceeds from Sale of a Condo. Located at Ritz Carlton in Los Angeles, California*, No. SACV151110JVSDFMX, 2018 WL 6016912, at *1 (C.D. Cal. Jan. 31, 2018), the United States sought forfeiture of, among other things, "4,275 shares in Solution Strategies International, Inc. . . . held in the name of Janet Lim Napoles." The court ultimately entered a default judgment in that case, allowing the Government to forfeit Napoles's interest in the company.

In *United States v. All Assets Held in Acct. No. XXXXXXXX in Name of Doraville Properties Corp.*, 299 F. Supp. 3d 121, 124 (D.D.C. 2018), the Government sought forfeiture

---

[18]     In that case, the United States sought to forfeit a one-sixth right to lottery payments acquired by the gang leader Whitey Bulger when he purchased a share of a lottery "season ticket" that won a $14 million jackpot and entitled him to annual installment payments for twenty years. The First Circuit analogized the interest in the lottery ticket to *shares of stock* in a company, finding that there was "no meaningful difference" between the two. *Id.* at 44-45. The court concluded that it could exercise jurisdiction over an "intangible res," including "the right to receive future dividends." *Id.*

of a range of intangible assets, including investment portfolios named by reference to the funds to which they could be traced, such as "all assets held in the investment portfolio of Blue Holding (1) PTE. Ltd., on behalf of or traceable to Ridley Group Limited, [a]nd/[o]r the Ridley Trust at James Hambro & Partners LLP and all interest, benefits, or assets traceable thereto." The United States also sought forfeiture of corporations in that action, such as "Doraville Properties Corporation, [a] British Virgin Islands Corporation, together with its assets and all property traceable thereto." *Id*.

The United States has sought forfeiture of corporate interests and assets in other cases involving intangible assets, as well. *See, e.g., United States v. Charles M. Hallinan*, 2:16-cr-00130-ER (E.D. Pa. Jan. 29, 2022), D.E. 697 (forfeiting "[a]ll equity interest in Whetstone entities held by Charles Hallinan, CapFunding, and Fast Business Funding"); *United States v. Susan K. Harris et al*, 1:17-cr-01836-MV (D.N.M. Sept. 29, 2021) (forfeiting "[a]ll interest in and assets of, and any and all funds in accounts owned, held, controlled, maintained, or held in trust for third parties by[] the following: Ayudando Advocacy, Inc., Ayudando Alpha, Inc., Ayudando Enterprises, Ltd., Ayudando Guardians, LLC, Ayudando Guardians, Inc.").

Here, the United States seeks the forfeiture of the 95% stake in PNC Corporate Plaza Holdings LLC -- the entity created to own PNC Plaza -- held by Optima CBD Investments LLC and Optima CBD 500 LLC. The Government explains that it chose to forfeit that interest in the building, rather than the building itself (which would have been

the more-typical approach, because (1) there was a pending sale when it brought the forfeiture action, and (2) an action against the building itself would likely have disrupted that sale, including by prejudicing the rights and interests in the company and the property of the third-party investor. *See* [20-cv-23279, ECF No. 1 ¶¶ 157-58].

Those may well be practical and strategic reasons for naming an intangible asset as the *in rem* defendant, rather than naming the real property itself as the defendant.

"A plaintiff is the master of his own complaint." *Mordi v. Zeigler*, 870 F.3d 703, 707 (7th Cir. 2017). But the question is whether the United States has the legal authority to name the type of intangible asset it named here, in the specific and unusual way it did here, rather than the more-traditional approach of naming the real property itself.

Evaluating the propriety of the United States' approach can be assisted with an overview of what actually is going on, from a common-sense, practical perspective.

Claimants contend [ECF No. 155, p. 2] that the United States "really wants to forfeit real property", which is not actually named as the *in rem* defendant. That true intention has been revealed on numerous occasions, including in the lis pendens filed shortly after litigation commenced. *See* [20-cv-23279, ECF No. 9]. The lis pendens states that "the United States of America filed a Complaint . . . seeking the **forfeiture** of **Real Property** located at 500 West Jefferson Street Louisville, Kentucky, 4020[.]" *Id.* (emphasis in original) (hereinafter "PNC Plaza").

