UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:20-CV-23278-GAYLES/GOODMAN

UNITED STATES OF AMERICA,

           Plaintiff,

vs.

APPROXIMATELY $9,105,221.62 IN FUNDS (PLUS INTEREST) CURRENTLY HELD BY THE UNITED STATES MARSHALS SERVICE REPRESENTING 95% OF THE NET PROCEEDS FROM THE SALE OF THE REAL PROPERTY LOCATED AT 500 WEST JEFFERSON STREET, LOUISVILLE, KY 40202 KNOWN AS PNC PLAZA,

           Defendant.
_____/

**UNITED STATES' OPPOSITION TO CLAIMANTS' JOINT MOTION
TO DISMISS THE FIRST AMENDED COMPLAINT**

Claimants' Motion to Dismiss (the "Motion") the government's First Amended Complaint ("FAC") should be denied.  The Motion offers three arguments for dismissal, none of which has merit, and two of which have already been decisively rejected by the Court.

First, the Motion rehashes Claimants' failed argument that the one-year limitations period in 18 U.S.C. § 984(b) bars this action.  The Court rejected that argument with respect to the original complaint; it should do so with respect to the FAC.  The FAC does not invoke Section 984, and its limitations period is irrelevant to this action brought under Section 981.  Second, the Motion contends that there is no "substantial connection" between the property subject to forfeiture and the unlawful conduct.  That is simply wrong.  The Defendant Asset in this case is traceable to the misappropriation of funds from PrivatBank, as well as to property involved in the laundering of those funds.  Finally, the Motion suggests that the FAC should be dismissed because the Court

lacks jurisdiction. That issue has been settled; this Court granted the government's motion to amend its complaint in the face of Claimants' identical objections. Claimants offer no reason for the Court to reverse itself now. The Motion should therefore be denied.

## BACKGROUND

Given the multitudinous filings related to Claimants' prior motion to dismiss, the United States provides a factual summary that addresses the issues most pertinent to the instant Motion.

The United States seeks to forfeit $9,105,221.62 held in escrow by the United States Marshals Service ("USMS"), which is the net proceeds of the sale of real property located at 500 West Jefferson Street, Louisville, KY 40202 known as PNC Plaza (the "Defendant Asset"). ECF 187 ¶ 3. The United States seeks forfeiture pursuant to: (1) 18 U.S.C. § 981(a)(1)(C), because it is traceable to violations of U.S. law and specified unlawful activity, including violations of 18 U.S.C. §§ 1956, 1957, 2314, and 2315; and (2) 18 U.S.C. § 981(a)(1)(A), because it was involved in and facilitated one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957, or was traceable to such property. Id. ¶¶ 6-8.

As alleged in the FAC, Ihor Kolomoisky and Gennadiy Boholiubov, two Ukrainian oligarchs, misappropriated billions of dollars from PrivatBank, one of the largest banks in Ukraine, via fraudulent loans. Id. ¶¶ 14, 15, 19. They laundered the misappropriated funds through accounts at PrivatBank's Cyprus branch held in the names of entities they owned or were associated with. Id. ¶ 21. After flowing through dozens of PrivatBank accounts, sometimes in a matter of minutes, the funds were laundered into the United States, where they were used to purchase assets for safekeeping and further laundering by Mordechai Korf and Uriel Laber, Kolomoisky and Boholiubov's U.S. associates and two of the claimants in this action. Id. ¶¶ 22-23, 85.

1

One of the assets they acquired was PNC Plaza. *Id*. ¶¶ 103, 105.  Korf and Laber used the U.S.-based company, Optima Ventures LLC, and a specially created entity, Optima 500 LLC, for the acquisition.  *Id*.  Optima Ventures was owned approximately 33% each by Kolomoisky and Boholiubov, and approximately 16% each by Korf and Laber. *Id*. ¶ 92.

To purchase the property, Kolomoisky and Boholiubov misappropriated funds via two fraudulent loans obtained from PrivatBank: (1) $9,300,000 to Zaporozhye Ferroalloy Plant ("ZFZ"), a metal processing plant, purportedly for the purpose of funding ferroalloy operations of that company; and (2) $13,500,000 to Nikopol Ferroalloy Plant ("NZF"), also a metal processing plant, for the same purported purpose. *Id*. ¶¶ 111-27.  The loan applications were submitted and approved, and the funds disbursed to ZFZ's and NZF's respective accounts, just two weeks after the initial deposit to purchase PNC Plaza, in the case of the loan to ZFZ, and only ten days before Optima acquired the property, in the case of the loan to NZF.  *Id*. ¶¶ 111, 119.  The applications contained material misrepresentations.  *See id*. ¶¶ 112-18; 120-27.

