**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 20-cv-23278-GAYLES/GOODMAN**

UNITED STATES OF AMERICA,

     *Plaintiff*,

v.

APPROXIMATELY $9,105,221.62 IN FUNDS (PLUS
INTEREST) CURRENTLY HELD BY THE UNITED
STATES MARSHALS SERVICE REPRESENTING 95%
OF THE NET PROCEEDS FROM THE SALE OF THE
REAL PROPERTY LOCATED AT 500 WEST
JEFFERSON STREET, LOUISVILLE, KY 40202
KNOWN AS PNC PLAZA,

     *Defendant.*

_____/

**[PROPOSED] REPORT AND RECOMMENDATIONS ON CLAIMANTS' MOTION TO
DISMISS THE GOVERNMENT'S AMENDED CIVIL FORFEITURE COMPLAINT
WITH PREJUDICE**

Claimants Mordechai Korf, Uriel Laber, Optima CBD Investments LLC ("CBD Investments"), and CBD 500, LLC ("CBD 500") move to dismiss the Government's First Amended Complaint for *in rem* civil forfeiture under 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C § 981(a)(1)(A) (the "FAC") with prejudice. They do so on three bases: 1) the FAC's allegations demonstrate the Government cannot establish the Defendant Asset constitutes "proceeds" of a crime or that it was "involved in" or "traceable to" illicit activity with the requisite "substantial connection" required for forfeiture; 2) any alternate theory the Government could advance is time-barred; and 3) the jurisdictional defect in the original Complaint cannot be cured by amending and substituting a new defendant.

Because the FAC fails to state a viable civil forfeiture action, the Undersigned **respectfully recommends** that United States District Judge Darrin P. Gayles **grant Claimants' motion** and dismiss the FAC with prejudice.

## Procedural and Factual Background[1]

Four years ago, the Government filed its first Complaint on August 6, 2020. Following extensive briefing and multiple requests for stays to allow more time for a criminal investigation (*see, e.g.,* ECF Nos. 46, 201), the Undersigned recommended dismissing the Government's Complaint because it improperly named

---

[1] This R&R incorporates the factual summary included in the previous R&R located at ECF No. 164. This summary recounts only facts relevant to Claimants' present motion.

*in personam* rights and interests that are not recoverable through an *in rem* action. ECF No. 164 (the "R&R") at 60-74. Significantly, the R&R noted that the Government's theory "effectively claims that Korf and Laber are personally culpable, based on prior acts -- but civil forfeiture is 'not an action against the claimant [owner].'" *Id.* at 71 (citations omitted). The R&R expressly cautioned the Government against using an *in personam* theory to pursue an *in rem* claim, and instructed the United States to "firm up, clarify and explain in more-precise factual terms the theory used to support the claim for the forfeitability of the proceeds." *Id.* at 71-74, 81-82. The Court agreed and entered an Order affirming and adopting the R&R on January 3, 2023. ECF No. 185.

Two days later, on January 5, the Government filed its FAC. ECF No. 187. The FAC is virtually identical to the original complaint, edited only to swap the Defendant Asset from CBD Investments and/or CBD 500's rights and interests to $9,105,221.62 of proceeds due to Claimants from the 2020 sale of PNC Plaza, an office building in Louisville, Kentucky (the "Defendant Asset"). *Id.*

The FAC alleges that in 2011—thirteen years ago—Ihor Kolomoisky and Gennaidy Boholiubov, two Ukrainian businessmen, used their ownership and control of PrivatBank to issue fraudulent loans to related parties. FAC ¶¶ 41, 48, 58 103-127. The Government alleges PNC Plaza was purchased using funds obtained through two of such allegedly fraudulent loans. *Id.* ¶¶ 111-134. Specifically, the

Government alleges that $15,600,000 of these fraudulent loan proceeds were, after a series of transfers, transferred to an entity named Optima 500, LLC ("Optima 500"), which purchased PNC Plaza in 2011. *Id.* ¶¶ 134-136. Optima 500 was a subsidiary of Optima Ventures, which was "owned by Kolomoisky, Boholiubov, Korf, and Laber." *Id.* ¶ 92(c)(viii).  To fund the purchase of PNC Plaza, Optima 500 (a) paid $13,151,167.17 derived from the allegedly illicit loans, (b) paid an additional $3,500,000.00 not alleged to be improperly sourced, and (c) assumed the preexisting mortgage of $65,700,000 (the "2011 Transaction"). *Id.* ¶¶ 107-110.

In 2017, six years after Optima 500 purchased PNC Plaza, it defaulted on the mortgage.  FAC ¶ 138. On January 31, 2018, U.S. Bank filed a foreclosure action as it was owed $65,106,639.31, and there is no dispute the property was, to use the Government's term, "underwater." *Id.* ¶¶ 138-140; ECF No. 234 at 36:5-24, 38:11-12. Stated simply, the debt owed to U.S. Bank exceeded the property's value and, therefore, Optima 500's equity.

During the foreclosure proceedings, Korf and Laber formed entities separate from Kolomoisky and Boholiubov—CBD Investments and CBD 500, which were ultimately owned only by Korf and Laber. *Id.* ¶¶ 142-147. Korf, Laber, and these entities entered into a joint venture with an unrelated third party, Firm A, to purchase the promissory note that U.S. Bank was foreclosing on (the "Joint Venture"). *Id.* ¶¶ 146-149. "Firm A was an unrelated third-party investor," that "had no connection to

the Optima Family of companies or Kolomoisky and Boholiubov's misappropriation scheme from PrivatBank." *Id.* ¶ 142 n.10. Korf and Laber owned 95% of the Joint Venture and Firm A owned the other 5%. *Id.* ¶ 153.

