UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:20-CV-23278-GAYLES/GOODMAN

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

APPROXIMATELY $9,105,221.62 IN FUNDS (PLUS
INTEREST) CURRENTLY HELD BY THE UNITED
STATES MARSHALS SERVICE REPRESENTING
95% OF THE NET PROCEEDS FROM THE SALE OF
THE REAL PROPERTY LOCATED AT 500 WEST
JEFFERSON STREET, LOUISVILLE, KY 40202
KNOWN AS PNC PLAZA,

               Defendant.

_____/

## REPORT AND RECOMMENDATIONS ON CLAIMANTS' MOTION TO DISMISS THE GOVERNMENT'S FIRST AMENDED COMPLAINT

This *in rem* civil forfeiture action involves $9,105,221.62, plus interest, held in escrow by the United States Marshals Service ("USMS"). The money is the net proceeds of the Government-approved sale of real property located at 500 West Jefferson Street, Louisville, KY 40202, known as PNC Plaza (the "Defendant Asset"). [ECF No. 187, ¶ 3]. The lawsuit's allegations involve several transactions concerning this same real property, which date back thirteen years (to 2011). Moreover, the case is factually complex and atypical. Indeed, the United States acknowledges that a significant aspect of the case is "a

1

curiosity" and that the case is "also unusual" for yet another reason unique to the facts. [ECF No. 235, p. 24].

The Undersigned needs to address several legal issues in order to rule on the pending motion to dismiss the First Amended Complaint ("FAC"). But, at bottom, the **primary** substantive dispute between Claimants and the United States boils down to one overarching, almost metaphysical, issue: did a 2018 restructuring of the property (which did not involve tainted funds) somehow *cleanse* the asset and sever the alleged substantial connection to criminal activity (thereby preventing the requested forfeiture) or does the property's substantial connection to the property *remain* (with Claimants able to assert an "innocent owner" affirmative defense and, if successful, to prevent the requested forfeiture)?

The Undersigned concludes that (1) the substantial connection remains (despite the restructuring which occurred after the initial purchase was made in 2011 with funds obtained from fraudulent loans); and (2) Claimants may introduce evidence to support an innocent owner defense. Therefore, I recommend that United States District Judge Darrin P. Gayles **deny** Claimants' Motion to Dismiss [ECF No. 221 ("the Motion")].[1] [The Undersigned is also not persuaded, for dismissal purposes, by other arguments asserted by Claimants, and the rationale for those conclusions will be outlined below].

---

[1]    Judge Gayles referred this matter to me for a report and recommendation. [ECF No. 219].

## I.    BACKGROUND

Claimants Mordechai Korf, Uriel Laber, Optima CBD Investments LLC, and CBD 500 LLC (collectively "Claimants") have moved to dismiss the government's FAC [ECF No. 187] on three grounds. First, they argue that the FAC is time-barred. Second, they argue that the Court lacks jurisdiction. Finally, they contend that the FAC fails to state a claim because it does not adequately plead a "substantial connection" between the defendant *in rem* and the relevant criminal conduct.

<u>Procedural Background</u>

The United States filed a Verified Complaint for Forfeiture *In Rem* [ECF No. 1] on August 6, 2020, in Case No. 20-cv-23279. The action was consolidated with the Government's simultaneously-filed Case No. 20-cv-23278. Two additional civil forfeiture actions, all arising from similar facts and circumstances, have also been consolidated into Case No. 20-cv-23278 (Case Nos. 20-cv-25313 and 22-cv-20238). Claimants filed claims and moved to dismiss. The other three actions were stayed, but the Court allowed this action to proceed. After extensive briefing and a hearing regarding Claimants' motion to dismiss the Verified Complaint, the Undersigned recommended that the motion be granted in part and denied in part.  [ECF No. 164]. On January 3, 2023, the Court adopted the Report and Recommendation, dismissing the Complaint without prejudice. [ECF No. 185]. Simultaneously, the Court granted the United States leave to amend its Complaint. [ECF No. 186].

The United States filed the FAC on January 5, 2023. [ECF No. 187].

The FAC alleges that the net proceeds of the sale of Kentucky real property known as PNC Plaza (the "Defendant Asset") is forfeitable on two grounds. First, the FAC alleges that the Defendant Asset is forfeitable pursuant to 18 U.S.C. § 981(a)(1)(C), because it is traceable to violations of specified unlawful activity, including violations of 18 U.S.C. §§ 1956(c)(7)(B)(iii), 2314, and 2315. Second, the FAC alleges that the property is forfeitable under 18 U.S.C. § 981(a)(1)(A), because it was involved in and facilitated one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and 1957, or is traceable to such property. *Id*. at ¶¶ 6-8.

Claimants filed claims and moved to dismiss the FAC. [ECF Nos. 192-6]. The Government moved to stay the action. [ECF No. 201]. Over Claimants' objection, the Court stayed the action on August 23, 2023, in part because Claimants' motion to dismiss [ECF No. 196] attached and relied on extrinsic evidence. [ECF No. 214]. In response to the Court's order staying the action, Claimants withdrew portions of their original motion to dismiss that relied on facts and allegations outside the four corners of the FAC. [ECF No. 216]. Also, they requested that the Court set a briefing schedule on the slimmed-down motion. *Id.*

On December 18, 2023, the Undersigned granted Claimants' motion to set a briefing schedule on their motion to dismiss [ECF No. 220] and ordered that they refile the motion with the "withdrawn" portions removed entirely, which they did on

December 19, 2023. [ECF Nos. 220-1]. An opposition and reply [ECF Nos. 222-3] were duly filed. On May 2, 2024, the Undersigned held argument on the Motion, and instructed the parties to each submit a proposed report and recommendation ("R&R") for the Undersigned's consideration, which they did. [ECF Nos. 232; 235-6].

<u>Factual Background</u>

This Report and Recommendation accepts "all of the factual allegations in the Complaint as true," *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009), for purposes of deciding the Motion, "and construe[s] them in the light most favorable to the plaintiff[]," *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1347 (11th Cir. 2016). A motion to dismiss must be denied where a complaint pleads "'enough facts to state a claim to relief that is plausible on its face.'" *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1210 (11th Cir. 2020) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Iqbal*, 556 U.S. at 678).

As noted above, the FAC seeks forfeiture of the Defendant Asset, amounting to $9,105,221.62, plus interest, held in escrow by the United States Marshals Service ("USMS"). [ECF No. 187, ¶ 3].

The FAC alleges that Ihor Kolomoisky and Gennadiy Boholiubov, two Ukrainian oligarchs, misappropriated billions of dollars from PrivatBank, one of the largest banks in Ukraine, via fraudulent loans. *Id*. at ¶¶ 14-15, 19. Kolomoisky and Boholiubov

allegedly laundered the misappropriated funds through accounts held in the names of entities they owned or were associated with at PrivatBank's Cyprus branch. *Id*. at ¶ 21. The FAC alleges that the misappropriated funds flowed through dozens of PrivatBank accounts and were, in certain circumstances, used to purchase assets in the United States by Mordechai Korf and Uriel Laber. Korf and Laber are alleged to be Kolomoisky and Boholiubov's U.S. associates, and they are two of the claimants in this action. *Id*. at ¶¶ 22-3, 85.