65

Moreover, the official Department of Justice press release bears the headline "Justice Department Seeks **Forfeiture** of **Two Commercial Properties** . . . [.]" (emphasis supplied). The questionable naming of the Defendant Asset was further revealed when the United States sought an *Ex Parte* Order [20-cv-23279, ECF No. 5]. In its *Ex Parte* Motion, the United States identified Supplemental Rule G(7) as the basis for the Court "to approve the sale of a defendant asset . . . and place the proceeds of such sale in an account maintained by the United States pending the conclusion of the forfeiture action." [20-cv-23279, ECF No. 4, pp. 5-6].

But Rule G(7) applies to the "defendant property" and the United States admits it did not sell the defendant property (i.e., the interest of an LLC in another LLC); *real estate* (which is not the Defendant property) was sold. *See* [ECF No. 145, at 86:22-87:1 (DOJ attorney admitting the United States "didn't sell the right, title, and interest of Corporate Plaza Holdings LLC held by [the CBD Entities]" instead "the **real estate** was sold") (emphasis added)].

Confronted with this problematic procedural history (real estate was sold even though it is not named as the defendant property in this *in rem* forfeiture case), the United States now claims that the interlocutory sale "was not a sale organized or overseen by the United States" but rather "a private transaction . . . **without the involvement of the United States.**" [20-cv-23278, ECF No. 150, p. 2 (emphasis added)].

But that is simply not accurate.

The United States not only oversaw the sale, it was intimately involved and coordinated closely with the parties -- the title company, the purchaser, and the Claimants. In fact, the title company expressly stated, "The DOJ has confirmed that this [sale] arrangement is acceptable and that we are authorized to fund tomorrow on this basis" and "The DOJ is signed off and has authorized closing to occur today."

In addition, in a November 16, 2020 email, the National Underwriting Counsel advised others involved in the closing that "We provided the attached 3 invoices (for attorney's fees from different law firms) to the DOJ in support of the Seller's proposed disbursements" but the "DOJ advised: 'Please remove all three of those disbursements; we do not consent to any of them.'[19] We are updating the Closing Statement accordingly." [ECF No. 155-4, pp. 1-2 of 9 (footnote added)].

Later that same day, the DOJ attorney responded in writing, in the affirmative, to the following request: "Please confirm that as per our discussion this afternoon, and notwithstanding the DOJ's earlier assertion … that no legal fees would be payable out of closing proceeds, the DOJ has authorized the payment of my firm's legal fee but has refused to consent to the payment of the other two invoices attached hereto." *Id.* at p. 1 of 9.

---

[19]     One of the invoices submitted was from the Black Srebnick firm, counsel to the Claimants in this *in rem* civil forfeiture case. [ECF No. 155-4, p. 2 of 9].

In other words, the DOJ was directing the allocation of proceeds from the sale of real estate even though the only forfeiture complaint it filed seeks to forfeit the interest of an LLC in another LLC -- i.e., not the actual real property being sold.

In addition, although the United States did not produce the closing statement in response to the Court's Post-Hearing Administrative Order directing the filing of documents concerning the sale[20], [ECF No. 143], the DOJ attorney himself signed it on a page entitled "Approved [a]nd Accepted." Before DOJ counsel did so, the National Underwriting Counsel involved in the closing circulated an email to other attorneys and participants, saying "We confirm that we are providing [the draft Closing Statement] to the DOJ for review, so they can provide their final closing/escrow instructions." [ECF No. 155-4, p. 8 of 9].

The closing statement defined the "Property" as "500 West Jefferson Street, Louisville, KY 40202," (Ex. 2, at 1), and so did the Purchase and Sale Agreement. *See* [ECF No. 150-2]. But, as noted several times, the United States did not bring this civil forfeiture case against PNC Plaza, the real estate at 500 West Jefferson Street, Louisville, Kentucky.