"On September 19, 2011, at 4:36 PM, $3,658,273 from the line of credit established [for ZFZ] was transferred from ZFZ's PrivatBank loan account into a different ZFZ account." *Id*. ¶ 129.  That same day, "at 7:00 PM, $11,116,246 from the line of credit established [for NZF] was transferred from NZF's PrivatBank loan account into a different NZF account." *Id*. ¶ 130.

The funds were then transferred to the accounts of Kolomoisky and Boholiubov-owned and associated entities held at PrivatBank's Cyprus branch. *Id*. ¶¶ 131-33.  Just over an hour after the initial transfer of funds among ZFZ's accounts in Ukraine, they were transferred to an account in the name of Chemstar at PrivatBank's Cyprus branch. *Id*. ¶ 131.  Only minutes after the initial transfer of funds among NZF's accounts in Ukraine, they were sent to the very same Chemstar account, comingling the criminal proceeds.  *Id*.  The next day, between 5:02 PM and 6:32 PM, a

2

portion of the comingled funds was moved through several other accounts at PrivatBank Cyprus, before being returned to the same Chemstar account. *Id*. ¶ 132.

On September 22, 2011, the misappropriated funds flew through additional accounts at PrivatBank's Cyprus branch before being sent to the United States for the purchase of PNC Plaza. *Id*. ¶ 133. "At 6:17 PM, $18,260,000, which included the loan funds, was transferred from Chemstar's account to Divot's account." *Id*. At 6:54 PM, $15,600,000 of those funds were transferred to an account in the name of Kadis Holding Limited, an entity ultimately owned by Kolomoisky. *Id*. Seconds later, the funds were transferred from Kadis's account to an account in the name of Pavanti Enterprises Limited, an entity owned by Kolomoisky, which he used repeatedly to purchase U.S. assets with misappropriated funds, including PNC Plaza. *Id*.

At 7:04 PM, the funds were transferred from Pavanti's account to an account in the name of Optima Ventures in the United States via two separate transfers. *Id*. The memo lines for the transfers stated: "'For OPTIMA VENTURES LLC 0077605470 for PAYMENT ACCORDING TO LOAN AGREEMENT NO. 2 DATED 21/09/2011'" and "'For OPTIMA VENTURES LLC 0077605470 for PAYMENT ACCORDING TO LOAN AGREEMENT NO. 1 DATED 21/09/2011.'" *Id*. Optima Ventures' account had a balance of less than $3,000 before it received the misappropriated funds. *Id*. From Optima Ventures' account, the funds were transferred the same day to Progressive Closing and Escrow and were used to purchase PNC Plaza. *Id*. ¶ 134. Funds misappropriated from PrivatBank were thus directly used to purchase PNC Plaza for the benefit of Kolomoisky and Boholiubov. *Id*. ¶ 135-36.

Optima 500 also assumed a substantial mortgage as part of the acquisition. *Id*. ¶ 108. Korf and Laber extracted value from PNC Plaza but failed to pay the debt—they transferred roughly $2

3

million from Optima 500 to Optima Ventures. *Id.* ¶ 141 n.9. They defaulted on the outstanding mortgage in 2017, and the property went into foreclosure. *Id.* ¶ 138.

Korf and Laber, however, were able to keep PNC Plaza. They, along with a third-party investor ("Firm A"), created a new entity to own the property. *Id.* ¶¶ 142-47. Korf and Laber, through their newly created entities Optima CBD Investments LLC and CBD 500 LLC, owned 95% of the joint venture entity. They then acquired the promissory note Optima 500 had defaulted on from the noteholder. *Id.* ¶ 149. That purchase required obtaining new financing of approximately $17 million, and an injection of approximately $9.5 million from Korf and Laber's Optima-affiliated entity, Felman Trading Americas Inc. *Id.* ¶ 154-55.

With the joint venture entity having purchased the note, Optima 500 now effectively owed CBD 500 $27 million. *Id.* ¶ 151. At that point, Optima 500 transferred the deed to the property to the joint venture entity owned by CBD 500. *Id.* ¶¶ 152-53.