Firm A, the manager of the Joint Venture, then "entered into an agreement with US Bank to purchase the promissory note on PNC Plaza—which provided the right to receive mortgage payments and the ability to foreclose on the property in case of default—for approximately $27 million." *Id.* ¶ 149. This purchase was financed by a loan of approximately $17 million from a third-party lender, $9.5 million from Korf and Laber, and $500,000 from Firm A. *Id.* ¶ 154. The funds Korf and Laber used for the purchase came from Felman Trading Americas, Inc. ("Felman"). *Id.* ¶ 155. The FAC alleges that Felman, though legally separate, shares a bank account, offices, a registered agent, and management with Felman Trading Inc., which is owned by Kolomoisky and Boholiubov in addition to Korf and Laber. *Id.* ¶ 156. The FAC, however, is devoid of any allegation that either Felman or Felman Trading Inc. received any funds misappropriated from PrivatBank. To the contrary, after three years of "ongoing" criminal investigation (ECF No. 46), the Government concedes that this acquisition's financing still "has not been traced to criminal activity[.]" ECF No. 222 at 16.

At the completion of the transaction in 2018, the Joint Venture owned U.S. Bank's preexisting $65 million secured debt. Instead of finishing the judicial

foreclosure, the Joint Venture received a Deed in Lieu of Foreclosure from Optima 500 (the "2018 Transaction"). *Id.* ¶ 152. The FAC does not allege that Optima 500 or its members would have been entitled to any surplus if a judicial foreclosure had occurred.[2] To be sure, the FAC does not connect the Joint Venture's ownership of PNC Plaza in 2018 to *any* purported criminal activity.

"In late 2019, Firm A made an offer to purchase PNC Plaza from Korf and Laber, which Korf and Laber accepted" *Id.* ¶ 161. The agreement was entered into in 2020, with an ultimate sale price of $22.25 million (the "2020 Transaction"). *Id.* ¶ 162. Neither party argues this represented an unfair or below market price, or that Firm A purchased PNC Plaza unlawfully.[3] Upon completion of the sale, $9,105,221.62 of CBD 500's sale proceeds were transferred to the United States Marshals Service and held in escrow for purposes of this action. *Id.* ¶¶ 165-66. The United States now seeks to forfeit this $9.1 million, claiming that it constitutes criminal "proceeds" pursuant to 18 U.S.C. § 981(a)(1)(C) or is otherwise "involved in" unlawful criminal activity pursuant to 18 U.S.C. § 981(a)(1)(A).

On December 19, 2023, Claimants moved (again) to dismiss this action. ECF

---

[2] Nor could it. The Government admits that PNC Plaza was "underwater" (ECF No. 234 at 36:5-24, 38:11-12) and that a deed-in-lieu is "used when 'the value of the real estate is considerably less than the balance due.'" ECF No. 119 at 19 (citation omitted)

[3] To the contrary, the United States sought to compel the sale's completion, *id.* ¶163-64, and the "United States not only oversaw the sale, it was intimately involved and coordinated closely with the parties -- the title company, the purchaser, and the Claimants," R&R at 67.

No. 221. Following briefing, oral argument took place on May 2, 2024. ECF No. 232, 234.

**Standard of Review**

To decide a motion to dismiss, the Court evaluates the legal sufficiency of the complaint, "accepting the factual allegations in the complaint as true and construing them in the light most favorable to the plaintiff." *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 856 F.3d 1338, 1339 (11th Cir. 2017) (citation omitted). To state a claim, a "plaintiff must plausibly allege all the elements of the claim for relief." *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1339 (11th Cir. 2017). "The mere possibility the defendant acted unlawfully is insufficient to survive a motion to dismiss." *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1261 (11th Cir. 2009), *abrogated on other grounds by Mohamad v. Palestinian Auth.*, 566 U.S. 449 (2012).

Significant to this case, where the plaintiff's theories are foreclosed by the complaint's own factual allegations and those allegations demonstrate that amendment is futile, dismissal with prejudice is appropriate. *See Ounjian v. Globoforce, Inc.*, 89 F.4th 852, 862 (11th Cir. 2023) (affirming dismissal with prejudice because "[t]he flaws requiring dismissal inhered in the nature of the claims Ounjian asserted, rather than a correctible pleading deficiency"); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1213 (11th Cir. 2001) ("if a more carefully drafted complaint could not state a claim . . . , dismissal with prejudice is proper." ) (citation

omitted); *United States v. All Funds on Deposit in Lee Munder Wealth Plan. Res. Acct. No. ***-**1080*, 137 F. Supp. 3d 125, 132 (D. Mass. 2016) (dismissing civil forfeiture complaint with prejudice for failure to state a claim). Dismissal with prejudice is particularly appropriate when a plaintiff is put on notice of deficiencies by the court but fails to cure them. *See Chiron Recovery Ctr., LLC v. United Healthcare Servs., Inc.*, 438 F. Supp. 3d 1346, 1356 (S.D. Fla. 2020); *Comparelli v. Bolivarian Republic of Venezuela*, 655 F. Supp. 3d 1169, 1194 (S.D. Fla. 2023).

## A. The Civil Asset Forfeiture Reform Act ("CAFRA")

The Civil Asset Forfeiture Reform Act ("CAFRA") was enacted in 2000 with an "effective date [of] August 23, 2000." *United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002). "The substantial safeguards that CAFRA introduced were in response to mounting concerns about due process in civil forfeiture proceedings." *United States v. Schlesinger*, 396 F. Supp. 2d 267, 276 (E.D.N.Y. 2005). To provide greater due process to claimants, CAFRA provided additional procedural protections, including raising the Government's burden of proof from probable cause to a preponderance of the evidence standard. *See* Civil Asset Forfeiture Reform Act of 2000, PL 106–185, April 25, 2000, 114 Stat 202. The purpose of CAFRA was to provide greater due process, not less. *See $80,180.00*, 303 F.3d at 1184 ("Prior to the enactment of CAFRA, the allocation of the burden of proof in civil judicial forfeiture proceedings tilted heavily in the government's favor

7

. . . . In response to widespread criticism of this regime . . . Congress enacted CAFRA."). Thus, for forfeiture cases initiated after August 23, 2000, the Government's burden of proof is heightened. And as explained below, CAFRA did not alter the Government's obligation to establish a "substantial connection" or relax any of the preexisting pleading requirements in civil forfeiture actions.