The FAC alleges that, Kolomoisky, Boholiubov, Korf, and Laber acquired PNC Plaza through this scheme. *Id*. at ¶¶ 103, 105. The FAC further alleges that Korf and Laber used the U.S.-based company, Optima Ventures LLC, and a specially created entity, Optima 500 LLC, for the acquisition. *Id*. Allegedly, Optima Ventures was owned approximately 33% each by Kolomoisky and Boholiubov, and approximately 16% each by Korf and Laber. *Id*. at ¶ 92.

The FAC alleges that Kolomoisky and Boholiubov misappropriated funds to purchase PNC Plaza via two fraudulent loans obtained from PrivatBank: (1) $9,300,000 to Zaporozhye Ferroalloy Plant, a metal processing plant, purportedly for the purpose of funding ferroalloy operations of that company; and (2) $13,500,000 to Nikopol Ferroalloy Plant, also a metal processing plant, for the same purported purpose. *Id.* at ¶¶111-27. The loan applications submitted to the bank allegedly contained material misrepresentations, including language regarding the true purpose of the loans. *Id*. at ¶¶ 112-18, 120-27.

The FAC includes detailed allegations (the Government describes them as being "down to the minute") tracing the allegedly misappropriated funds between September 19, 2011, when the loan proceeds were disbursed, and September 22, 2011, when they were used to purchase PNC Plaza. *Id*. at ¶¶ 129-36. The loan funds were allegedly transferred through multiple accounts in the names of entities owned by, or associated with, Kolomoisky and Boholiubov held at PrivatBank's Cyprus branch. *Id*. ¶¶ at 131-3.

In addition to using the misappropriated funds, Korf and Laber allegedly assumed a mortgage of $65,700,000. *Id*. at ¶ 108. The FAC explains that Korf and Laber obtained income from PNC Plaza, but did not pay the assumed mortgage, which then led to a default in 2017. *Id*. at ¶¶ 138, 141.

At that point Korf and Laber allegedly created new entities, Optima CBD Investments LLC and CBD 500 LLC, to restructure the ownership of the property and effectively refinance the debt. *Id*. at ¶ 149. The FAC goes on to say that they partnered with an unrelated investor, referred to as "Firm A," to create a joint venture in which CBD 500 LLC owned a 95% interest. *Id*. at ¶¶ 142-7. The FAC alleges that Claimants, through the joint venture entity, acquired the promissory note that Optima 500 had previously defaulted on. *Id*. at ¶ 149. To acquire the promissory note, the joint venture allegedly used approximately $9.5 million from Korf and Laber's Optima-affiliated

entity, Felman Trading Americas Inc. to take on $17 million of new debt. *Id*. at ¶ 154-5. Significantly, the FAC **does not allege that the new funds were tainted**.[2]

Once the joint venture entity acquired the note, Optima 500 allegedly transferred the deed for PNC Plaza to the joint venture entity in lieu of foreclosure. *Id*. at¶¶ 152-3.[3] Thus, the FAC alleges, Korf and Laber continued to own the property after the restructuring. Therefore, the restructuring *itself* was allegedly part of the criminal money laundering conduct. *Id*. at ¶ 160.

The FAC alleges that in July 2020, Korf and Laber entered an agreement to divest from PNC Plaza entirely by selling it to the third-party investor. *Id*. at¶ 162. Before the sale closed, the Government brought this action, seeking to forfeit Claimants' corporate

---

[2]      The FAC alleges that Felman Trading Americas Inc., though legally separate, shares a bank account, offices, a registered agent, and management with Felman Trading Inc., which is owned by Kolomoisky and Boholiubov, in addition to Korf and Laber. [ECF No. 187 ¶ 156]. The FAC, however, is devoid of any allegation that either Felman Trading Americas Inc. or Felman Trading Inc. received any funds misappropriated from PrivatBank. To the contrary, after three years of "ongoing" criminal investigation [ECF No. 46], the Government concedes that this acquisition's financing still "has not been traced to criminal activity[.]" [ECF No. 222, p. 16].

[3]      In an earlier-filed memorandum concerning the first motion to dismiss, the United States explained that a deed in lieu of foreclosure "allow[s] the mortgagee to avoid the stigma of a foreclosure, but it can be of significant economic benefit to the borrower where the value of the real estate is considerably less than the balance due." [ECF No. 119, p. 19 (citing *Kennedy v. JP Morgan Chase Nat. Corp.*, No. 10-cv-11324, 2011 WL 1576569, at *3 (D. Mass. Apr. 26, 2011) ("Under a deed in lieu, the borrower conveys a fee-simple title to the mortgagor in exchange for a forgiveness of the debt secured by the mortgage.")]].

interests in the entity that owned PNC Plaza. *Id*. at ¶ 163. The Government sought a restraining order to preserve the value of the property, preventing Claimants from interfering with the sale for which they had contracted. *Id*. at ¶ 164.[4] Under the sales contract it had entered, CBD 500 stood to receive approximately $9,105,221.62 from the sale,[5] representing its ownership interest in PNC Plaza. *Id*. at ¶¶ 165-6. Those funds were, pursuant to the restraining order, sent to the USMS to hold in escrow pending the outcome of this action. *Id*.

## II.    LEGAL ANALYSIS

<u>Standard of Review</u>

The parties disagree about the applicable pleading standards and whether the United States must allege a "substantial connection" between the property to be forfeited and the illegal activity alleged by the Government.

---

[4]    The United States sought to compel the sale's completion. "The United States not only oversaw the sale, [but] it was intimately involved and coordinated closely with the parties -- the title company, the purchaser, and the Claimants." [ECF No. 164, p. 67].

[5]    The agreement was entered into in 2020, with an ultimate sale price of $22.25 million (the "2020 Transaction"). [ECF No. 187, ¶ 162]. Neither party argues this represented an unfair or below market price, or that the buyer purchased PNC Plaza unlawfully. Upon completion of the sale, $9,105,221.62 of CBD 500's sale proceeds were transferred to the USMS and held in escrow for purposes of this action. *Id*. at ¶¶ 165-6. The United States now seeks to forfeit this $9.1 million, claiming that it constitutes criminal "proceeds" pursuant to 18 U.S.C. § 981(a)(1)(C) or is otherwise "involved in" unlawful criminal activity pursuant to 18 U.S.C. § 981(a)(1)(A).

The United States highlights that civil forfeiture complaints are governed by the pleading standards set forth in Rule G[6] of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture ("Supplemental Rules") and, to the extent they are not "inconsistent" with the Supplemental Rules, by the Federal Rules of Civil Procedure. [ECF No. 222, p. 5 n. 1 (citing Supp. R. A(2))]. Similarly, Supplemental Rule G(1) also provides that if Rule G "does not address an issue [,]" then Supplemental Rules C and E and the Federal Rules of Civil Procedure apply.