---

[20]    The Undersigned's Post-Hearing Administrative Order did not specify that the closing statement itself must be filed. It did, however, require the United States to file "copies of **all communications** between the United States and the interlocutory sale purchaser, including communications with the purchaser's attorney or agent, concerning the specific description of the property being sold in the interlocutory sale and the nature of the property interest being conveyed." [ECF No. 143, pp. 3-4 (emphasis added)].

On November 17, 2020, DOJ counsel wrote an email to other attorneys involved in the sale of the real estate and said: "Per the closing statement (which the DOJ attorney presumably had), the funds **will be held** in an account in the name of the U.S. Marshal's Service. **I** will let **you** know once I've received confirmation that the funds have been received by wire." [ECF No. 155-5, p. 2 of 22 (emphasis added)].

The United States has not convinced the Undersigned that its decision to pursue an unorthodox forfeiture strategy did not result in a jurisdictional defect arising from the naming of an incorrect *in rem* defendant. By choosing to not name the real property as the *in rem* Defendant, the United States has, in effect, opted to pursue what seems more like an *in personam* action or perhaps a *quasi in rem* claim.

Civil forfeiture is predicated upon *in rem* jurisdiction. *See $389,820 in U.S. Currency*, 829 F. App'x at 490; Supp. Rule G (the Government must plead "grounds for . . . in rem jurisdiction over the defendant property"). "An essential characteristic, however, of a proceeding *in rem* is that there must be a *res* or subject-matter upon which the court is to exercise its jurisdiction." *Overby v. Gordon*, 177 U.S. 214, 221 (1900).

Civil forfeiture is "not an action against the claimant[.]" *$38,000.00 Dollars in U.S. Currency*, 816 F.2d at 1543 n.12. There is a "sharp distinction between *in rem* civil forfeitures and *in personam* civil penalties[.]" *United States v. Ursery*, 518 U.S. 267, 275 (1996). "A judgment in personam imposes a personal liability or obligation on one person in favor of another." *Hanson v. Denckla*, 357 U.S. 235, 246 n.12 (1958).

An *in rem* civil forfeiture action cannot be an *in personam* action, which asserts "jurisdiction over a defendant's personal rights, rather than merely over property interests." *Cap. Yacht Club v. Vessel AVIVA*, No. 04-0357, 2006 WL 2792679, at *1 n.1 (D.D.C. Sept. 27, 2006). Nor can a civil forfeiture be a *quasi in rem* action. *See United States v. Obaid*, 971 F.3d 1095, 1101 (9th Cir. 2020) (explaining that "there is no dispute" that civil forfeiture does not involve the *quasi in rem* proceedings contemplated by *Shaffer*,[21] in which the "action is not really against the property; rather, the action involves the assertion of a personal claim against the defendant of the type usually advanced in an *in personam* action.").

Unlike a judgment *in rem*, which proceeds against property and binds the world, "[a] judgment *quasi in rem* affects the interests of **particular** persons in designated property," *Hanson*, 357 U.S. at 246 n.12 (emphasis added), and "[t]he action is not really against the property; rather, the action involves the assertion of a personal claim against the defendant of the type usually advanced in an *in personam* action[.]" *Obaid*, 971 F.3d at 1099.

By proceeding against all of the CBD Entities' "right to and interest" in PNC LLC, the United States is, in effect, seeking to forfeit their "personal rights," *AVIVA*, 2006 WL 2792679, at *1, and to affect their particular "interests . . . in designated property," *Hanson*, 357 U.S. at 246 n.12, -- namely the real estate known as PNC Plaza.

---

[21]     *Shaffer v. Heitner*, 433 U.S. 186 (1977).

In a very real way, this civil forfeiture case appears to be an *in personam* proceeding, or, at most, a *quasi in rem* matter. In fact, the DOJ attorney explained, at the hearing, that "seizing the Claimants' rights who are the ones that are involved in the laundering activity[,] seizing their rights is effectively what this forfeiture is about." *See* [ECF No. 145, at 87:21-88:1].