In July 2020, Korf and Laber entered an agreement to sell PNC Plaza to a new entity created by the same third-party investor. *Id.* ¶ 162. Before the sale closed, the government brought this action, seeking to forfeit Optima's corporate interests in the entity that owned PNC Plaza. *Id.* ¶ 163. The government sought a restraining order to preserve the value of the property, which this Court granted. *Id.* ¶ 164. That order commanded that the sales contract be executed on the terms that had been negotiated and agreed to before the government's intervention. *Id.* CBD 500 stood to receive approximately $9,105,221.62 from the sale, representing its ownership interest in PNC Plaza. *Id.* ¶¶ 165-66. Those funds were instead, per the restraining order, sent to the USMS to hold in escrow pending the outcome of this action. *Id.* The restraining order also substituted the specific proceeds from the sale of the building, held in escrow, as the *res* in this action. 20-23279

Dkt. No. 5 at 3 ("Upon consummation of the sale and the transfer of 95% of the net proceeds . . . those net sale proceeds shall be treated as a substitute *res* for the property.").

The original Complaint was dismissed on the grounds that the description of the *res* incorrectly identified intangible rights to the corporation that owned PNC Plaza.  ECF 164 at 70.

In finding that the true *res* was effectively PNC Plaza (or now, the proceeds from the sale of the property), Magistrate Judge Goodman recommended that the government be granted leave to amend its complaint to clearly identify the real property proceeds as the *res* itself.  *Id*. at 74.  The government was granted leave to amend.  ECF 186.  The FAC has now redefined the *res* to constitute the proceeds from the sale of PNC Plaza held by the USMS.  ECF 187 at 1.

## ARGUMENT

"[A] motion to dismiss on the basis of the pleadings should rarely be granted."  *Garcia v. AV-MED, Inc.*, 958 F. Supp. 592, 593 (S.D. Fla. 1997) (citing *Madison v. Purdy*, 410 F.2d 99, 100 (5th Cir. 1969)).[1]  The Court must "take all of the factual allegations in the Complaint as true," *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009), "and construe them in the light most favorable to the plaintiff[]," *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347 (11th Cir. 2016).  A motion to dismiss must be denied where a complaint pleads "'enough facts to state a claim to relief that is plausible on its face.'"  *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1210 (11th Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*. (quoting *Iqbal*, 556 U.S. at 678).

---

[1] Civil forfeiture complaints are governed by the pleading standards set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture ("Supplemental Rules") and, to the extent they do not conflict with the Supplemental Rules, by the Federal Rules of Civil Procedure.  *See* Supplemental Rule A(2).

The legal sufficiency of a forfeiture complaint is governed by Supplemental Rules E and G. Under Supplemental Rule E(2)(a), the complaint need only set forth its claims "with such particularity that the defendant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." The complaint is only required to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). *See United States v. $15,860 in U.S. Currency*, 962 F. Supp. 2d 835, 839 (D. Md. 2013) ("The government does not have to fully prove its case to meet the pleading requirements, but must only state enough facts for the Court to find a reasonable belief, based on the totality of the circumstances, that the defendant property is linked to [a crime]"). At trial, that burden requires proof "by a preponderance of the evidence" that the defendant asset is subject to forfeiture. 18 U.S.C. § 983(c)(1). If the complaint alleges that the property was involved in the commission of a crime, the government must also prove at trial "that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). In practical terms: "At the pleading stage, it suffices for the government to simply allege enough facts so that the claimant may understand the theory of forfeiture, file a responsive pleading, and undertake an adequate investigation." *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 14 (D.D.C. 2013) (*citing United States v. Mondragon,* 313 F.3d 862, 864 (4th Cir. 2002)). *See also United States v. Aguilar*, 782 F.3d 1101, 1109 (9th Cir. 2015) ("Even if, as the Appellants argue, the government may not be able to show *all* of the claimed funds are tainted and subject to forfeiture, this does not render the complaint deficient.").

I.      **The Complaint is Not Time Barred**

Undeterred by this Court's complete rejection of the argument in their last motion to dismiss, Claimants again assert that this action is time barred under 18 U.S.C. § 984(b). *See* ECF

6

221 at 8-9.  Like the original Complaint, the FAC seeks forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 981(a)(1)(A) and does not allege forfeiture pursuant to the fungibility provisions of Section 984.  Accordingly, Section 984(b)'s limitations period remains inapplicable, and the Court should reject Claimants' argument that this action is time barred.