### B. The Government's Burden at Pleading Stage as Opposed to Trial

At the pleading stage, a civil forfeiture complaint must plead a "substantial connection" between the property to be forfeited and the illegality alleged by the government. As this Circuit has held for decades, that requirement is a *pleading requirement*. *See United States v. Two Parcels of Real Property*, 92 F.3d 1123, 1126 (11th Cir. 1996) (pre-CAFRA)[4] ("*the complaint must allege* sufficient facts to provide a reasonable belief that the property is subject to forfeiture: in particular, that . . . *a substantial connection exists* between the property to be forfeited and [the statutory violation]") (quotations and citation omitted)[5]; *United States v. $38,000.00 Dollars in U.S. Currency*, 816 F.2d 1538, 1548 (11th Cir. 1987) (pre-CAFRA) (same); *United States v. 862 Zana Drive, Ft. Myers, Fla. 33905*, 2008 WL 4371354, at *3 (M.D. Fla. Sept. 22, 2008) (dismissing complaint for "fail[ure] to *plead a substantial connection* between this property and any criminal activity").

---

[4] Cases predating CAFRA's enactment of additional protections are denoted as such.

[5] All emphasis is added unless otherwise indicated.

The Government suggests that "[a]t the pleading stage, it suffices for the government to simply allege enough facts so that the claimant may understand the theory of forfeiture, file a responsive pleading, and undertake an adequate investigation." ECF No. 222 at 6 (quoting *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 14 (D.D.C. 2013)). But this quote cuts off too early. In the very next sentence, the decision explains that "[a] claimant in an *in rem* proceeding may move to dismiss in the same form provided by Rule 12(b)," 941 F. Supp. 2d at 14, which, of course, requires courts to dismiss a complaint for "failure to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6).[6] Moreover, as the Government's cited authority acknowledges, this includes the requirements of meeting the standards of the Supplemental Rules as well as the statutory requirements: a civil forfeiture complaint

> must state sufficiently detailed facts to support a reasonable belief that it will be able to prove at trial that the Respondent Properties were involved in or are traceable to property involved in money laundering—that is, that the Respondent Properties had a *substantial connection* to money laundering or are *traceable to property having a substantial connection* to money laundering.

---

[6] While 18 U.S.C. § 983(a)(3)(D) provides that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property[,]" the Claimants are not "argu[ing] that the Government's *evidence* is insufficient, but rather that its *allegations* are." *Account No. ***-**1080*, 137 F. Supp. 3d at 128, 128 n.7 (dismissing forfeiture complaint with prejudice) (emphasis in original). Moreover, hypothetical additional evidence is irrelevant where the plaintiff's theories are foreclosed by the complaint's own factual allegations and those allegations demonstrate that amendment is futile. *See Ounjian*, 89 F.4th at 862; *Ziemba*, 256 F.3d at 1213.

*United States v. Title & Int. in the Real Prop. & Appurtenances*, 2015 WL 12748176, at *5 (W.D. Tex. Mar. 24, 2015). Indeed, "[w]hile a motion to dismiss challenges the sufficiency of the pleadings, not proof at trial, the Government must still allege facts that support a reasonable belief they will be able to meet their burden of proof at trial," *United States v. $170,000 In U.S. Currency*, 2024 WL 2922718, at *9 (D.P.R. June 10, 2024) (quotations and citations omitted) (dismissing forfeiture claim at motion to dismiss stage for failure to plead substantial connection), including the burden of establishing a substantial connection, *see Title and Interest*, 2015 WL 12748176, at *5; *$38,000.00 Dollars*, 816 F.2d at 1548.

Additionally, the Supplemental Rules of Certain Admiralty and Maritime Claims "impose a more stringent obligation on the Government than the notice pleading requirements of the Federal Rules of Civil Procedure to set forth grounds for forfeiture." *United States v. Two Parcels of Real Prop. Located in Russell Cnty., Ala.*, 92 F.3d 1123, 1126 (11th Cir. 1996) (pre-CAFRA); *United States v. $134,972.34 Seized from FNB Bank, Acct. No.-£5351*, 94 F. Supp. 3d 1224, 1229 (N.D. Ala. 2015) (post-CAFRA pleading standard remains "heightened"); *United States v. $1,370,851.62 in United States Currency*, 2009 WL 10712511, at *1 (S.D. Fla. Aug. 13, 2009) (maintaining application of the Supplemental Rules post-CAFRA); *United States v. Funds in the Amount of Forty-Five Thousand Fifty Dollars ($45,050.00)*, 2007 WL 2323307, at *2–3 (N.D. Ill. Aug. 9, 2007) ("In post-

CAFRA cases such as this one, the government must . . . present facts supporting a reasonable belief that it can meet its burden of proof at trial.").

## Is the Defendant Asset Traceable to a Statutory Violation?

As to Count I, the issue is whether the $9,105,221.62 in funds derived from the 2020 Transaction constitutes "proceeds traceable to" an enumerated statutory violation under 18 U.S.C. § 981(a)(1)(C).[7] It does not.

"The traceability inquiry has particular, and demanding, contours." *United States v. Wood*, 2016 WL 8131221, at *2 (E.D. Ky. Oct. 17, 2016). "[P]roperty 'traceable to' means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998) (pre-CAFRA); *United States v. Sperber*, 2023 WL 3562967, at *5 (N.D. Ga. May 19, 2023) ("Only funds used in or traceable to the illegal activity are subject to forfeiture, and not any commingled legitimate funds used in facilitating the scheme.") (citation omitted); *United States v. Grant*, 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008) ("[p]roceeds are property that a person would not have *but for* the criminal offense."); *Wood*, 2016 WL 8131221, at *2 (same). Thus, for the $9.1 million in sale proceeds to be "traceable," the Government must show that, "*but for*" the allegedly

---

[7] "Proceeds," are defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto." 18 U.S.C. § 981(a)(2)(A).

criminal 2011 loan scheme, the $22.25 million Firm A used to purchase PNC Plaza in 2020 (of which $9.1 million has been retained by the Marshals Service as proceeds) would not exist. The Government fails to carry this burden.