Thus, the Government notes, the FAC is required to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." *Id*. at 6 (citing Supp. R. G(2)(f)). Claims asserted in the *In Rem* Complaint must be set forth "with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." *Id*. (citing Supp. R. E(2)(a)).[7]

The United States emphasizes that, like an *in personam* civil action, the burden in the *in rem* context is not high. Specifically, it says, "[a]t the pleading stage, it suffices for the [G]overnment to simply allege enough facts so that the claimant may understand the theory of forfeiture, file a responsive pleading, and undertake an adequate investigation."

---

[6]     Rule G is entitled "Forfeiture Actions In Rem" and "governs a forfeiture action in rem arising from a federal statute."

[7]      Supplemental Rule E is entitled "Actions In Rem and Quasi In Rem: General Provisions."

*Id*. (quoting *United States v. One Gulfstream G-V Jet Aircraft*, 941 F. Supp. 2d 1, 14 (D.D.C. 2013) (explaining that the pleading requirements in a civil forfeiture action are simultaneously governed by the Federal Rules of Civil Procedure and the Supplemental Admiralty Rules) (*citing United States v. Mondragon*, 313 F.3d 862, 864 (4th Cir. 2002))).

Moreover, as stated in *One Gulfstream G-V Jet Aircraft*, a court "may not dismiss the complaint 'on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property.'" 941 F. Supp. 2d at 14 (citing Supp. R. G(8)(b)(ii); 18 U.S.C. § 983(a)(3)(D)).

Focusing on the Civil Asset Forfeiture Reform Act ("CAFRA"), effective since August 20, 2000, Claimants note that CAFRA enacted safeguards in response to mounting concerns about due process in civil forfeiture proceedings and raised the Government's burden of proof at trial from probable cause to a preponderance of the evidence standard. [ECF No. 236-1, p.7].[8] According to Claimants, "CAFRA did not alter the Government's obligation to establish a 'substantial connection' between the unlawful activity and the property to be forfeited." *Id*. at 8.

Moreover, Claimants argue that a civil forfeiture complaint must plead a "substantial connection" between the property to be forfeited and the illegality alleged by the Government, and they emphasize that this is a *pleading* requirement, not merely a

---

[8]    As previously stated, the Undersigned required both parties to submit a proposed R&R to chambers. The Undersigned reviewed these proposed R&Rs [ECF Nos. 235-6] and treats them as additional briefs.

trial burden. Many of the cases they cite are pre-CAFRA cases, which suggests that the holdings should be **more** Government-friendly, not less. *Id*. *See, e.g., United States v. Two Parcels of Real Property*, 92 F.3d 1123, 1126 (11th Cir. 1996) (pre-CAFRA) ("the complaint must allege sufficient facts to provide a reasonable belief that the property is subject to forfeiture: in particular, that . . . a substantial connection exists between the property to be forfeited and [the statutory violation]") (quotations and citation omitted).

However, they also rely on post-CAFRA authority. *Id*. *See, e.g., United States v. 862 Zana Drive, Ft. Myers, Fla*. 33905, No. 2:07-cv-822, 2008 WL 4371354, at *3 (M.D. Fla. Sept. 22, 2008) (dismissing complaint for "fail[ure] to plead a **substantial connection** between this property and any criminal activity") (emphasis supplied).

Claimants further highlight the point that the Supplemental Rules require a civil forfeiture complaint to

> state sufficiently detailed facts to support a reasonable belief that it will be able to prove at trial that the Respondent Properties were involved in or are traceable to property involved in money laundering—that is, that the Respondent Properties had a *substantial connection* to money laundering **or** are *traceable* to property having a *substantial connection* to money laundering.

*Id*. at 9 (quoting *United States v. Title & Int. in the Real Prop. & Appurtenances Located At 641 E Stadium Beach Rd. W, Grapeview, Washington 98546, With All Improvements and Attachments Thereon et al*., ("Title & Int."), No. EP-14-cv-60, 2015 WL 12748176, at *5 (W.D. Tex. Mar. 24, 2015) (emphasis supplied)).

But *Title & Int.* actually **undermines** a significant part **of** Claimant's argument (and supports the Government's position) because it held that, at the *pleadings* stage (which is where we are at now), the Government "must only convince the Court that there is evidence sufficient to support a *reasonable belief* that the Government will be able to prove that substantial connection at trial." 2015 WL 12748176, at *5 (citing *United States v. $200,255.00*, No. 7:05–CV–27(HL), 2006 WL 1687774, at *7 (M.D. Ga. June 16, 2006) ("[T]he Government need not satisfy the burden imposed by § 983(c)(3) at the initial pleading stage.")).

Claimants amplify the Government's reference to *One Gulfstream G-V Jet Aircraft* by noting that the Court there explained that "[a] claimant in an *in rem* proceeding may move to dismiss in the same form provided by Rule 12(b), which, of course, requires courts to dismiss a complaint for "failure to state a claim upon which relief can be granted," [ECF No. 236-1 (quoting 941 F. Supp. 2d at 14; Fed. R. Civ. P. 12(b)(6))].

Although 18 U.S.C. § 983(a)(3)(D) provides that "[n]o complaint may be dismissed on the ground that the Government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property[,]" the Claimants here are not "argu[ing] that the Government's evidence is insufficient, but rather that its *allegations* are." *Id*. at 9 n. 6 (quoting *United States v. All Funds on Deposit in Lee Munder Wealth Planning Resource Account Number Account No. ***-**1080*, 137 F. Supp. 3d at 128, 128 n.7 (dismissing forfeiture complaint with prejudice) (emphasis in original)).

13

Similarly, Claimants argue, "[w]hile a motion to dismiss challenges the sufficiency of the pleadings, not proof at trial, the Government must still allege facts that support a reasonable belief they (stet) will be able to meet their burden of proof at trial [.]"*Id*. at 10 (quoting *United States v. $170,000 In U.S. Currency*, No. 13-01318, 2024 WL 2922718, at *9 (D.P.R. June 10, 2024) (quotations and citations omitted) (dismissing forfeiture claim at motion to dismiss stage for failure to plead substantial connection)); *see Title and Interest*, 2015 WL 12748176, at *5; *$38,000.00 Dollars*, 816 F.2d at 1548.

Additionally, Claimants note, the Supplemental Rules of Certain Admiralty and Maritime Claims "impose a more stringent obligation on the Government than the notice pleading requirements of the Federal Rules of Civil Procedure to set forth grounds for forfeiture." *Id*. (quoting *Two Parcels of Real Prop.*, 92 F.3d at 1126); (citing *United States v. $134,972.34 Seized from FNB Bank, Acct. No.-£5351*, 94 F. Supp. 3d 1224, 1229 (N.D. Ala. 2015) (post-CAFRA pleading standard remains "heightened"); *United States v. $1,370,851.62 in United States Currency*, No. 09-21277, 2009 WL 10712511, at *1 (S.D. Fla. Aug. 13, 2009) (maintaining application of the Supplemental Rules post-CAFRA); *United States v. Funds in the Amount of Forty-Five Thousand Fifty Dollars* ($45,050.00), No. 06 C 6948, 2007 WL 2323307, at *2–3 (N.D. Ill. Aug. 9, 2007) ("In post-CAFRA cases such as this one, the government must . . . present facts supporting a reasonable belief that it can meet its burden of proof at trial.")).