The United States seems to have based its forfeiture case here on the alleged prior conduct of the CBD Entities' individual owners -- Mordechai Korf and Uriel Laber -- which predated the existence of the CBD Entities. At the hearing, the United States explained that it is seeking to forfeit the CBD Entities' rights and interests, because at the bottom of the corporate chain (a company not named as a defendant) owns PNC Plaza and because a prior corporation that Korf and Laber held minority interests in previously owned PNC Plaza.

So, according to the United States, it can forfeit the CBD Entities' rights and interests because PNC Plaza went "from one hand of the same parties to the other hand" and "[Korf and Laber] stood on both sides of that transaction." [ECF No. 145, at 80:21-81:17]. This theory effectively claims that Korf and Laber are personally culpable, based on prior acts -- but civil forfeiture is "not an action against the claimant [owner]." *$38,000.00 Dollars in U.S. Currency*, 816 F.2d at 1543. Here, the United States seems to hinge its claim on *in personam* reasoning.

At the hearing, the United States referenced Claimants' Opposition to the Motion to Strike to bolster its argument that the *rem* is like stock. But that is not how the United States defined the defendant-*in-rem*. The United States seeks to forfeit "all right to and interest in [PNC LLC] held, controlled, or acquired, directly or indirectly, by the [CBD Entities]" including "any interest held in or secured by" the real property known as PNC Plaza, "any right to collect and receive profit, rent, income and proceeds therefrom," and "any interest derived from the proceeds invested in [PNC LLC]." That definition would effectively wipe CBD 500 LLC out as a member of PNC LLC (no management rights or ability to control PNC LLC, etc.).

Moreover, limited liability company interests of Delaware LLCs are not "effectively shares of stock," as the United States contends. Ownership interests in a Delaware LLC are not readily transferrable and cannot be attached or executed upon. *See* Del. Stat. Title 6, 18-703(d)-(e), which is part of Delaware's Limited Liability Company Act.[22]

---

[22]   Subsection (d) provides: "The entry of a charging order is the exclusive remedy by which a judgment creditor of a member or a member's assignee may satisfy a judgment out of the judgment debtor's limited liability company interest and attachment, garnishment, foreclosure or other legal or equitable remedies are not available to the judgment creditor, whether the limited liability company has 1 member or more than 1 member."

Subsection (e) provides: "No creditor of a member or of a member's assignee shall have any right to obtain possession of, or otherwise exercise legal or equitable remedies with respect to, the property of the limited liability company."

Further complicating the question of whether the United States named the correct *in rem* defendant and whether the property sold under its supervision was different than the property named as an *in rem* defendant is the United States' description of the sale as an interlocutory sale. Interlocutory sales have specific procedural requirements.

For example, Supplemental Rule G(7)(b)(iii) (Interlocutory Sale or Delivery) provides that the sale is governed by 28 U.S.C. §§ 2001, 2002, and 2004, "unless all parties, with the court's approval, agree to the sale, aspects of the sale, or different procedures." In the instant case, there was a motion to vacate and a dispute.

The United States did not follow the procedures. The United States contends that the sale was a private one, without its "involvement." 28 U.S.C. § 2001 authorizes a private sale, but it provides, *inter alia*, that:

> Before confirmation of any private sale, the court shall appoint three disinterested persons to appraise such property or different groups of three appraisers each to appraise properties of different classes or situated in different localities. No private sale shall be confirmed at a price less than two-thirds of the appraised value. Before confirmation of any private sale, the terms thereof shall be published in such newspaper or newspapers of general circulation as the court directs at least ten days before confirmation.

Those steps did not occur.

The United States recently advised, in response to an Order requiring background on the sale, that "this was not a typical, court-ordered interlocutory sale." *See* [ECF No. 150, p. 2].

So this was not a typical interlocutory sale in an *in rem* civil forfeiture case. The naming of an incorrect defendant largely contributed to the unusual aspects of the sale.