*First*, Section 984 has nothing to do with this forfeiture action.  The FAC alleges two bases for forfeiture, both under 18 U.S.C. § 981.  *See* ECF 187 at 39-45.  Section 981 provides that "[t]he following property is subject to forfeiture to the United States," including, among other things, "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property;" and "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense."  18 U.S.C. § 981(a)(1)(A), (a)(1)(C).  In other words, property that is itself involved in violations of the money laundering statutes, or traceable to that property, is forfeitable.  And any property that is itself the proceeds of specified unlawful activity, or traceable to those proceeds, is forfeitable.

Congress enacted Section 984 to address the problem of truly fungible property.  *See United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 158 (3d Cir. 2003) ("Section 984 is a 'substitute asset provision' enacted to overcome [] tracing difficulties and ease the government's burden of proof in civil forfeiture proceedings involving fungible property."). Where the subject of forfeiture is "cash, monetary instruments in bearer forms, funds deposited in a financial institution (as defined in section 20 of this title), or precious metals," the government need not "identify the specific property involved in the offense that is the basis for forfeiture."  18

U.S.C. § 984(a)(1)(A). Thus, it is "not [] a defense that the property involved in such an offense has been removed and replaced by identical property." *Id*. § 984(a)(1)(B).

When Congress removed the tracing requirement for "fungible" property, it simultaneously restricted the time to bring an action under Section 984: "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense." *Id*. § 984(b). *See Contents in Acct. No. 059-644190-69*, 253 F. Supp. 2d 789, 793 (D. Vt. 2003) ("Section 984 gave the government a broad, new power to seize fungible property without regard to its traceability to proscribed conduct, but simultaneously imposed a one-year, instead of five-year limitations period.").

However, the government is not required to invoke Section 984 simply because it seeks to forfeit property in a bank account—and it does not do so here. Section 984(d) is clear: "Nothing in this section may be construed to limit the ability of the Government to forfeit property under any provision of law if the property involved in the offense giving rise to the forfeiture or property traceable thereto is available for forfeiture." 18 U.S.C. § 984(d). Thus,

> [Section] 984 enhances rather than replaces and limits the government's forfeiture powers. Where the government cannot prove the traceability of fungible property, as required by § 981, the government is free to proceed under § 984. But where the government can establish property is traceable to an offense giving rise to forfeiture, it is free to proceed under any other provision of law, whether or not the property is fungible.

*Contents in Acct. No. 059-644190-69*, 253 F. Supp. 2d at 794. "As long as, 1) the property involved in the offense giving rise to the forfeiture is available for forfeiture or 2) property traceable thereto is available for forfeiture, the Government is not required, simply because the case involves fungible property, to proceed under 18 U.S.C. § 984." *United States v. Contents of Four Bank Accts. Located in Bank of Dadeville, Dadeville, Alabama*, 330 F. Supp. 2d 1299, 1304 (M.D. Ala. 2004) ("*Four Accounts*"). If "the Government can meet the requirements of 18 U.S.C.

8

§ 981, it may proceed on that basis." *Id*.  This action is not "pursuant to" Section 984; the statute of limitations does not apply.

In response, Claimants cite *United States v. $61,900.00*, 2010 WL 11623206, at *3–4 (E.D.N.Y. Sept. 8, 2010).  ECF 221 at 7, n.3.  But that case supports the government's position.  The Court held that "the Government is free to use § 981 when funds are traceable, employing § 984 only when needed." *Sixty-One Thousand Nine Hundred Dollars*, 2010 WL 11623206, at *4.  And the decision cites *Four Accounts* for the proposition that subsection (d) allows the government to proceed under Section 981.  Claimants also cite *United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 144 (3d Cir. 2003) to suggest that Section 984 applies even where the government proceeds under Section 981, but in that case, the government was expressly proceeding under both Sections 981 and 984.  *Id*. at 144.  Moreover, that case holds that if the government proceeds under Section 984, it "need not identify the specific property involved in the money laundering scheme"—but the government *has* identified the specific property involved in the offense.  *Id*. at 159.