The proceeds derived from the sale of PNC Plaza in 2020 are not "traceable" to any money laundering or criminal activity. The Government makes no such allegations in the FAC, and to the contrary, concedes that the 2018 Transaction "has not been traced to criminal activity." ECF No. 222 at 16.  This remains true even if we assume PNC Plaza was purchased with the allegedly illegal Ukrainian loans in 2011, because the FAC does not allege (nor can it) that any portion of those tainted funds were used for, involved in, or even survived the 2018 or 2020 Transactions. FAC ¶¶ 142-56.  This is sufficient to dispose of the proceeds theory.

Moreover, the FAC forecloses any other method to connect the allegedly tainted 2011 purchase with the proceeds from the 2020 purchase. Specifically, the FAC alleges that the purchase and subsequent transfer of the Deed in Lieu of Foreclosure "extinguished the original promissory note." *Id.* ¶ 152. And the Government admits that at the time the Joint Venture received the Deed, Optima 500 was "underwater" and therefore, if there had been a foreclosure on PNC Plaza, Optima 500 would have received no money – and, equally, the Government would have received nothing in a forfeiture action. *See* ECF No. 234 at 36:5-12. By extension, the Joint Venture received no tainted value from Optima 500's

"underwater" interest in PNC Plaza in 2018. Finally, the funds for the Joint Venture's purchase of PNC Plaza were sourced from a third-party lender, Firm A, and Felman, none of which are alleged to be involved in any criminal activity. *Id.* ¶¶ 154-156.[8]

The Government's two remaining arguments in support of its "proceeds" theory are unavailing. First, the Government argues it does not need to plead a "substantial connection" between illegality and the defendant asset when proceeding under a § 981(a)(1)(C) "proceeds traceable" theory, as opposed to a § 981(a)(1)(A) "involved in" theory. Assuming *arguendo* that is correct,[9] the Government still has to satisfy the "traceability inquiry" which "has particular, and demanding, contours" that include this connective pleading requirement. *Wood*, 2016 WL 8131221, at *2. Specifically, "[p]roperty 'traceable to' means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources." *Bornfield*, 145 F.3d at 1135; s*ee also United States v. Real Prop. Located at 20832 Big Rock Drive, Malibu, Cal. 902655*, 51 F.3d 1402, 1411 (9th Cir.

---

[8] The Government's allegation that the entity was treated like another entity owned by Kolomoisky and Boholiubov is irrelevant to traceability given that the Government does not allege that funds used to obtain ownership of PNC Plaza in 2018 derived from any illegal activity or that Felman or Felman Trading Inc. engaged in any illegal activity. *Id.* ¶ 156.

[9] The Government appears to assume that CAFRA's § 981(a)(1)(C) statutory definition of the "substantial connection" requirement for "involved in" theories of forfeiture is the sole basis for requiring a substantial connection. That isn't correct. Before CAFRA, the Eleventh Circuit held that under Rule E(2)(a), a forfeiture complaint must "allege sufficient facts to provide a reasonable belief that the property is subject to forfeiture: in particular, that the Government has probable cause to believe that a substantial connection exists between the property to be forfeited and the [alleged crime]." *Two Parcels*, 92 F.3d at 1126. CAFRA raised the Government's burden of proof at trial but did not lower the Eleventh Circuit's pre-existing pleading standards under Rule E(2)(a).

1995) (pre-CAFRA) ("Any interest in property purchased with illegitimate assets is forfeitable, but any interest purchased with legitimate assets, even the legitimate assets of a drug dealer or someone who knows they are doing business with a drug dealer, is not forfeitable because it is not 'proceeds traceable to' a drug transaction."). Thus, accepting all the allegations as true, the Government does not allege that the purchase of PNC Plaza in 2018 was funded by *any* tainted sources. The traceability inquiry requires the establishment of that connection, which is entirely absent here. *Cf., United States v. Ayika*, 837 F.3d 460, 473 (5th Cir. 2016) (vacating preliminary order of forfeiture, reasoning that "there were many deposits and withdrawals of both legitimately and fraudulently obtained funds over the life of the Chase account. It would thus appear that, here, tracing the remaining funds under § 982(a)(7), as [defendant] argues, would be virtually impossible.").[10]

Second, the Government claims that once an asset is tainted, it can never become untainted, such that any assets traceable to PNC Plaza must, *forever*, be subject to forfeiture. However, the Government's sole source for this argument is *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) (pre-CAFRA), a criminal case which has no application in the *civil* forfeiture context. *See U.S.*

---

[10] Interpretations of § 982(a)(1) aid with respect to interpretation of § 981(a)(1)(A) due to the mirrored statutory language. *See United States v. $688,670.42 Seized from Regions Bank Acct.*, 449 Fed. Appx. 871, 877, 877 n.4 (11th Cir. 2011) (applying *United States v. Seher*, 562 F.3d 1344 (11th Cir. 2009), because § 981(a)(1)(A) "contains nearly identical language").