In response to these Claimants-urged arguments, though, the Government has a straightforward response: the FAC alleges forfeitability under **both** 18 U.S.C. §§ 981(a)(1)(C) and (a)(1)(A), and the "substantial connection" requirement Claimants refer to applies *only* to the *latter* theory. It then says that, in any event, the FAC *does* establish sufficient allegations of a substantial connection between the criminal activity and the defendant Asset, and that the connection "was not severed by the transfer of the deed in lieu of foreclosure." [ECF No. 235-1, p. 16].

The "substantial connection" requirement is found in 18 U.S.C. § 983(c)(3). That provision relates to the Government's "[b]urden of proof" **at trial.** That burden, set forth by the CAFRA, need not be met *before* trial. *Id*. "The government, [ ] under 18 U.S.C. § 983(c)(3), does not have to satisfy the need for a substantial connection between the property and a forbidden act at the initial pleading stage." *Id*. (quoting *United States v. Acct. of Prop. Futures, Inc.*, No. 08-81244-CIV, 2010 WL 11447277, at *3 (S.D. Fla. Feb. 18, 2010), *report and recommendation adopted*, No. 08-81244-CIV, 2010 WL 11447278 (S.D. Fla. Mar. 22, 2010)); *see also United States v. $200,255.00 in U.S. Currency*, No. 7:05-CV-27 (HL), 2006 WL 1687774, at *7 (M.D. Ga. June 16, 2006) ("[T]he Government need not satisfy the burden imposed by § 983(c)(3) at the initial pleading stage.").

Although "[t]he Government's burden at trial will be to prove by a preponderance of the evidence that the seized funds had a substantial connection to a [criminal] transaction," at "the pleading stage, [ ] the complaint needs only to 'state sufficiently

detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial.'" *United States v. Approximately $126,880 in United States Currency,* No. 2:19CV728FTM60MRM, 2020 WL 3270601, at *3 (M.D. Fla. June 17, 2020)); *see also Title & Int.,,* 2015 WL 12748176, at *5 (denying Claimant's motion to dismiss and holding that "at the pleadings stage the Government must only convince the Court that there is evidence sufficient to support a *reasonable belief* that the Government will be able to prove that substantial connection at trial.") (emphasis in original).

As to the FAC's First Claim for Relief, Section 983(c)'s "substantial connection" requirement does **not** apply. The First Claim alleges that the Defendant Asset is subject to forfeiture because it "constitutes, or is derived from, proceeds traceable to" specified unlawful activity. [ECF No. 187, ¶ 39]; see 18 U.S.C. § 981(a)(1)(C).

As discussed above, the "substantial connection" standard does not apply to property that constitutes, is derived from, or is traceable to proceeds. *See United States v. $125,938.62,* 537 F.3d 1287, 1293 n.2 (11th Cir. 2008) ("the Government was required to demonstrate only that the funds were derived from or were traceable to" proceeds).

Indeed, precisely the same issue concerning the substantial connection standard arose in *Title & Int.* In that case, the court explained the inapplicability of Section 983(c)(3)'s substantial connection requirement to claims for forfeiture under Section 981(a)(1)(C):

> [T]he Government is proceeding under *two* theories of forfeiture: (1) that the [defendant assets] were involved in money laundering (18 U.S.C. §

981(a)(1)(A)), which would trigger the 'substantial connection' requirement under 18 U.S.C. § 983(c)(3); and, (2) that the [defendant assets] constituted or were derived from proceeds traceable to illegal activities (18 U.S.C. § 983(a)(1)(C)), which does *not* trigger the 'substantial connection' requirement. Thus, [Claimant's] assertion that 'the Government must plead a substantial connection between the [defendant assets] and the alleged offenses' oversimplifies the matter.

2015 WL 12748176, at *5 (emphasis in original).

The same legal scenario is present here, as well. The First Claim for Relief is based on a proceeds theory, and so Claimants' dismissal argument based on a lack of alleged "substantial connection" is inapplicable.

But the rest of the FAC's claims for relief *does* rely on an "involved in" theory, as opposed to a "proceeds" theory, and so the FAC must allege facts sufficient to support a reasonable belief that, at trial, the Government will be able to establish a substantial connection between the Defendant Asset and the alleged criminal activity.

Therefore, by way of summary, the Undersigned's analysis of whether the FAC adequately states a claim will depend on which theory of forfeiture is being discussed (and whether the "substantial connection" requirement is present).

Before engaging in that evaluation, however, the Undersigned will first tackle two threshold issues: whether the FAC is time barred and whether the Court has jurisdiction.

<u>Is the Action Time Barred?</u>

Claimants argue that this action should be dismissed because it is barred by the statute of limitations. [ECF No. 221, pp.8-13]. They direct the Court to 18 U.S.C. § 984,

which provides a one-year limitations period for forfeitures of "fungible" property. *Id*. at 8-9. They also argue that the "relation back doctrine," under which an amended complaint is judged to be filed as of the time of the initial complaint, does not apply. *Id*. at 9-13.

In response, the Government posits that Claimants have cited the wrong statute, and that Section 984 does not apply to this action because it does not involve a forfeiture of fungible property. [ECF No. 222, pp.6-13]. The Government argues that the applicable statute of limitations is five years. It contends that, if the Court were to find Section 984's limitations period applicable, under the relation back doctrine, then the FAC would nevertheless be timely filed, but that the Court need not address the issue. *Id*. at 11-13.

The Undersigned already concluded, in the prior R&R on the first motion to dismiss, that Section 984(b) remains "completely inapplicable, as it is concerned exclusively with fungible, untraceable assets." [ECF No. 164, p.83 n.25]. Section 984 governs the forfeiture of "fungible property," and provides that where the subject of the forfeiture is "cash, monetary instruments in bearer forms, funds deposited in a financial institution (as defined in section 20 of this title), or precious metals," the Government need not "identify the specific property involved in the offense that is the basis for forfeiture." 18 U.S.C. § 984(a)(1)(A). Thus, it is "not [ ] a defense that the property involved in such an offense has been removed and replaced by identical property." *Id*. at §984(a)(1)(B).

Section 984 is, in effect, a "substitute asset" provision -- it allows the government to forfeit property that cannot, because of its fungibility, be definitively identified as the property connected to the criminal activity. *See United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 158 (3d Cir. 2003) ("Section 984 is a 'substitute asset provision' enacted to overcome [] tracing difficulties and ease the government's burden of proof in civil forfeiture proceedings involving fungible property."); *United States v. $83,274.51*, No. 2:13-CV-153-JEO, 2013 WL 5524729, at *6 (N.D. Ala. Sept. 30, 2013) ("§984 allows the Government to substitute fungible property that is not directly traceable to the structuring offense for property that was directly traceable to the offense.").

Examples of cases where Section 984 applies include situations where a specific bank account was used to further criminal activity, and funds passed in and out of the account. Section 984 allows forfeiture of funds *equivalent* to the amount of dirty money that flowed through the account, even if the specific funds were removed. *See United States v. Funds on deposit at Bank One, Indiana account 1563632726*, No. 2:02CV480, 2010 WL 909091, at *7 (N.D. Ind. Mar. 9, 2010), *aff'd sub nom. United States v. Funds on Deposit at Bank One Chicago Acct. 1110010428312*, 393 F. App'x 391 (7th Cir. 2010).