At bottom, the United States tried to fit a square peg into a round jurisdictional hole but was unable to accomplish the process smoothly.

Given this jurisdictional defect, the Undersigned **respectfully recommends** that Judge Gayles **dismiss this lawsuit without prejudice**, giving the United States leave to amend. [In a post-hearing memorandum, [ECF No. 153, p. 12], the United States explained that it would amend the Complaint to seek forfeiture of the **proceeds of the sale of PNC Plaza itself** if the Court determines that the Complaint is flawed. It explained that the amendment would cure any defect "because it would name the proceeds of the sale of the real property which is directly traceable to fraudulently obtained and embezzled funds from PrivatBank."].[23]

<u>Did the Verified Complaint Adequately Trace the Tainted Proceeds?</u>

Claimants contend that the judgments by the Ukrainian courts "refute" [ECF No. 78, p. 16, n.7] the United States' "core allegations" that the funds used to purchase PNC Plaza are traceable to alleged fraud or misappropriation. Therefore, they argue, the

---

[23]     Where a court determines that a forfeiture complaint is inadequate in some respect, "it should . . . dismiss[] the complaint with leave to amend." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala.*, 941 F.2d 1428, 1442 (11th Cir. 1991); *see also United States v. Certain Accts., Together With all Monies on Deposit Therein*, 795 F. Supp. 391, 399 (S.D. Fla. 1992) (dismissing claims but granting the Government leave to amend).

United States has failed to allege "sufficiently detailed facts" to support a reasonable belief that it will prove the existence of any underlying conduct.

But Claimants are confusing a purported lack of adequate evidence (which might cause them to prevail on a summary judgment motion or at trial) with the pleadings standard being used now -- i.e., does the Complaint adequately *allege* what is necessary to state a claim. It may well be that the Ukrainian judgments will be evidence submitted in support of a summary judgment motion and it may well also be that the United States does not have sufficient evidence to back its allegations. But those potential scenarios do not help us determine whether the Complaint's *allegations* are adequate. *See Kuba v. Disney Fin. Servs.*, LLC, No. 6:21-CV-312-JA-LRH, 2021 WL 3269248, at \*2 (M.D. Fla. July 30, 2021) ("In assessing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), 'the Court must accept the allegations in the complaint as true and construe them in the light most favorable to the plaintiff.'" (quoting *Henley v. Payne*, 945 F.3d 1320, 1326 (11th Cir. 2019)); *Spigot, Inc. v. Hoggatt*, No. 218CV764FTM29NPM, 2020 WL 1955360, at \*6 (M.D. Fla. Apr. 23, 2020) ("While defendants dispute the accuracy of these allegations, these factual disputes are for another day. . . . [A] motion to dismiss is not the vehicle to resolve questions of fact[.]" (citations and internal quotation marks omitted)); *Am. Metabolic Testing Labs., Inc. v. Alfa Wassermann Diagnostic Techs., LLC*, No. 17-CV-60119, 2017 WL 7794346, at \*3 (S.D. Fla. July 7, 2017) ("[T]he truth or existence of a fact as alleged is an issue not properly resolved at the motion to dismiss stage.") (citation

omitted).

The specific forfeiture authority invoked for Count 1 of the Verified Complaint, 18 U.S.C. § 981(a)(1)(C), subjects to forfeiture "any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of" these specific unlawful offenses.

Claims 2 through 8 allege forfeiture under 18 U.S.C. § 981(a)(1)(A), which makes forfeitable any property "involved in a transaction or attempted transaction in violation of" the money laundering laws "or any property traceable to such property." For both types of forfeiture -- "involved in" or traceable proceeds -- a substantial connection, or nexus, must exist between the defendant property and the alleged criminal offense, and the Government must meet this burden by a preponderance of the evidence, even at the pleading stage. 18 U.S.C. §§ 983(c)(1) & (3).