*Second*, Section 984 does not apply because the property sought to be forfeited *is traceable*—to proceeds of, and property involved in, money laundering and specified unlawful activity.  *See United States v. Approximately $3,275.20 seized from Bank of Am. Acct. No. XXXXXXXXXX*, No. 21-20614-CIV, 2021 WL 5300512, at *6 (S.D. Fla. Nov. 15, 2021) (rejecting applicability of Section 984 where allegations included traceability).  The FAC meticulously records the transfers of misappropriated funds from PrivatBank used to acquire PNC Plaza, the conversion of those funds into the property itself, the instrument of which was the deed, the transfer of that deed (and thus ownership of the real property) among the Optima entities, the conversion of the deed and real property into monetary funds via the sale of PNC Plaza, and finally

9

the transfer of the funds to the USMS. ECF 187 ¶¶ 129-35; 151-53; 161-66. Thus, even if the Defendant Asset could qualify as "fungible" property because it comprises funds in a bank account, its traceability renders Section 984's limitations period inapplicable.

*Third*, Magistrate Judge Goodman's Report and Recommendation regarding the prior motion to dismiss (the "R&R"), which was adopted by the Court, already settled this question, and determined that Section 984 does not apply. ECF 164 at 82-83. The R&R found:

> In addition, section 984(b) is completely inapplicable, as it is concerned exclusively with fungible, untraceable assets. When the Government seeks to forfeit "cash, monetary instruments in bearer forms, funds deposited in a financial institution ..., or precious metals," 18 U.S.C. § 984(a)(1), and such property is "not traceable directly to the offense that is the basis for the forfeiture," the forfeiture action must be commenced within one year from the date of the offense, 18 U.S.C. § 984(b). This action, though, does not seek fungible property such as bulk cash or loose diamonds. Instead, it seeks interests in corporate entities that owned an office building in Kentucky purchased with funds misappropriated from PrivatBank. **The Verified Complaint details the transfers of fraudulently obtained loans from PrivatBank and their transfer to Claimants.**

ECF 164 at 83 n.25 (emphasis added). Though the complaint has been amended to name the proceeds of the sale of PNC Plaza, the Court's prior holding regarding traceability applies—all that has changed is that rather than forfeiting the corporate interest in the funds, the government is seeking those funds directly.

*Fourth*, Section 984 does not apply because this is not a case involving fungible property. The FAC alleges that a specific set of funds generated by the sale of PNC Plaza, and immediately wired to the USMS and held in escrow, is subject to forfeiture. Though the asset is a cash equivalent, as opposed to a building, it is not "fungible" in the sense that Section 984 refers to fungibility—it is more akin to seizing a cashier's check than cash itself. *See United States v. All Funds Presently on Deposit Maintained at Am. Exp. Bank*, 832 F. Supp. 542, 559 (E.D.N.Y. 1993) ("Section 981 and its five-year limitations period are still available to the government as a means

10

of civil forfeiture where specific, identifiable property is concerned."). The forfeiture statute, and the statute of limitations, does not change if funds are wired to the USMS to hold in escrow rather than being transmitted as a cashier's check.

The relation back doctrine, to which Claimants devote significant energy, is irrelevant, as Section 984 does not apply. But even if Section 984 were to apply, the relation back doctrine puts the FAC firmly within the statute. Federal Rule of Civil Procedure 15(c)(1) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when:"

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and
>>
>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1).

Based on the plain language of Rule 15(c), the amendment relates back. The government believed that the value of the tainted portion of PNC Plaza was represented by CBD 500's ownership interest in the joint venture. However, the Court's order of dismissal and the R&R determined that the government's naming of the corporate rights, rather than the real property itself, was a mistake, and that that was not an intangible defendant *in rem*.

Claimants argue that the government's identification of the *in rem* defendant was not a "mistake" because it was purposeful. ECF 221 at 12. But as the Supreme Court explained in *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 541 (2010), "relation back under Rule 15(c)(1)(C) depends on what the party to be added knew or should have known, not on the amending party's

11

knowledge or its timeliness in seeking to amend the pleading." "Rule 15(c)(1)(C)(ii) asks what the prospective *defendant* knew or should have known during the Rule 4(m) period, not what the *plaintiff* knew or should have known at the time of filing her original complaint." *Id*. at 548 (emphasis in original). Even if a plaintiff knows of a potential defendant's existence, as in *Krupski*, plaintiff's misunderstanding of the role of the defendant constitutes a mistake regarding the party's identity under Rule 15. *Id*. at 549 (a "deliberate but mistaken choice does not foreclose a finding that Rule 15(c)(1)(C)(ii) has been satisfied").