*Commodity Futures Trading Comm'n v. Dinar Corp.*, 2016 WL 814893, at *6 (M.D. Ala. Feb. 29, 2016) (declining to apply *Ward* in forfeiture context because "*Ward*, a criminal case, addressed whether the government is required to trace the origin of the commingled funds to establish the elements of the crime of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i)"). Moreover, even if *Ward* is relevant here, it is inapposite. *Ward* was about criminal convictions where the Defendant mixed criminal proceeds with a large amount of legal proceeds. In that case, the court held that "[b]ecause money is fungible," no amount of dilution can cure commingled funds, and that "[o]nce proceeds become tainted, they cannot become untainted." *Ward* is thus inapplicable to a case, like this one, that doesn't involve allegedly commingled funds. Moreover, the role of the illicit proceeds in *Ward* was very different from the role the allegedly illicit proceeds played here. In *Ward*, the "modest amount" of allegedly tainted proceeds may have been "critical to the ability of the new corporation to get up and running." 197 F.3d at 1082. Here, because PNC Plaza was "underwater" at the time of the 2018 Transaction, any "tainted" equity Optima 500 had was wiped out (such that the Government would have received nothing in a forfeiture action [11]).  Neither the 2018 nor the 2020 transaction were

---

[11] This case is more akin to the circumstance identified in *United States v. Banco Cafetero Panama*, in which tainted proceeds are no longer deemed traceable because the balance of the tainted account "fall[s] below the amount of the tainted deposit." 797 F.2d 1154, 1159–60 n.5 (2d Cir. 1986) ("untainted money added to the account after the balance has fallen below the amount of the tainted proceeds is immune from seizure."). Because Optima 500's pecuniary interest in PNC Plaza

dependent on or had any connection to the original allegedly "tainted" Ukrainian funds from 2011. Instead, the proceeds derive from the purchase of U.S. Bank's preexisting promissory note (an untainted asset) with monies that the Government does not claim were tainted.

Underscoring the inapplicability of *Ward* to civil forfeiture cases is that its outcome would be inconsistent with forfeiture authority both pre- and post-CAFRA. *See, e.g. Bornfield*, 145 F.3d at 1137 ("the funds contained in Bornfield's business account, which according to the record had no connection to the money laundering offense, are not forfeitable assets"); *Sperber*, 2023 WL 3562967, at *6 ("The United States further concedes the $1 million payment . . . was untainted. This means that the initial $1 million paid . . . is not traceable to proceeds of the fraud").

To state it succinctly, both pre- and post-CAFRA forfeiture cases recognize that "proceeds traceable" means what it says: to be forfeitable, the assets must *actually* be traced to proceeds from tainted sources. *See Rothstein*, 717 F.3d at 1212 ("Property can only be forfeited as proceeds, however, where the Government establishes the requisite nexus between the property and the offense."). The Third

---

at the time of the 2018 Transaction was zero, zero tainted proceeds transferred to the Joint Venture. The Eleventh Circuit has recognized that, if the situation identified in *Banco Cafetero* applies, the District Court errs in ordering forfeiture of the funds as proceeds because the Government cannot "establish[] the requisite nexus between the property and the offense." *In re Rothstein, Rosenfeldt, Adler, P.A.*, 717 F.3d 1205, 1212-13 (11th Cir. 2013) (quotations and citations omitted) (applying 18 U.S.C. § 982(a)(1)).

Circuit also makes this clear in *United States v. Voigt*, where it recognized the limits of the exacting traceability inquiry in a criminal forfeiture case:

> Where the property involved in a money laundering transaction is commingled in an account with untainted property, however, the government's burden of showing that money in the account or an item purchased with cash withdrawn therefrom is "traceable to" money laundering activity will be difficult, if not impossible, to satisfy.

89 F.3d 1050, 1087 (3d Cir. 1996) (applying 18 U.S.C. § 982(a)(1)); *supra* n.10.

In short, because the United States does not allege that the $9.1 million paid by Firm A for PNC Plaza's sale in 2020 was traceable to any illegal proceeds, the Undersigned recommends that Judge Gayles dismiss Count I with prejudice.

**<u>Were the Assets "Involved in" Specified Unlawful Activity?</u>**

The Government's second basis for forfeiture is an "involved in" theory of forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), which permits forfeiture of property "involved in a transaction . . . in violation of [specified money laundering activity] . . . or any property traceable to such property." Additionally, "if the Government's theory of forfeiture is that the property . . . was *involved in* the commission of a criminal offense, the Government shall establish that there was a *substantial connection* between the property and the offense." 18 U.S.C. § 983(c)(3). For property to have a "substantial connection," it "must have more than an incidental or fortuitous connection to criminal activity." *United States v. Seher*, 562 F.3d 1344, 1369 (11th Cir. 2009).

At the outset, the Government's suggestion that it does not need to plead a "substantial connection" for forfeiture actions under Section (a)(1)(A) is refuted by the statute, which only applies to property "involved in" a violation "or any property traceable to such property." 18 U.S.C. § 981(a)(1)(A). "Such property" necessarily must be those "involved in" money laundering and, therefore, must be substantially connected to money laundering. 18 U.S.C. § 983(c)(3); *see also $38,000.00 Dollars*, 816 F.2d at 1548 (a "forfeiture complaint must allege sufficient facts to provide a reasonable belief that the property is subject to forfeiture: in particular . . . that a substantial connection exists"). It is also inconsistent with the caselaw cited by the Government. *See, e.g., Title & Interest*, 2015 WL 12748176, at *5 ("the Government must state sufficiently detailed facts to support a reasonable belief that it will be able to prove at trial . . . that the Respondent Properties *had a substantial connection* to money laundering *or are traceable to property having a substantial connection* to money laundering."). Indeed, requiring the Government to establish "a substantial connection between the criminal offense and the property" makes good sense because it "guards against an arbitrary taking of private property." *von Hofe v. United States*, 492 F.3d 175, 186 (2d Cir. 2007).