But the FAC does not seek to forfeit *fungible* property. It alleges forfeitability of a specific asset -- the proceeds from the sale of a building, which were sent directly to the USMS. The bases for that forfeiture arise under 18 U.S.C. § 981, *not* §984. [*See* ECF No. 187,¶¶ 39-45]. Section 984 "enhances[,] rather than replaces and limits[,] the

government's forfeiture powers." *United States v. Contents in Acct. No. 059-644190-69*, 253 F. Supp. 2d 789, 794 (D. Vt. 2003) ("Section 984 gave the government a broad, new power to seize fungible property without regard to its traceability to proscribed conduct.").

As the Undersigned noted earlier in the R&R for the first motion to dismiss, "[t]his action [ ] does not seek fungible property such as bulk cash or loose diamonds." [ECF No. 164, p.83 n.25]. Instead, it seeks a particular asset. *See United States v. All Funds Presently on Deposit Maintained at Am. Exp. Bank*, 832 F. Supp. 542, 559 (E.D.N.Y. 1993) ("Section 981 and its five-year limitations period are still available to the government as a means of civil forfeiture where specific, identifiable property is concerned.").

In addition to the Defendant Asset not being the sort of "fungible" property encompassed by §984, the FAC sufficiently alleges that the subject property is traceable. Section 984(d) makes clear that it may not "be construed to limit the ability of the Government to forfeit property under any provision of law if the property involved in the offense giving rise to the forfeiture or property traceable thereto is available for forfeiture." 18 U.S.C. § 984(d); *see United States v. Contents of Four Bank Accts. Located in Bank of Dadeville, Dadeville, Alabama*, 330 F. Supp. 2d 1299, 1304 (M.D. Ala. 2004) ("As long as, 1) the property involved in the offense giving rise to the forfeiture is available for forfeiture or 2) property traceable thereto is available for forfeiture, the Government is not required, simply because the case involves fungible property, to proceed under 18 U.S.C. §984.").

The FAC explains, in detail, connection between the misappropriated funds transfers from PrivatBank used to acquire PNC Plaza, the conversion of those funds into the property (the instrument of which was the deed), the deed's transfer (and thus ownership of the real property) among the Optima entities, the conversion of that deed and real property into funds via the sale of PNC Plaza, and, finally, the transfer of those funds to the USMS. [ECF No. 187 ¶¶ 129-35, 151-3, 161-6].

The FAC therefore includes sufficiently detailed allegations regarding **traceability** of the Defendant Asset. *See United States v. Approximately $3,275.20 seized from Bank of Am. Acct. No. XXXXXXXXXXX*, No. 21-20614-CIV, 2021 WL 5300512, at *6 (S.D. Fla. Nov. 15, 2021) (rejecting applicability of Section 984 where allegations included traceability).

Section 984 is irrelevant to this action because the Government seeks to forfeit specific, identifiable property (as opposed to fungible property) and because it alleges traceability. 18 U.S.C. § 981(d) identifies the applicable statute of limitations for these actions as 19 U.S.C. § 1621, which provides a **five-year** limitations period from the discovery of the alleged offense. Claimants initially argued that the FAC was barred by even the five-year statute of limitations, but they have withdrawn, and therefore *waived*, that argument. [*See* ECF Nos. 216, p.2; 216-1 pp. 2, 14-16]. *United States v. Horsfall*, 552 F.3d 1275, 1283–84 (11th Cir. 2008); *see also United States v. Cobb*, 842 F.3d 1213, 1222 (11th Cir. 2016); *United States v. Pellegrino*, 777 F. App'x 972, 973 (11th Cir. 2019). The Undersigned

therefore recommends the Court **deny** Claimants' Motion on the ground that the action is time barred.

Does the Court Have Jurisdiction?

Claimants also argue that the Court lacks jurisdiction over this case because the Government's original complaint improperly identified the defendant *in rem*. [ECF No. 221, p.16]. In essence, they contend that an *in rem* jurisdictional defect divests the court of jurisdiction and cannot be cured.

The Government responds that the Court has always had subject-matter jurisdiction, and that a curable *in rem* jurisdictional defect does not divest it of jurisdiction. [ECF No. 222, pp. 18-9].

The Court has already decided this issue. The Undersigned's R&R with respect to Claimants' first motion to dismiss concluded that leave to amend ***was*** proper. [ECF No. 164 at 74].   Claimants later opposed the Government's motion for leave [ECF No. 169] based on the same theory they advance here, that the jurisdictional defect in the first complaint divested the Court of jurisdiction entirely. [ECF No. 180]. Over that objection, the Court granted the Government's motion to amend.  [ECF No. 186].

Claimants have offered no reason for the Court to revisit and reconsider its early decisions. The Court has jurisdiction. In a civil forfeiture action, a court must have both subject matter and *in rem* jurisdiction, that is, jurisdiction over the property at issue. *See* Supp. R. G(2)(b) (a complaint must "state the grounds for subject-matter jurisdiction, in

22

rem jurisdiction over the defendant property, and venue"); *SEC v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007) ("*In personam* jurisdiction, simply stated, is the power of a court to enter judgment against a person. *In rem* jurisdiction is the court's power over property.").

A lack of subject-matter jurisdiction divests the court of the ability to act. But a lack of *in rem* jurisdiction, much like a lack of *in personam* jurisdiction, does not. *See* Wright & Miller 5B Fed. Prac. & Proc. Civ. § 1351 (3d ed.) ("Although Rule 12(b)(2) only refers to 'lack of personal jurisdiction,' the provision presumably is sufficiently elastic to embrace a defense or objection that the district court lacks *in rem* or *quasi-in-rem* jurisdiction.")

Courts may allow amendments to cure an *in rem* jurisdictional defect. *See, e.g., Complaint of McLinn*, 744 F.2d 677, 685 (9th Cir. 1984) (leave to amend proper where there was an *in rem* jurisdictional defect);[9] *see also United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1268 (11th Cir. 2009) (leave to amend allowed where court lacked personal jurisdiction); *Krisko v. Marvel Ent., LLC*, 473 F. Supp. 3d 288, 301 (S.D.N.Y. 2020) ("Even when courts lack personal jurisdiction over a defendant, 28 U.S.C. § 1406(a) permits them to transfer an action . . .").

And, *in rem* jurisdiction may even be waived by the parties. *See* Supp. R. G(5)(b) ("A claimant waives an objection to in rem jurisdiction or to venue if the objection is not

---

[9]     *See also United States v. Approximately $77,000.00 in U.S. Currency*, No. 1:11-CV-01251 GSA, 2013 WL 6842889, at *3 (E.D. Cal. Dec. 20, 2013) (allowing the Government to amend an *in rem* civil forfeiture complaint to allow for a verification, which was missing from the initial complaint).

made by motion or stated in the answer."); *Leopard Marine & Trading, Ltd. v. Easy St. Ltd.*, 896 F.3d 174, 183 (2d Cir. 2018) (a "jurisdictional defect" related to the *res* "can be waived."); *Porsche Cars N. Am. Inc. v. Porsche.net*, 302 F.3d 248, 256 (4th Cir. 2002) ("[I]n admiralty and civil forfeiture cases, for years courts have held that objections to *in rem* jurisdiction may be waived."); Fed. R. Civ. P. 12(h). If a challenge to the jurisdictional requirement is waivable, then a defect does not automatically divest this Court of the ability to hear the case.