Claimants' argument can be outlined as follows:

The gist of the Verified Complaint is the allegation that $13 million of the $77 million purchase price of PNC Plaza in 2011 was derived from a "foreign bank fraud" by the two then-majority shareholders of PrivatBank. However, the United States makes no effort to trace the alleged specified unlawful Ukrainian bank funding (i.e., the $13 million from 2011) into any bank account, much less into any bank account associated with the ownership of PNC Plaza, either at the time of the 2011 acquisition, or at the time of the 2018 and 2020 resales.

According to Claimants, there is no legal or factual assertion in the Verified Complaint that the 2018 and 2020 ownership of PNC Plaza or even any related bank account is derived from, or traceable to, the specified unlawful activity in Ukraine in 2011.

To the contrary, the Verified Complaint alleges that, in 2018, the original financing of the PNC Plaza acquisition from 2011 was "extinguished" as part of foreclosure proceedings in Kentucky state court. [ECF No. 1 at ¶¶ 138, 149]. At that time, the "promissory note" was purchased by "Firm A." *Id.* at ¶ 146. The Complaint expressly disavows any connection between Firm A and the prior Ukrainian financing. *Id.* at ¶ 139 n.10 (admitting that Firm A is an "unrelated third-party investor, which, on information and belief, had no connection to the Optima Family of companies or Kolomoisky and Boholiubov's misappropriation scheme from PrivatBank").

Thus, Claimants say, as of 2018, the original financing was "extinguished" in foreclosure proceedings, which was accomplished by a purchase by a new entity, Firm A, wholly unrelated to PrivatBank. *Id.* at ¶¶138, 149. The extinguishment of the original alleged Ukrainian financing was further compounded by Firm A's agreement in late 2019, implemented in 2020, to buy PNC Plaza in its entirety using its own monies. *Id.* at ¶ 157.

Moreover, as described by Claimants, though the Verified Complaint alleges that certain funds used to repurchase the property out of foreclosure in 2018 are derived from Felman, it does not -- and cannot -- allege that such funds are derived from misappropriated PrivatBank funds, let alone traceable to the original 2011 PrivatBank

funds identified as being derived from specified unlawful activity.

To summarize Claimants' construction of the Verified Complaint's factual allegations, because the Government cannot establish that the financing of the transactions involving PNC Plaza in 2018 or 2020 originated from the alleged specified unlawful PrivatBank proceeds in 2011, there is no substantial connection between the property and the alleged offense. Claimants argue that the failure to trace ownership of PNC Plaza to funds derived from specified unlawful activity and the failure to demonstrate a substantial connection to specified unlawful activity is fatal to any Government tracing claim.[24]

The United States provides a fact-specific response to Claimants' arguments. Before doing so, however, it highlights the fact that the forfeiture statute does not limit

---

[24]    Claimants assert another purported pleadings defect with the Verified Complaint: they say it also fails to plead a substantial connection between the alleged loans issued in Ukraine in 2010 and 2011 and the rights and interests of Optima CBD Investments LLC and CBD 500 LLC in PNC Corporate Plaza Holdings LLC. They highlight that neither Optima CBD Investments LLC, CBD 500 LLC, nor PNC Corporate Plaza Holdings LLC even *existed* in 2011. In addition, the funds used by Optima CBD Investments LLC, CBD 500 LLC, and PNC Corporate Plaza Holdings LLC to purchase PNC Plaza out of foreclosure came from *separate* money, i.e., from Felman. Claimants proclaim that none of the money provided by Felman is alleged to be traceable to the 2010 and 2011 loans.

Therefore, Claimants posit, the failure to connect or trace Optima CBD Investments LLC, CBD 500 LLC, and PNC Corporate Plaza Holdings LLC back to the alleged specified unlawful 2010 and 2011 loans in Ukraine fails to meet the requirement of "a substantial connection between the property and the offense," let alone of "stating sufficiently detailed facts to support a reasonable belief that the [G]overnment will be able to meet its burden of proof at trial." Supplemental Rule G(2).

forfeiture to property that was **directly** purchased with tainted funds; rather, it authorizes forfeiture of property "involved in" or "traceable to" property involved in a money laundering transaction, and property "which constitutes or is derived from proceeds traceable to" specified unlawful activity. 18 U.S.C. §§ 981(a)(1)(A), (a)(1)(C).