Claimants also argue that the mistake is a "legal" mistake, which they say is not within Rule 15(c)(1)(C)'s ambit. ECF 221 at 13. But Rule 15 draws no distinction between mistakes of law and fact, and as Claimants admit, neither does the Eleventh Circuit. *Id*. Circuit courts that have addressed this question have determined that "legal" mistakes do not preclude relation back. For example, the Second Circuit in *Soto v. Brooklyn Corr. Facility*, 80 F.3d 34 (2d Cir. 1996), noted that the plaintiff "was required to sue" a particular defendant, and that "but for his mistake as to the technicalities of constitutional tort law, he would have named the [proper defendants] in the original complaint." *Soto*, 80 F.3d at 37. Nevertheless, that failure was "a 'mistake' for purposes of Rule 15(c)(3)." *Id*. The Sixth Circuit, though limiting the breadth of its holding, similarly held that "Rule 15(c)'s reference to a 'mistake concerning the identity of the proper party' includes [plaintiff's] mistake of naming an immune institutional defendant rather than an individual one," which, in that case, was a mistake of law. *Black-Hosang v. Ohio Dep't of Pub. Safety*, 96 F. App'x 372, 376 (6th Cir. 2004). "The purpose of the relation back rule is to ensure that the statute of limitations is not used mechanically to prevent adjudication of claims where a real party in interest was sufficiently alerted to the proceedings, or was involved in them in a practical sense from an early stage." *Hampton v. Hanrahan*, 522 F. Supp. 140, 144-45 (N.D. Ill.

12

1981) ("it should make no difference whether the amendment to be related back corrects a mistake of fact or of law").

The government is unaware of any *in rem* action where amendment such as the one sought here has been denied. Supplemental Rule G (7)(b)(iv) provides that, following an interlocutory sale, the "[s]ale proceeds are a substitute res subject to forfeiture in place of the property that was sold," which is what has happened here. *See* 20-23279 Dkt. No. 5 at 3. It would be nonsensical to allow substitution of the *res* while forbidding amendment to conform the description of the defendant asset to the substitute *res*.

Section 984 simply does not apply; the relevant limitations period is five years, and the government brought its claim within that window.

## II. The Complaint Adequately States a Claim

Claimants next argue that the government has not met the heightened pleading standard for civil forfeiture. Specifically, they claim that there is not a "substantial connection" between the criminal activity alleged in the FAC and the Defendant Asset because the United States does not allege that the money used to restructure PNC Plaza's ownership in 2018 was the proceeds of criminal activity. ECF 221 at 13-15. Claimants' arguments rest on a misunderstanding of the "substantial connection" requirement and are inconsistent with the allegations in the FAC.

First, Claimants erroneously conflate the differing legal requirements for forfeiture applicable to distinct claims for forfeiture alleged in the FAC. As set forth in the FAC, the Defendant Asset is subject to forfeiture (1) because it "constitutes or is derived from proceeds traceable to" specified unlawful activity, and, alternatively, (2) because it was "involved in" a money laundering transaction or is property traceable to such property. 18 U.S.C. §§ 981(a)(1)(C), (a)(1)(A). The "substantial connection" requirement only applies to the latter theory. Section

13

983(c)(3) is clear: "if the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was *involved in* the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." *Id*. § 983(c)(3) (emphasis added).

The "substantial connection" standard does not apply to property that constitutes proceeds or is traceable to proceeds. *See United States v. $125,938.62*, 537 F.3d 1287, 1293 n.2 (11th Cir. 2008) ("the Government was required to demonstrate only that the funds were derived from or were traceable to" proceeds); *United States v. Title & Int. in the Real Prop. & Appurtenances*, No. EP-14-CV-60-DB, 2015 WL 12748176, at *5 (W.D. Tex. Mar. 24, 2015) ("In the instant cause, the Government is proceeding under *two* theories of forfeiture: (1) that the [defendant assets] were involved in money laundering (18 U.S.C. § 981(a)(1)(A)), which would trigger the 'substantial connection' requirement under 18 U.S.C. § 983(c)(3); and, (2) that the [defendant assets] constituted or were derived from proceeds traceable to illegal activities (18 U.S.C. § 983(a)(1)(C)), which does *not* trigger the 'substantial connection' requirement. Thus, [Claimant's] assertion that 'the Government must plead a substantial connection between the [defendant assets] and the alleged offenses' oversimplifies the matter."). Therefore, even if Claimants were correct about a lack of substantial connection (which, as explained below, they are not) that would *not* be a basis for dismissal of the FAC, as Count One is based entirely on a proceeds theory.