Turning to the actual allegations, the Government has failed to allege any facts indicating the Defendant Asset was "involved in" or "traceable to such property." *$170,000 In U.S. Currency*, 2024 WL 2922718, at *9 ("While a motion to dismiss

18

challenges the sufficiency of the pleadings, not proof at trial, the Government must still allege facts that support a reasonable belief they will be able to meet their burden of proof at trial."). The Government's cited allegations—paragraphs 90, 92-97, 137, 141, and 160 of the FAC (*see* ECF No. 222 at 15)—do not allege that the 2018 Transaction was in any way funded by money "involved in" money laundering or "traceable to such property." 18 U.S.C. § 981(a)(1)(A). Specifically, as to the 2018 Transaction, the FAC only alleges that a third-party loan, Firm A, and Felman contributed funds to the purchase, and that subsequent to the purchase, Optima 1375 II LLC invested approximately $2.4 million. FAC ¶¶ 149, 154-58. The FAC does not claim these entities used laundered money or money traceable to money laundering activity to fund the 2018 Transaction. To the contrary, the Government admits that "[t]he acquisition was funded by money that has not been traced to criminal activity." ECF No. 222 at 16.

Instead, the Government's entire theory is centered on the contention that the 2018 Transaction "**allowed Korf and Laber to continue owning the property**, which had been purchased [back in 2011] using approximately $13.1 million in stolen money." FAC ¶ 160. This allegation is the crux of the Government's claim, s*ee* ECF No. 222 at 16, and it makes clear that the FAC is not really an *in rem* theory, but rather, *in personam*. Stated differently, the Government's theory appears to be that because Korf and Laber were involved in the 2011 and 2018 Transactions, the

$9.1 million is "involved in" money laundering or is traceable to property involved in money laundering.   This theory reveals that the Government is repeating its original mistake and is, in reality, proceeding under an *in personam* theory, not *in rem*. The Government has done exactly what I cautioned them from doing in the September 28, 2022 R&R.

Indeed, at argument, the Government admitted that it would receive nothing in a forfeiture action in 2018 because Optima 500 was "underwater" and all of the tainted proceeds from 2011 were extinguished:

> If the government had seized the property in 2018. . . then they wouldn't
> have had any value, because . . . the property was underwater . . . and
> the government would have been left with nothing in 2018.

ECF No. 234 at 36:5-12. This admission by the Government underscores a critical point: the Government would have received nothing if it had sought to forfeit PNC Plaza in 2018 because Optima 500 was "underwater" on its promissory note with U.S. Bank and thus held no value in PNC Plaza in 2018; it necessarily follows that the new Joint Venture received no tainted value from Optima 500 in 2018 when it purchased U.S. Bank's promissory note. Nevertheless, the Government claims that the Defendant Asset has a "substantial connection" to crime and is forfeitable *because* Korf and Laber are involved in the subsequent transactions. *Id.* at 36:20-24 ("Usually when a building is underwater and the government either forfeits it or doesn't, then the people who knew about the dirty nature and the connection to the

crime *aren't the people who own it on the other side*, and so they are truly innocent owners."); *id.* 38:11-12 ("there aren't many cases like this where an underwater property is transferred from the claimants *to themselves*"). These arguments lay bare what is already apparent from the face of the FAC—the theory of liability is premised on Korf and Laber's purported involvement, and *not* the 9.1 million dollars' supposed "involvement in" money laundering activities.[12]  *See, e.g.*, FAC ¶ 152 ("They in effect never stopped owning the real property."); *id.* ¶ 142 n.10 ("Firm A was an unrelated third-party investor, which . . . had no connection to the Optima Family of companies or Kolomoisky and Boholiubov").

In pursuing its theory, the Government ignores that the innocence, or guilt, of the owners is irrelevant to an *in rem* forfeiture inquiry.[13] There is a "sharp distinction between *in rem* civil **forfeitures** and *in personam* **civil penalties**[.]" *United States v. Ursery*, 518 U.S. 267, 275 (1996) (emphasis in original) (pre-CAFRA). Under the legal fiction of an *in rem* forfeiture, "the property is considered the 'offender,'" and

---

[12] It is also consistent with the Government's nearly identical previously dismissed Complaint. *See* R&R at 71 ("The United States seems to have based its forfeiture case here on the alleged prior conduct of the CBD Entities' individual owners -- Mordechai Korf and Uriel Laber -- which predated the existence of the CBD Entities.").

[13] Indeed, the "innocent owner" defense under 18 U.S.C. § 983 is only concerned with the knowledge, or lack thereof, by the property's owner of the purported illegality. It is a separate statutory protection that is not relevant to the connection of the defendant *res* to money laundering activity. *See United States v. Real Prop., Including All Improvements Thereon & Appurtenances Thereto, Located at 246 Main St., Dansville, Livingston Cnty., New York*, 118 F. Supp. 3d 1310, 1330 (M.D. Fla. 2015).

to qualify as such, the asset must be traced to the purported illegal conduct under the tests set out by the civil forfeiture statute. *United States v. Carrell*, 252 F.3d 1193, 1199 n.5 (11th Cir. 2001). "A forfeiture proceeding is not an action against the claimant but rather is an *in rem* action against the seized property." *$38,000 Dollars*, 816 F.2d at 1543 n.12. "Among its implications: the acquittal, or even non-prosecution, of the owner on criminal charges is irrelevant as to the forfeitability of the property." *United States v. One Parcel Prop. Located at 427 & 429 Hall St., Montgomery, Montgomery Cnty., Ala.*, 74 F.3d 1165, 1169 (11th Cir. 1996) (pre-CAFRA). By contrast, culpability of the individual is fundamental to *in personam* forfeiture: "only after criminal conviction may an *in personam* forfeiture occur." *von Hofe*, 492 F.3d at 185.

In this case, no Claimants have had a verdict or even an indictment entered against them. The Government therefore can only proceed *in rem* against the asset—$9,105,221.62 of funds to be paid to CBD 500 by Firm A for its lawful purchase of the PNC Plaza in 2020 with indisputably clean money. And the Government therefore must prove the property, *i.e., the $9.1 million,* has a substantial connection to the purported money laundering violations. To do so, the Government must "establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3). It has failed to do so.