Claimants have not called our attention to any *in rem* action where an amendment such as the one sought here has been denied. Supplemental Rule G (7)(b)(iv) provides that, following an interlocutory sale, the "[s]ale proceeds are a substitute *res* subject to forfeiture in place of the property that was sold" which is what has happened here. *See United States Of America v. All right to and Interest in PNC Corporate Plaza Holdings, LLC Held, Controlled, or Acquired, Directly or Indirectly, by Optima CBD Investments, LLC and/or CBD 500 LLC*, Case No. 20-cv-23279, ECF No. 5, p.3.[10] It would be illogical to allow substitution of the *res* while forbidding an amendment to conform the description of the Defendant asset to the substitute *res*.

---

[10]     Before consolidation, the *in rem* civil forfeiture complaint involving PNC Plaza was filed as Case 20-cv-23279.

Because *in rem* jurisdictional defects can be cured and *in rem* jurisdictional challenges can be waived, the initial defect did not divest the Court of the ability to allow amendments nor divest the Court of its ability to adjudicate this matter.

The FAC addresses, and fixes, the initial complaint's jurisdictional shortcoming. Significantly, the Court has exercised control over the Defendant Asset since the first complaint was filed. *See Id.* The Undersigned therefore **respectfully recommends** that the Court conclude it has jurisdiction and **deny** Claimants' motion to dismiss on this ground.

<u>Does the FAC State a Claim?</u>

To recap, as to the FAC's First Claim for Relief, Section 983(c)'s "substantial connection" requirement does not apply. The First Claim alleges that the Defendant Asset is subject to forfeiture because it "constitutes, or is derived from, **proceeds** traceable to" specified unlawful activity. [ECF No. 187, ¶169]; see 18 U.S.C. § 981(a)(1)(C) (emphasis added).

The rest of the FAC's claims for relief does rely on an **"involved in"** theory, as opposed to a "proceeds" theory; and so the FAC must allege facts sufficient to support a reasonable belief that, at trial, the Government will be able to establish a substantial connection between the Defendant Asset and the alleged criminal activity.

"The term 'involved in' has consistently been interpreted broadly by courts to include any property involved in, used to commit, or used to facilitate the offense." *United*

*States v. Seher*, 562 F.3d 1344, 1369 (11th Cir. 2009) (internal quotation marks omitted) (forfeiture statute allowed for forfeiture of property that facilitated a violation of the requirement to report cash purchases of jewelry of more than $10,000). The term "involved in" also "refers to property that is itself being laundered." *United States v. Approximately 250 Documents Containing the Forged Hand Writing of President John F. Kennedy & Others*, No. 03 CV 8004 (GBD), 2008 WL 4129814, at *3 (S.D.N.Y. Sept. 5, 2008).

A "[s]ubstantial connection may be established by showing that use of the property made the prohibited conduct less difficult or more or less free from obstruction or hindrance." *United States v. Approximately $299,873.70 Seized from a Bank of Am. Acct.*, 15 F.4th 1332, 1340 (11th Cir. 2021) (quoting *United States v. Herder*, 594 F.3d 352, 364 (4th Cir. 2010)). "[T]he nexus between the property and the illegal activity need not be integral, essential, or indispensable." *United States v. Thirty-Eight Thousand Three Hundred Twenty Dollars in U.S. Currency*, No. 221CV02624JPMTMP, 2022 WL 6755863, at *3 (W.D. Tenn. Oct. 11, 2022) (same) (granting summary judgment to United States).

The FAC states that PNC Plaza was allegedly used to launder funds misappropriated from PrivatBank, to provide a seemingly legitimate place to hide the funds.  [ECF No. 187, ¶¶ 90; 92-97; 137; 141 n.9; 160]. The FAC alleges, and Claimants do not dispute that it alleges, that PNC Plaza was purchased in 2011 with funds stolen from PrivatBank, and that it was therefore "involved in" criminal activity. *Id*. at ¶¶ 107-136.

There is thus no dispute that the FAC alleges that the Defendant Asset was, **at least at one point**, substantially connected to the criminal activity.

Claimants nonetheless assert that the 2018 restructuring "cleansed" the asset and severed the substantial connection -- because Claimants used *new* funds that are unconnected to the initial criminal acts.  [ECF No. 221, pp. 14-16].

Evaluated from a superficial vantage point, the existence of new funds seems to generate an equitable theory that the tainted asset is no longer subject to forfeiture because the clean money somehow sanitized the connection to criminal activity. But this notion overlooks the reality that the property was initially obtained with allegedly tainted funds. And, more importantly, it conflates the concept of a claimant's ability to prevail on an innocent owner defense with the question of whether the property is subject to a forfeiture lawsuit (which the Government might ultimately lose at the summary judgment or trial stages).

But the sale of the property, even when purchased with clean money, does not magically or automatically make it any less "connected" to a crime. Just as a car that was used to transport drugs, once sold, *still* transported those drugs, the building, even following the sale, was still alleged to have facilitated money laundering. The car is still substantially "connected" to criminal activity even after its sale because it was once a tool used to facilitate the crime.

The same analysis applies to PNC Plaza.

If a mere transfer could sever the substantial connection between the property involved in a crime and the underlying offense, then criminals would have an easy time shielding otherwise forfeitable property. They would simply transfer property involved in a crime from one corporate entity to another. But that recipe for money laundering is not endorsed by a plain reading of the statute, which says nothing of the sort, nor any case law cited by Claimants.

As a practical matter, of course, if the Government had no evidence to successfully challenge a Claimant's innocent owner defense, then the Government would likely choose to **not** pursue an *in rem* civil forfeiture action against property which had been sold after the initial unlawful transaction. For example, the Government would be expected to forego filing an *in rem* civil forfeiture action against a home when a well-known and reliable bank held a purchase money mortgage issued after the illegal activity occurred; there was little to no equity in the property above the mortgage and the bank had no reason to know of the illegal activity before it provided a loan and accepted a mortgage.

But the mere fact that the Government would likely exercise its discretion to not pursue a forfeiture action does not mean that it could not legally do so. To be sure, the Government would likely lose under an "innocent owner" defense raised by the bank and/or subsequent purchasers, but that does not mean that the United States would be prohibited from *pursuing* an action and challenging an innocent owner defense. For

example, the Government might have evidence that the supposedly reputable bank was not a bona fide purchaser, or it might have evidence that a Claimant was a mere alter ego for the former owner who purchased the home with tainted proceeds or who knew of the illegal activity. In those situations, the Government strategy of filing an *in rem* civil forfeiture lawsuit would appear sound.