As a result, the purchase of an asset by another entity with purportedly clean money, while relevant to the *innocent owner defense*, does not affect the **forfeitability** of the property. *See United States v. Four Million, Two Hundred Fifty-Five Thousand*, 762 F.2d 895, 905 (11th Cir. 1985).

Therefore, the United States contends, the 2018 restructuring involved the transfer of tainted property that did not lose its taint merely because it was purchased with allegedly untainted funds -- Optima (and Korf and Laber) stood on both sides of the transaction.

Shifting to the Government's factual response, the United States contends that Optima 500 defaulted on a mortgage for PNC Plaza in 2017, and, in 2018, facing foreclosure, Korf and Laber entered into a deal with third-party Firm A to refinance the Mortgage -- represented as a promissory note worth roughly $61 million -- and restructure ownership of PNC Plaza. [ECF No. 1 ¶¶ 135-39]. Through that deal, detailed in the Verified Complaint, Korf and Laber erased more than $40 million in debt by transferring ownership of PNC Plaza to a new entity owned jointly with Firm A, 500 West Jefferson Street LLC, in which Korf and Laber beneficially held a 95% stake through CBD

500, and in which Firm A held a 5% stake. *Id.* ¶¶ 146-49.

The United States notes that the Verified Complaint explains how Korf and Laber accomplished that through a series of transactions that included: (1) Korf and Laber transferring a Deed in Lieu of Foreclosure, which extinguished the original promissory note, *id.* ¶ 149; (2) Firm A buying the mortgage on PNC Plaza for roughly $27 million, which was funded by a loan of roughly $17 million that 500 West Jefferson took out from a third-party lender, and roughly $10 million from Korf and Laber, who borrowed it from another entity, Felman, *id.* ¶¶ 150-53; and (3) Firm A transferring the promissory note purchase agreement to 500 West Jefferson for roughly $25.7 million, *see id.* ¶ 147.

Through that deal, the United States explains, Korf and Laber transferred ownership of PNC Plaza from one entity they owned, to another entity they owned 95% of, while extinguishing $40 million of debt. *Id.*

Based on this factual perspective, the United States contends that the taint from funds used to purchase PNC Plaza in 2011 survived this restructuring because it was carried through by the transfer of the Deed in Lieu of Foreclosure. The Deed in Lieu of Foreclosure represents a thing of value -- namely the conveyance of a fee-simple title to the property in exchange for forgiveness of a mortgage -- that was transferred as part of the restructuring deal, and which is itself traceable to the tainted funds used to acquire the property. *See Kennedy v. JP Morgan Chase Nat. Corp.*, 2011 WL 1576569, at *3 (D. Mass. Apr. 26, 2011) ("Under a deed in lieu, the borrower conveys a fee-simple title to the

mortgagor in exchange for a forgiveness of the debt secured by the mortgage. Not only does the deed in lieu allow the mortgagee to avoid the stigma of a foreclosure, but it can be of significant economic benefit to the borrower where the value of the real estate is considerably less than the balance due on the mortgage.").

Because ownership of PNC Plaza was transferred through a tainted asset, the United States argues, the property *remained* traceable to the original criminal activities.

But Claimants, relying on *United States v. Certain Accts.*, argue that the Government's theory is too attenuated and that the substantial connection requirement "precludes the [G]overnment from forfeiting the funds of 'various indirect accountholder payees'" because that approach would function like a "contagious disease" and "could contaminate any account that had dealings with it." 795 F. Supp. at 398.

The sufficiency of the United States' allegations is rendered more problematic because, as explained above, it pursued an odd jurisdictional approach for an *in rem* civil forfeiture lawsuit and named an incorrect defendant. This impacts the analysis of the tracing allegations and whether a substantial connection has been properly alleged. It is difficult for a court to agree that the allegations supporting an *in rem* forfeiture complaint are adequate if the *in rem* defendant is incorrectly named.