Where the government relies on an "involved in" forfeiture theory, it must allege a substantial connection between the criminal activity and allegedly forfeitable property. "The term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate the offense." *United States v. Seher*, 562 F.3d 1344, 1369 (11th Cir. 2009) (internal quotation marks omitted). It also "refers to property that is itself being

14

laundered." *United States v. Approximately 250 Documents Containing the Forged Hand Writing of President John F. Kennedy & Others*, No. 03 CV 8004 (GBD), 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008). "[A]t the pleadings stage the Government must only convince the Court that there is evidence sufficient to support a *reasonable belief* that the Government will be able to prove that substantial connection at trial." *Title & Int. in the Real Prop. & Appurtenances*, 2015 WL 12748176, at *5 (emphasis in original). "[T]he Government need not satisfy the burden imposed by § 983(c)(3) at the initial pleading stage." *United States v. $200,255.00 in U.S. Currency,* No. 7:05-CV-27 (HL), 2006 WL 1687774, at *7 (M.D. Ga. June 16, 2006).

A "[s]ubstantial connection may be established by showing that use of the property made the prohibited conduct less difficult or more or less free from obstruction or hindrance." *United States v. Approximately $299,873.70 Seized from a Bank of Am. Acct.*, 15 F.4th 1332, 1340 (11th Cir. 2021) (quoting *United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010)). "[T]he nexus between the property and the illegal activity need not be integral, essential, or indispensable." *United States v. Thirty-Eight Thousand Three Hundred Twenty Dollars in U.S. Currency*, No. 221CV02624JPMTMP, 2022 WL 6755863, at *3 (W.D. Tenn. Oct. 11, 2022).

The FAC alleges that PNC Plaza was used to launder funds misappropriated from PrivatBank, to provide a seemingly legitimate place where the funds could be hidden. *See, e.g.*, ECF 187 ¶¶ 90; 92-97; 137; 141 n.9; 160. And, critically, Claimants *do not dispute* that the FAC alleges that PNC Plaza, when it was purchased in 2011 with funds stolen from PrivatBank, was "involved in" criminal activity and had a substantial connection to that activity.[2]

---

[2] Claimants made that argument in their first motion to dismiss but have abandoned it here. It was, and is, meritless. As summarized above, the FAC traces the misappropriated funds to PNC Plaza.

15

Section 981 expressly authorizes forfeiture of property "involved in" a transaction in violation of 18 U.S.C. §§ 1956 and 1957, as well as "any property *traceable* to such property." Thus, forfeiture is permissible if the Defendant Asset *itself* has a substantial connection to money laundering *or* if it is *traceable* to property having such a substantial connection. *Title & Int. in the Real Prop. & Appurtenances*, 2015 WL 12748176, at *5 ("[T]he Government must state sufficiently detailed facts to support a reasonable belief that it will be able to prove at trial that the [defendant assets] were involved in or are traceable to property involved in money laundering— that is, that the [defendant assets] had a substantial connection to money laundering *or are traceable to property having a substantial connection to money laundering*.") (emphasis added). Here, because the Defendant Asset is traceable to the sale of PNC Plaza in 2020, which Claimants do not dispute was involved in and had a substantial connection to criminal activity, the FAC satisfies the government's pleading requirements.

Nevertheless, Claimants assert that the 2018 restructuring somehow "cleansed" the asset. ECF 221 at 14-16. That is incorrect. First, as noted, because property traceable to property involved in an offense remains subject to forfeiture, the restructuring of the investment in which that property is held cannot immunize the property from forfeiture. Additionally, the restructuring itself was part of the criminal money laundering conduct alleged in the FAC. *See* ECF 187 at ¶ 160. After acquiring PNC Plaza in 2011 by paying $13.1 million in criminal proceeds and assuming a prior mortgage, in 2017, Optima 500 defaulted on the more than $60 million debt secured by PNC Plaza. *Id*. ¶ 138. Unlike a normal default where an unrelated creditor forecloses on a property, Claimants created a new joint venture entity with Firm A to keep PNC Plaza. *Id*. ¶ 149. That joint venture acquired the promissory note, representing the debt, from the creditor for $27 million. *Id*. The acquisition was funded by money that has not been traced to criminal activity,

including roughly $17 million from a third-party lender, and roughly $9.5 million from Felman Trading Americas, an Optima-affiliated entity. *Id.* ¶ 154. At that point, Optima 500 still owned PNC Plaza. There is thus no dispute that the FAC alleges that PNC Plaza was still a tainted asset and substantially connected to the money laundering at that time.