The Government's reliance on *United States v. Approximately $299,873.70*

*Seized From a Bank of Am. Acct.*, 15 F.4th 1332 (11th Cir. 2021) and *Title and Interest*, 2015 WL 12748176, is unpersuasive because both cases had allegations or evidence of a substantial connection to the defendant asset. In the first case, the United States put on evidence of the direct "transfer of funds into domestic bank accounts as part of the scheme" to fraudulently obtain EB-1C visas. 15 F.4th at 1336. In *Title and Interest*, 2015 WL 12748176, the accounts the government expressly alleged to be in receipt of tainted funds were traced to the property's purchase. *Id.* at *6. In contrast, here, there is no allegation that the $9,105,221.62 was paid to CBD 500 by Firm A for any illegal purpose, and certainly no pleading that the payment was for involvement in money laundering offenses. FAC ¶¶ 161-62. Indeed, the 2020 transaction was court-authorized and managed, with the purchase monies being undisputedly legal, and the sale transferring valid, legal title. Neither the court nor the government, which were involved in the sale, were thereby authorizing the investment of money "involved in" money laundering. The FAC is equally devoid of any allegation that the 2018 Transaction was funded by payments from or involved in money laundering; it affirmatively pleads that the assets were untainted. *Id.* ¶¶154-56; *see also* ECF No. 222 at 16 ("The acquisition was funded by money that has not been traced to criminal activity.").[14]

---

[14] Take a hypothetical: My law clerk buys a house that was previously purchased with drug money. The current owner, knowing its history, lawfully bought it from foreclosure and passed that

The Government's cite to *United States v. $19,985.99 in U.S. Currency*, 2011 WL 5303131, at *3 (C.D. Cal. Nov. 1, 2011), is also inapposite. The case stands for the unremarkable position that money is fungible, and thus one cannot avoid forfeiture by making a purchase with a credit card, and paying the credit card with tainted proceeds. "Though property need not be used exclusively for illegal activities to be forfeitable, it must have more than an incidental or fortuitous connection to criminal activity." *Seher*, 562 F.3d at 1370 (quotations and citation omitted).

The proper remedy for the Government's failure to show a substantial connection between the Defendant Asset and the alleged criminal activity is dismissal. *862 Zana Drive*, 2008 WL 4371354, at *3 (granting Claimants' motion to dismiss when because "the government makes no specific allegations tying this property to any criminal activity"). For example, in *United States v. Certain Accts., Together With all Monies on Deposit Therein*, the court found that because "[t]here has been no allegation that the indirect accounts were used for money laundering," the government's action seeking all the funds in the account required dismissal. 795 F. Supp. 391, 398 (S.D. Fla. 1992).

---

information on to my clerk prior to her purchase. She, in turn, paid for the home with her clean (and generous) federal salary. The upshot is that the United States can't seize the house. Not because she's an innocent owner without knowledge of a criminal connection under 18 U.S.C. § 983, but because there's no link to her purchase of the house and criminal activity under 18 U.S.C. § 981. Since this is an *in rem* case, it doesn't matter who buys the house; the focus is on the property's connection to crime. So, even if my clerk later sells the house back to the reformed drug dealers, now tech startup millionaires, the Government still can't touch it. As the Rolling Stones wisely put it, "You can't always get what you want"—especially when the law says otherwise.

Similarly, in *Seher*, the Eleventh Circuit held that "[s]ince we can identify no evidence to support the district court's finding as it pertains to Chaplin's bank accounts, we find that the district court clearly erred." 562 F.3d at 1370. Indeed, the parallels between the discussion in *Seher* and this case are striking:

> The government provides no record cites to a specific Chaplin's bank account. Instead, the government focuses on the interconnectedness between Chaplin's and Midtown and asserts that all of the assets of both companies, including their bank accounts, were thereby involved in the offenses. It also notes that some Midtown employees occasionally worked at Chaplin's and often were paid in cash. Though this latter fact could support the inference that Perkins' cash was used to pay employees, it would not tie the cash to a Chaplin's bank account.

*Id.* As in *Seher*, there is no record of illegitimate money financing the 2018 or 2020 Transactions. And there is nothing to link the $9,105,221.62 to any illegal conduct beyond the Government's cursory assertion that Felman should be considered coextensive with Felman Trading Inc., without actually pleading that either entity had any connection to anything illegitimate. *See, e.g.*, FAC ¶ 156 ("Shipments of manganese ore seamlessly transitioned, during 2018, from Felman Trading Inc. to Felman Trading Americas Inc."). A mere connection to a company partially owned by Kolomoisky or Boholiubov does not establish illegality; the statute requires allegations of violations of specific statutory provisions.

While the ability of the Government to bring actions of forfeiture is broad, that power cannot be exercised beyond the strictures of the statutory authority from which its power derives. Adherence to these rules is important, as "[t]he

Supplemental Rules guarantee protection above and beyond plaintiff's good judgment, however well-intentioned it may be" and absent enforcement of the constraints of the statutes, "[t]he outer limits of this theory would be bounded only by Plaintiff's imagination." *Certain Accounts*, 795 F. Supp. at 398. In a civil forfeiture action, the Government can bring an action for an *in rem* forfeiture and plead the requisite elements. But what the government cannot do is use an *in rem* action to pursue an *in personam* theory of forfeiture.

To state it succinctly, the FAC (like the Complaint) conflated *in rem* and *in personam* forfeiture by hinging the entire theory of forfeiture on Korf and Laber's interest in the Joint Venture as opposed to the culpability (or lack thereof) of the $9.1 million Defendant Asset. By continuing to blend *in personam* reasoning into the civil forfeiture of this specific *in rem* defendant, namely, the $9.1 million, the Government still has not "firm[ed] up, clarif[ied] and explain[ed] in more-precise factual terms the theory used to support the claim for the forfeitability of the proceeds (from the sale of the real estate)" as instructed nearly two years ago. *See* ECF No. 164 at 81-82. For these reasons, the Undersigned recommends dismissal of Counts II-VI with prejudice. *See Burger King Corp. v. Weaver*, 169 F.3d 1310, 1320 (11th Cir. 1999).