In the instant case, of course, it seems clear that the United States does not view Claimants as parties who could prevail on an innocent owner defense, as some were involved from the initial purchase or are considered by the Government to be associates of those suspected of involvement. But the United States rejects the notion that later transactions (which did not involve the use of funds for which the Government has evidence of criminality) somehow cleansed the tainted property and generated a **bar** to the filing of an *in rem* civil forfeiture action.

In fact, other courts faced with the same question (which seems to have an almost metaphysical aspect to it) have reached the same conclusion. For example, *United States v. $131,551.03 Plus Accrued Int. from Sale of 10 Table Bluff Rd., Loleta, CA* ("$131,1551.03 Plus Accrued Int.") a post-CAFRA case, involved the civil forfeiture of a house that had been used to facilitate narcotics transactions. No. C06-05256 SI, 2010 WL 1135743, at *3 (N.D. Cal. Mar. 22, 2010). Following the criminal conduct, the house was purchased by the defendant's mother, using funds that had no connection to criminal activity. *Id*. at *1. The

court found that the house's substantial connection to the criminal activity **remained**, even after the sale. *Id*. at *3.

Similarly, in *United States v. 1309 Fourth St., La Grande, Union Cnty., Dist. of Or.*("1309 Fourth St.") another post-CAFRA case, the Government sought to forfeit real property that had been used to facilitate narcotics trafficking. No. 2:12-CV-02263-MA, 2015 WL 670572, at *7 (D. Or. Feb. 17, 2015). The owner at the time of the forfeiture was not the drug trafficker, but rather his sister, who had purchased the property from him using funds *unconnected to illegal activity*. The court concluded that the property retained its "substantial connection" following the sale. *Id*. at *6-7. Property -- real or otherwise -- does not "lose" its substantial connection simply because its ownership is transferred.

Claimants raise several objections to this conclusion. They suggested at oral argument that the "nth" purchaser of property connected to criminal activity -- for instance, someone purchasing a gun that was used to commit a crime from a second-hand firearm shop -- might (under the Government's theory) lose their purchase in a civil forfeiture. They also suggested that, given that they and everyone else in Miami are aware that Al Capone used to own real estate in the city, real estate developers could lose their investments because they "know" that such property was "involved in" crime.

Neither of those hypotheticals changes the "substantial connection" analysis, and CAFRA's additions to civil forfeiture law **protect both classes of people.** Section 983(d)(1) protects "innocent owners" of property by providing that an "innocent owner's

interest in property shall not be forfeited." In the case of an individual who acquires an interest in property after the conduct giving rise to forfeiture has occurred, an innocent owner is one (1) who "was a bona fide purchaser . . . for value" and (2) who "did not know and was reasonably without cause to believe that the property was subject to forfeiture." 18 U.S.C. § 983(d)(3).

In the case of the gun purchaser, the third, or fourth, purchaser down the line would be able to show that he did not have reason to believe that the property was connected to criminal activity. Thus, although the gun would retain its "substantial connection" to the crime, the "innocent owner" defense would protect the innocent owner's interest from forfeiture. And the Government would presumably not bother to pursue a civil forfeiture lawsuit because the fourth purchaser (and perhaps earlier purchasers) would prevail on an innocent owner defense. It would be illogical for the Government to pursue civil forfeiture, even though it technically could file the lawsuit and state a claim (subject to the likely-successful innocent owner defense).

To follow up on Claimants' hypothetical, in the case of a corporation involved in real estate development, its interest in the once-owned-by-Al-Capone property would similarly be protected by the statute of limitations. As noted above, the applicable statute of limitations for civil forfeitures is "five years after the time when the alleged offense was discovered, or . . . within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever was later." 19 U.S.C. § 1621. Counsel

can thus rest easy that property that everyone "knows" is connected to Capone's criminal enterprise would not be subject to forfeiture, as the knowledge of the crime accrued many years ago, and the statute of limitations has long run.

In both *$131,551.03 Plus Accrued Int.* and *1309 Fourth St.*, the courts noted that there was no doubt the property was substantially connected to a crime, and the relevant question was, instead whether, in spite of that connection, the claimant, who had used clean money to acquire the asset, was an innocent owner.

In *$131,551.03 Plus Accrued Int.*, the court held that, to the extent the claimant (the mother of a criminal defendant who entered a no contest plea to the charge of felony maintenance of a building used for the unlawful manufacture, storage or distribution of a controlled substance) wished to challenge the forfeiture, she would have to do so as an innocent owner,[11] by proving that she had no knowledge of the illegal conduct when she acquired the house. 2010 WL 1135743, at *4. Under the specific facts there, however, the court held that the claimant could not successfully assert an innocent owner defense

---

[11]     The court noted that CAFRA established a different test for determining whether a person qualifies as an innocent owner, depending on whether the person's interest in the property was acquired before or after the conduct giving rise to forfeiture. 2010 WL 1135743, at *4. For a property interest that existed at the time the illegal conduct took place, an "innocent owner" is defined as one who "did not know of the conduct giving rise to forfeiture" or who, "upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." *Id.* (quoting 18 U.S.C. § 983(d)(2)(A)). For a property interest that arose after the illegal conduct, an "innocent owner" is one who "was a bona fide purchaser for value" and who "did not know and was reasonably without cause to believe that the property was subject to forfeiture." *Id.* (quoting 18 U.S.C. § 983(d)(3)(A)).

because she had "full knowledge of the illegal conduct that had occurred at the property," and therefore granted the Government's summary judgment motion (and denied her motion). *Id.* at *5.

Likewise, in *1309 Fourth St.*, the court analyzed whether, despite the substantial connection, the claimant could nevertheless defeat the forfeiture using the innocent owner defense. It held that the defense did not factually apply because the claimant had not engaged in an "arm's-length transaction" to acquire the property. 2015 WL 670572 at *9.

PNC Plaza, and the deed representing ownership of it, did not lose its taint simply because it nominally changed hands -- it was still just as connected to the criminal activity. Even when tainted assets change form, they retain their taint. "Once proceeds become tainted, they cannot become *untainted*." *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) (emphasis supplied) (rejecting district judge's view that the "illicit funds" had "become 'too attenuated' or 'turn over too many times' so that no part of the funds in the account can be said to be derived from" illegal proceeds).[12] *See also United States v. Long*, 1:08-cr-043, 2009 WL 10675289 (N.D. Ga. Sept. 10, 2009) (citing *United States v. Dazey*,

---

[12]     *Ward* is a criminal case, where the Government's burden of proof is beyond a reasonable doubt -- a higher standard than the preponderance of the evidence standard established by CAFRA. *Cf. U.S. v. Abbell*, 271 F.3d 1286, 1296, n. 5 (11th Cir. 2001) (citing *Ward* for the point that "the district court's theory that the passage of time and the large infusion of legal proceeds remove the taint from the illegal proceeds defeats the purpose of the money laundering statute and promotes money laundering schemes").

403 F.3d 1147, 1163 (10th Cir. 2005) ("The government need not meticulously trace the funds involved in a monetary transaction offense or prove that the funds could not have come from a legitimate source.")).