Because the United States will soon be filing an amended complaint to name a different *in rem* defendant (assuming that Judge Gayles were to adopt this Report and Recommendations), the United States shall in the next version of its complaint firm up,

clarify and explain in more-precise factual terms the theory used to support the claim for the forfeitability of the proceeds (from the sale of the real estate). Thus, although the Undersigned is not necessarily concluding that the motion to dismiss should be granted for failure to adequately trace the illegal proceeds, I am adopting the commonsense approach that it would be far-more logical and helpful for the Court to evaluate the sufficiency of the allegations in the context of an amended complaint against a different *in rem* defendant.

Therefore, the Undersigned **respectfully recommends** that Judge Gayles **reject as moot** Claimants' argument that the forfeiture allegations do not adequately trace the criminal activity to the defendant property to be forfeited.

<u>Does the Statute of Limitations Bar the Claim?</u>

Claimants argue that the Verified Complaint was filed *years* too late. Specifically, they say the applicable limitations period is one year but point out that the forfeiture complaint was filed approximately nine years after the transmission in 2011 of the proceeds of the two Ukrainian bank loans to the United States. To support their argument, Claimants rely on 18 U.S.C. § 984(c), which provides that "[n]o action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense."

Claimants have relied upon an incorrect statute of limitations, however. Title 18 is part of the *criminal* code.

19 U.S.C. § 1621, which applies to *civil* actions for forfeiture, requires that an action be commenced within *five* years from the discovery of the offense giving rise to the forfeiture.[25]

According to the United States' calculation, the fraudulent loan scheme, which underlies the offenses giving rise to the forfeiture, was not discovered until, at the earliest, the National Bank of Ukraine audited PrivatBank in 2016. [ECF No. 1 ¶ 11]. Even if the United States had discovered those offenses (and the laundering of the misappropriated funds into the United States) as early as Ukrainian authorities did -- which it did not -- this action was filed in August 2020, well before the expiration of the five-year limitations period.

Claimants did not address their statute of limitations argument in their reply [ECF No. 126], which suggest that they have abandoned it. *See De Fernandez v. Seaboard Marine, Ltd.*, No. 20-CV-25176, 2022 WL 2869730, at *8 (S.D. Fla. July 21, 2022) ("Since [the]

---

[25]    In addition, section 984(b) is completely inapplicable, as it is concerned exclusively with fungible, untraceable assets. When the Government seeks to forfeit "cash, monetary instruments in bearer forms, funds deposited in a financial institution . . . , or precious metals," 18 U.S.C. § 984(a)(1), and such property is "not traceable directly to the offense that is the basis for the forfeiture," the forfeiture action must be commenced within one year from the date of the offense, 18 U.S.C. § 984(b).

This action, though, does not seek fungible property such as bulk cash or loose diamonds. Instead, it seeks interests in corporate entities that owned an office building in Kentucky purchased with funds misappropriated from PrivatBank. The Verified Complaint details the transfers of fraudulently obtained loans from PrivatBank and their transfer to Claimants. *See, e.g.,* [ECF No. 1, §§ 125-131].

[d]efendant failed to respond to [the] [p]laintiff's argument in its [r]eply, [the] [d]efendant abandoned its original position."); *Five for Ent. S.A. v. Rodriguez*, No. 11-24142-CIV, 2013 WL 4433420, at *14 (S.D. Fla. Aug. 15, 2013) ("A failure to address issues in response to a motion is grounds for finding that the claims have been abandoned."); *Altare v. Vertical Reality MFG, Inc.*, No. 19-CV-21496, 2020 WL 209272, at *2 (S.D. Fla. Jan. 14, 2020) (Gayles, J.) ("[The] [p]laintiff did not respond to this argument and, consequently, the Court deems any response waived."). Regardless of whether Claimants have dropped the statute of limitations argument, the Undersigned does not find the argument compelling, and I therefore reject it for purposes of a ground on which to base a dismissal.

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on September 28, 2022.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to**:
The Honorable Darrin P. Gayles
All counsel of record