Next, Optima 500 transferred ownership of PNC Plaza to the joint venture via a Deed in Lieu of Foreclosure. *Id.* ¶¶ 152-53. The Deed in Lieu of Foreclosure was a thing of value—it represented fee-simple title to PNC Plaza. *See Kennedy v. JP Morgan Chase Nat. Corp.*, No. 10–CV–11324–RGS, 2011 WL 1576569, at *3 (D. Mass. Apr. 26, 2011) ("Under a deed in lieu, the borrower conveys a fee-simple title to the mortgagor in exchange for a forgiveness of the debt secured by the mortgage.").

PNC Plaza, and the deed representing ownership of it, did not lose its taint simply because it nominally changed hands—it was still just as connected to the criminal activity. Even when tainted assets change form, they retain their taint. "Once proceeds become tainted, they cannot become untainted." *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999).

PNC Plaza was connected to the money laundering activity and retained that connection when it was transferred from Optima 500 to CBD 500. And when it was converted into proceeds per the pre-complaint sale agreement, it retained that connection. A tainted asset does not become clean simply because clean money is added into the equation, or the property is transferred from one form (or one party) to another. *See United States v. $19,985.99 in U.S. Currency*, No. CV 07-03622-GHK FMOX, 2011 WL 5303131, at *3 (C.D. Cal. Nov. 1, 2011) (rejecting argument that property bought with credit card, when the credit card was paid using proceeds, was disconnected from illegal conduct, because "[i]t would defy logic if all an individual needs to do to "cleanse" illegal proceeds is make a purchase with a credit card").

17

The FAC alleges more than enough to meet the government's pleading requirement to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). The detailed allegations of the FAC support a reasonable belief that at trial the government will show that PNC Plaza, constitutes property "involved in" multiple money laundering transactions or property traceable to such property, and that a "substantial connection" exists between the proceeds from the sale of PNC Plaza and the money laundering offenses alleged. *See United States v. All Funds on Deposit in, or transferred to or through, Banc of Am. Acct. No. 207-00426 held in the Name of Kenneth V. Jaeggi & Patti S. Jae*, No. CV–05–3971(SJF), 2007 WL 2114670, at *7 (E.D.N.Y. July 16, 2007) (if the government pleads "specific facts supporting an inference that the defendants-in-rem are traceable to an offense constituting 'specified unlawful activity,' . . . it has met its burden at the pleadings stage").

To the extent claimants with standing to contest forfeiture wish to argue that they are "innocent" owners of the tainted asset, they will have an opportunity to do so, but that is an affirmative defense, not a ground for dismissal. *See United States v. Four Million, Two Hundred Fifty-Five Thousand*, 762 F.2d 895, 905 (11th Cir. 1985).

### III. This Court has Jurisdiction

Seemingly as an afterthought, Claimants argue that this Court lacks jurisdiction. This Court already rejected Claimants' identical argument made in opposition to the government's motion to amend. ECF 185; 186. The Court allowed amendment, as recommended by the R&R. *See* ECF 164 at 74. The issue is therefore settled.

Even if the Court were inclined to take up Claimants' jurisdictional argument, Claimants' Motion fails to provide any specifics about where the supposed lack of jurisdiction lies—is it a

lack of subject matter jurisdiction?  *In rem* jurisdiction?[3]  As the government explained the last time Claimants raised this "argument," and as the Court agreed, the Court does not lack jurisdiction.  *See* ECF 184 at 2-6 (analyzing both subject matter and *in rem* jurisdiction in depth).

## CONCLUSION

Based on the foregoing, the United States respectfully requests that the Court deny Claimants' Motion to dismiss the FAC.

Dated:  January 9, 2024

Respectfully submitted,

MARGARET A. MOESER, ACTING CHIEF

MONEY LAUNDERING & ASSET RECOVERY SECTION

BY:  */s/ Shai D. Bronshtein*
Shai D. Bronshtein (ID #A5502665)
Rachel E. Goldstein
Trial Attorneys
United States Department of Justice
1400 New York Avenue NW
Washington, DC 20005
(202) 616-5950
Shai.Bronshtein@usdoj.gov

*Attorneys for Plaintiff United States of America*

---

[3] Arguments made in passing are not considered, and Claimants may not raise new arguments in their reply.  *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 683 (11th Cir. 2014).