**If Amended, Is An Action under 18 U.S.C. § 984 Time-Barred?**

Because the Government cannot establish the Defendant Asset satisfies the definitions of 18 U.S.C. § 981, the Undersigned also considers whether it should be

26

permitted to amend this action to bring a claim under 18 U.S.C. § 984, which permits the forfeiture of fungible property even if the Government cannot "identify the specific property involved in the offense that is the basis for the forfeiture." 18 U.S.C. § 984(a)(1)(A); *see also United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 161 (3d Cir. 2003) ("if the government cannot fulfill the tracing requirement under section 981," then it "needs to resort to section 984"). Claimants contend any such amendment would be untimely and, therefore, futile. The Government responds that Section 984 does not apply, and that even if it did, the relation back doctrine would allow it to assert a claim under Section 984.

At the outset, the Undersigned notes that the Government has made it very clear it is not pursuing a Section 984 claim. *See* ECF No. 222 at 1; *id.* at 7 ("Section 984(b)'s limitations period remains inapplicable [and] has nothing to do with this forfeiture action"); *id.* at 8 ("the government is not required to invoke Section 984 . . . and it does not do so here"); *id.* at 9 ("This action is not 'pursuant to' Section 984"); *id.* at 10 ("Section 984 does not apply"); *id.* at 13 ("Section 984 simply does not apply"). Given the Government has (i) expressly stated that it has not brought this claim, (ii) has stated that this claim does not apply, and (iii) failed to seek leave to amend to add such an "inapplicable" claim, dismissal with prejudice is appropriate. *See Ounjian*, 89 F.4th at 862 ("A district court may dismiss a complaint

with prejudice where the plaintiff fails to request leave to amend"); *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009).

The Government's alternative contention—that the relation back doctrine permits it to assert a claim under Section 984—does not hold water. *See* ECF No. 222 at 11-13. Section 984's statute of limitation provides: "[n]o action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense." 18 U.S.C. § 984. It is undisputed that the Government's Section 984 claim would be time-barred unless it relates back under Fed. R. Civ. P. 15(c)(1).

Under Rule 15, an amendment to a pleading that names a new defendant can "relate back" to the prior complaint only where the new defendant "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1)(C). But "[w]hen the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision as opposed to a mistake concerning the proper defendant's identity, the requirements of Rule 15(c)(1)(C)(ii) are not met." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 552 (2010). "Even the most liberal interpretation of 'mistake' cannot include a deliberate decision not to sue a party whose identity

plaintiff knew from the outset." *Powers v. Graff*, 148 F.3d 1223, 1227 (11th Cir. 1998) (quotations and citations omitted).

Like in *Nelson v. Adams USA, Inc.*, United States "made no mistake." 529 U.S. 460, 467 (2000) ("[Respondent] knew of Nelson's role and existence and, until it moved to amend its pleading, chose to assert its claim for costs and fees only against OCP."); *see also Krupski*, 560 U.S. at 552.[15] For years, the Government argued that it named an appropriate Defendant Asset. *See* R&R at 69 ("By choosing to not name the real property as the *in rem* Defendant, the United States has, in effect, opted to pursue what seems more like an *in personam* action or perhaps a *quasi in rem* claim.").[16] While this choice was perhaps a mistake in strategy, it is not a "mistake" under any interpretation of Rule 15. Because amendment under 18 U.S.C. § 984 would not "relate back," the Undersigned recommends that Judge Gayles grant Claimants' motion and dismiss the FAC with prejudice.[17]

---

[15] The Government also suggested that the $9.1 million at issue is a substitute property for PNC Plaza under Supplemental Rule G(7)(b)(iv). But no such substitute asset was ever created, because, as the Government admits, the sale "was *not* an interlocutory sale governed by Supplemental Rule G." ECF No. 168 at 18 (emphasis in original). Indeed, the Government also never identified PNC Plaza as a *res*. *See* R&R at 64-69.

[16] *See also* R&R at 64, 69 (The "Government . . . chose to forfeit that interest in the building" and made a "decision to pursue an unorthodox forfeiture strategy," and "cho[se] to not name the real property as *in rem* Defendant.").

[17] Because the Undersigned finds that the Government has failed to state a claim, the Undersigned does not address Claimants' jurisdictional argument. However, even if it were to consider the argument, it would find, as the Government persuasively argued in *United States v. $389,820.00 in United States Currency*, No. 2:16-cv-985-ECM-WC, ECF No. 130 at 2, that because "this Court

## Conclusion

"Forfeitures are not favored in the law; strict compliance with the letter of the law by those seeking forfeiture must be required." *$38,000.00 Dollars*, 816 F.2d at 1547. And here, the Government's own allegations in the FAC refute any "reasonable belief that the government will be able to meet its burden of proof at trial." *$1,370,851.62*, 2009 WL 10712511, at *1. The authority of the Government to bring a forfeiture action is broad, but the Government may not seek an *in personam* civil forfeiture based on alleged personal culpability; civil forfeiture *in rem* is about culpability of the *res* itself and the Government may not proceed without establishing that the *res* is traceable to unlawful activity or substantially connected to such activity. It has failed to do so. Twice. The Undersigned therefore respectfully recommends that Judge Gayles grant Claimants' motion and dismiss the First Amended Complaint with prejudice.[18]

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on July 1, 2024.

---

did not have [*in rem*] jurisdiction at the beginning of this action . . . the present case should be dismissed." *See also $389,820 in U.S. Currency*, 829 F. App'x 488, 491 (11th Cir. 2020).

[18] The Parties will have fourteen days within which to file written objections, if any, with United States District Judge Darrin P. Gayles. Each party may file a response to the other party's objection within fourteen days. Failure to timely file objections shall bar the parties from a *de novo* determination on an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report, except upon grounds of plain error and if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.