PNC Plaza was connected to the money laundering activity and retained that connection when it was transferred from Optima 500 to CBD 500. It still retained that connection when it was converted into proceeds per the pre-complaint sale agreement. A tainted asset does not become clean simply because either clean money is added into the equation, or the property is transferred from one form (or one party) to another. *See United States v. $19,985.99 in U.S. Currency*, No. CV 07-03622-GHK FMOX, 2011 WL 5303131, at *3, n.5 (C.D. Cal. Nov. 1, 2011) (rejecting argument that property bought with credit card, when the credit card was paid using proceeds, was disconnected from illegal conduct, because "[i]t would defy logic if all an individual needs to do to "cleanse" illegal proceeds is make a purchase with a credit card").

At oral argument, Claimants raised the point that, had the government attempted to forfeit the Defendant Asset *before* the restructuring, there would have been nothing to seize (because PNC Plaza's mortgage was "under water," and so the mortgagee, a financial institution, would have recovered the entirety of the building's sale proceeds as an innocent owner). The United States described this status as a "curiosity of this case," but it notes that this status does not alter the "substantial connection" of the building to the criminal activity. Had, for instance, Claimants instead used the funds they invested

during the restructuring to pay down the original loan, the Government would have been able to seize the additional equity generated by the payment absent the restructuring.

Likewise, the United States recognizes that this case is "unusual" because Claimants owned PNC Plaza, with *negative* equity, but emerged from a foreclosure continuing to own the property, with *positive* equity. As explained by the Government, a foreclosure generally results in the debtor *losing* the property. Here, however, Claimants both retained the property and significantly reduced their debt.

But Claimants are not, as they argue, like a financial institution which later innocently purchased a tainted asset. They stood on both sides of the transaction.

The FAC alleges enough facts to meet the Government's pleading requirement to "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. G(2)(f). Its detailed allegations support a reasonable belief that at trial the Government will be able to show that (1) PNC Plaza constitutes property "involved in" money laundering transactions or property traceable to such property, and that (2) a "substantial connection" exists between PNC Plaza and the money laundering offenses alleged. *See United States v. All Funds on Deposit in, or transferred to or through, Banc of Am. Acct. No. 207-00426 held in the Name of Kenneth V. Jaeggi & Patti S. Jae*, No. CV–05–3971(SJF), 2007 WL 2114670, at *7 (E.D.N.Y. July 16, 2007) (if the government pleads "specific facts supporting an inference that the

defendants-in-rem are traceable to an offense constituting 'specified unlawful activity,' . . . it has met its burden at the pleadings stage").[13]

The transfer of the Defendant Asset to Claimants -- two of whom are alleged to have been the initial purchasers of the property and to have used criminal proceeds for that purpose -- does not destroy or undermine these fundamental principles.

Claimants will have the ability to put on evidence at the appropriate time if they so wish to argue that they are "innocent owners" and that their interests should not be forfeited. But that is an **affirmative defense**, not a ground for *dismissal* at the *pleading* stage. *See United States v. Four Million, Two Hundred Fifty-Five Thousand*, 762 F.2d 895, 905 (11th Cir. 1985). This affirmative defense, even if successful, does not then alter the substantial connection between the property and the alleged crime. *Cf. U.S. v. One Single Family Residence Located at 6960 Miraflores Ave.* ("*6960 Miraflores Ave.*"), 995 F.2d 1558 (11th Cir. 1993) (bank met its burden of proving that it did not have actual knowledge that drug proceeds were traceable to mortgaged property); *see generally U.S. v. Real Property Known as 420 Sterling Park Circle, Alabaster, Shelby County*, No. 2:12-cv-02961, 2013 WL 3153540 (N.D. Ala., June 14, 2013) (granting summary judgment motion to claimant who acquired

---

[13]    Claimants do not argue that the 2020 sale of PNC Plaza severs the substantial connection, but, for avoidance of doubt, the Undersigned concludes that the transformation of the building into funds, which are the *res* in this action, does not undermine their substantial connection to the criminal activity. Section 981(a)(1)(A) allows forfeiture of property involved in a criminal offense, or "property traceable to such property." The sale proceeds are undoubtedly *traceable* to the real property.

legal title to real property when he acquired mortgage reformation decree and who successfully asserted his claim of innocent ownership); *United States v. One Parcel of Property Located at 8 Drumlin Rd.* ("*8 Drumlin Rd.*"), No. 5:90-CV-545, 5:90-CV-546, 2000 WL 194668 (D. Conn. February 9, 2000) (granting summary judgment motion filed by bank, who claimed innocent owner status in civil forfeiture proceeding as party holding mortgages on properties, noting that the United States did not oppose the motion -- because the bank did not know of or consent to criminal activity involving the defendant real properties -- and explaining that the court ordered interlocutory sale of the properties and the bank released its mortgages, reserving its right to the sale proceeds).

Moreover, Claimants' argument that the Government could, without negative consequence, pursue civil forfeiture complaints against property which had been repeatedly sold long after the initial transaction generating grounds for forfeiture overlooks the reality that CAFRA provides that "[T]he United States shall be liable for . . . reasonable attorney's fees and other litigation costs reasonably incurred by the claimant." 28 U.S.C. § 2465(b)(1)(A). *See U.S. v. $80,891.25 in U.S. Currency*, No. 4:11-cv-183, 2021 WL 170155 (S.D. Ga. Jan. 19, 2012) (awarding successful claimant attorney's fees and costs and pre-judgment and post-judgment interest in *in rem* civil forfeiture case).

It is, of course, the facts which influence the Government's decision on whether to challenge, in an *in rem* civil forfeiture lawsuit, a claimant's innocent owner defense. In circumstances where the claimant's innocent owner status appears clear, such as the

claimant bank in *8 Drumlin Rd.*, the United States would presumably concede the defense's viability.

But in cases where the Government has evidence that a claimant may in some way be involved with, or has knowledge about, the underlying criminal activity, then it could dispute the innocent owner defense -- which is what it may well do here if the case progresses beyond the motion-to-dismiss stage. Given the potential exposure to an award of attorney's fees and costs under CAFRA, the Government is motivated to adopt a reasonable approach and not recklessly challenge a claimant's innocent owner defense. *Cf. 6960 Miraflores Ave.*, 995 F.2d at 1564 (where the claimant bank successfully pursued an innocent owner claim to real property even though, among other factors, the bank did not ask for the purpose of the loan; the bank did not conduct a title search, and the guarantor used part of the loan proceeds to buy expensive gifts for the bank president's family).

Claimants have not convinced the Undersigned that the substantial connection to criminal activity alleged in the FAC was somehow purged by the 2011 restructuring. For the reasons outlined above, the Undersigned **respectfully recommends** that the Court **deny** Claimants' Motion to Dismiss [ECF No. 221].

## III.    OBJECTIONS

The parties will have 14 days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the

District Judge. Each party may file a response to the other party's objection within 7 days of the objection. Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in the Report except upon grounds of plain error if necessary in the interests of justice. *See* 29 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on July 26, 2024.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

<u>**Copies furnished to**</u>:
The Honorable Darrin P. Gayles
All Counsel of Record