**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 20-cv-23278-GAYLES/GOODMAN**

UNITED STATES OF AMERICA,

     *Plaintiff*,

v.

APPROXIMATELY $9,105,221.62 IN FUNDS (PLUS
INTEREST) CURRENTLY HELD BY THE UNITED
STATES MARSHALS SERVICE REPRESENTING 95%
OF THE NET PROCEEDS FROM THE SALE OF THE
REAL PROPERTY LOCATED AT 500 WEST
JEFFERSON STREET, LOUISVILLE, KY 40202
KNOWN AS PNC PLAZA,

     *Defendants*.

_____/

**CLAIMANTS' OBJECTIONS TO MAGISTRATE JUDGE JONATHAN**
**GOODMAN'S REPORT AND RECOMMENDATIONS REGARDING CLAIMANTS'**
**MOTION TO DISMISS**

Pursuant to Local Magistrate Rule 4, Claimants Mordechai Korf, Uriel Laber, Optima CBD Investments LLC, and CBD 500 LLC, (collectively, "Claimants"), respectfully submit the following objections to the Report and Recommendations ("R&R") (Dkt. 241), entered by the Honorable Jonathan Goodman recommending the denial of Claimants' Motion to Dismiss the Government's First Amended Complaint (Dkt. 221) (the "FAC").

## **Introduction**

In 2011, Mordechai Korf and Uriel Laber partnered with Ihor Kolomoisky and Gennadiy Boholiubov (two Ukrainians listed on the Forbes billionaires list) to create Optima 500, LLC and purchase an office tower in Louisville, Kentucky, known as PNC Plaza. Optima 500 obtained the capital to purchase PNC Plaza by (1) raising $3,500,000.00 of untainted funds, (2) obtaining $13,151,167.17 from the Ukrainians that the Government now alleges was tainted, and (3) assuming the preexisting $65,700,000 mortgage. FAC ¶¶ 41, 48, 58 103-127.  Seven years later, the real estate market crashed, PNC Plaza was no longer worth what was owed on the property, Optima 500 defaulted on the loan, and U.S. Bank initiated foreclosure proceedings. *Id.* ¶¶ 138-40. There is no dispute that if U.S. Bank foreclosed at that time, Optima 500 would have gotten nothing. R&R at 34-35. While U.S. Bank was litigating the foreclosure, Claimants Korf and Laber (without the Ukrainians) partnered with Firm A (an unrelated third party) to create a Joint Venture that purchased U.S. Bank's $65 million mortgage for "approximately $27 million"; they did so with $17 million from a lender, $9.5 million in funds contributed by Korf and Laber that is not alleged to be tainted, and $500,000 in funds from Firm A. *Id.* ¶ 154.[1] The Joint Venture thereby obtained title to PNC Plaza through a deed-in-lieu of foreclosure in 2018. R&R at 7-8. The money

---

[1] Following the purchase, Korf and Laber invested additional money into PNC Plaza, although the FAC does not quantify the additional amount invested. *Id.* ¶ 157.

used to purchase PNC Plaza in 2018 came from funds that the "FAC ***does not allege . . . were tainted***" and that "the Government concedes . . . [have] not been traced to criminal activity" *Id.* at 7-8, n.2 (emphasis in original). In 2020, Claimants sold their interest in PNC Plaza to Firm A for $22.25 million, of which $9.1 million constituted the proceeds to which Claimants were entitled. The Government initiated forfeiture proceedings, froze those $9.1 million in funds (the "Defendant Asset"), and now seeks their forfeiture. *Id.* at 8-9.

The FAC's counts seeking to forfeit the Defendant Asset are based on two theories of forfeiture: (1) a "proceeds" theory of forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C); and (2) an "involved in" theory of forfeiture pursuant to § 981(a)(1)(A). *See* FAC ¶¶ 168-73. Assets forfeitable under a "proceeds" theory are assets "acquired by the criminal wrongdoer as a direct result of the crime" whereas assets forfeitable under an "involved in" theory may be "legally acquired but nonetheless subject to forfeiture because of how it is used. Thus, property may be forfeited on a theory of facilitation if it is used to commit or conceal illicit activity[.]" U.S. Dep't of Justice, Criminal Division, Money Laundering and Asset Recovery Section, Asset Forfeiture Policy Manual (2023), Chap. 5, Sec. I. D.1, *available at* https://www.justice.gov/criminal/criminal-afmls/file/839521/dl.

Claimants moved to dismiss the FAC, but Judge Goodman recommended denial of Claimants' motion. Judge Goodman's R&R errs because the Government's "proceeds" and "involved in" theories both fail as a matter of law.

*First*, the R&R errs by finding the Government didn't need to plead the Defendant Asset was substantially connected to criminal activity when pursuing a "proceeds" theory of forfeiture. *Id.* at 16-17. Forfeitable "proceeds" must, ***by definition***, be substantially connected to crime because they are proceeds that ***would not exist but for*** the criminal offense. Said simply, to prevail

on a "proceeds" theory of forfeiture, the Government must show the Defendant Asset's "acquisition is attributable to the [alleged] scheme rather than from money obtained from untainted sources." Dkt. 223 at 5. The R&R recognizes that the Defendant Asset here constitutes proceeds from the sale of property whose "acquisition[] financing still 'has not been traced to criminal activity.'" R&R at 8 n.2. These proceeds would exist regardless of any alleged crime. The Government's "proceeds" theory is, therefore, insufficient as a matter of law and should be dismissed with prejudice.

*Second*, the R&R's holding that the Defendant Asset was "involved in" the commission of a crime is an error, too. The case law is clear that "clean" money is not "involved in" a crime and, therefore, cannot be forfeited if its "offense" is that it was merely comingled with tainted funds. *See United States v. Sperber*, 2023 WL 3562967, at *5, 10 (N.D. Ga. May 19, 2023) ("the mere fact untainted money was commingled with tainted funds (into the purchase of the home) does not mean—standing alone—the untainted money was involved in a money laundering offense.") (citing *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003)). In *Sperber*, claimants were "entitled to recover" the portion of equity attributable to clean money because there was "nothing 'more'—aside from its commingling with tainted funds in the purchase of the property"—to connect it to a crime and it therefore was not forfeitable. *Id.* As explained in detail below, any allegedly tainted equity from 2011 was "*negative*" and wiped out in the foreclosure sale, whereas all of the new "*positive* equity" was obtained with clean money in 2018. R&R at 35 (emphasis in original). Stated simply, because there was ***no value left*** from the 2011 transaction, the 2020 sale proceeds cannot be traced to the funds from 2011. Instead, the 2020 sale proceeds can only be traced to the "clean" money from 2018. And that clean money was never commingled with allegedly tainted funds. That's not enough.

Moreover, the statute requires that the forfeited property be "traceable to" property "involved in" the commission of an offense. To be "traceable to," the property cannot exist but for the involvement in money laundering. *See United States v. Voigt*, 89 F.3d 1050, 1087 (3d Cir. 1996) ("the term 'traceable to' means exactly what it says"); *In re Rothstein, Rosenfeldt, Adler, P.A.*, 17 F.3d 1205, 1213 (11th Cir. 2013) (the Third Circuit's decision in *Voigt* "offer[s] instructive guidance"). But the $9.1 million can't be traced to any property involved in any offense at all. Claimants' partial equity interest in PNC Plaza derives exclusively from the 2018 purchase out of foreclosure, which the government pleads was not funded by any laundered money. That purchase and the subsequent sale in 2020 have no connection to any alleged enterprise. The Government's "involved in" theory therefore also fails.

In sum, the $9.1 million at issue, representing the proceeds of the sale of Claimants' partial equity interest in PNC Plaza in 2020, was not "involved in" anything other than a legitimate real estate investment, let alone "involved" with the requisite "substantial connection" required by 18 U.S.C. § 983. Claimants' objection should be sustained, the R&R overturned, and the Government's FAC dismissed.

## **Procedural and Factual Background**

On September 28, 2022, Judge Goodman recommended dismissal of the initial Complaint because it was jurisdictionally defective for improperly naming rights and interests in the property not recoverable through an *in rem* action. Dkt. 164 at 60-74. This Court affirmed and adopted Judge Goodman's recommendation and dismissed the Complaint. Dkt. 185.

The FAC alleges that, in 2011, Claimants Mordechai Korf and Uriel Laber, along with two Ukrainians, Ihor Kolomoisky and Gennadiy Boholiubov, established Optima 500, LLC to invest in PNC Plaza. To purchase the property, Optima 500 obtained a $65 million mortgage, raised $3.7

million, and obtained a capital contribution of $13.1 million from the Ukrainians. The Government alleges the Ukrainians stole that $13.1 million from Privat Bank. ***Nothing*** in the Government's complaint alleges Korf or Laber knew that these Forbes-listed billionaires had allegedly engaged in any wrongdoing. █████████████████████████████████████

█████████████████████████████████████████████████████████████

By 2018, Optima 500 had defaulted on PNC Plaza's $65 million mortgage, leading U.S. Bank to initiate foreclosure proceedings. FAC ¶¶ 138, 140. The FAC alleges that while the foreclosure was being litigated, Korf and Laber (through an entity they formed, CBD 500 LLC) entered into a Joint Venture with "Firm A" (an unrelated third-party investment firm) in an effort to buy PNC Plaza at foreclosure. Later that year, the Joint Venture successfully purchased PNC Plaza from U.S. Bank for around $27 million. The government concedes this "acquisition was funded by money that has not been traced to criminal activity" and that the Ukrainians have no interest in CBD 500, PNC Plaza, or Firm A. Opp. at 17; FAC ¶ 142-155; Dkt. 241 at 8 ("Significantly, the FAC does not allege that the new funds were tainted").

Per the FAC, the Joint Venture resolved the foreclosure proceedings against PNC Plaza via a deed-in-lieu of foreclosure. FAC ¶ 152. That acquisition severed any connection between PNC Plaza and the allegedly tainted $13.1 million in proceeds from 2011. It's undisputed that Optima 500 lost its $13.1 million investment in PNC Plaza because it held "*negative* equity" at the time of foreclosure. R&R at 35. Optima 500 was not entitled to any surplus following foreclosure, and no surplus equity was transferred to the Joint Venture or its members. Indeed, the Government has

---



previously acknowledged that a deed-in-lieu is "used when 'the value of the real estate is considerably less than the balance due.'" Dkt. 119 at 19 (quoting *Kennedy v. JP Morgan Chase Nat. Corp.*, 2011 WL 1576569, at *3 (D. Mass. Apr. 26, 2011)). In short, the Joint Venture obtained the right to foreclose on PNC Plaza exclusively through clean money, it elected to satisfy the mortgage via a deed-in-lieu of foreclosure, and none of Optima 500's allegedly tainted equity transferred over. *See* Mot. 5-6; D.E. 155 at 12-16.

Two years later, in 2020, Firm A purchased CBD 500's interest in the Joint Venture for $22.25 million. After satisfying the amounts owed under the closing statement (Dkt. No. 155-2) and operating agreement (FAC ¶¶ 165-66), $9,105,221.62 of net proceeds remained for CBD 500 and its members, Korf and Laber. The Government now seeks to forfeit that $9 million based entirely on the alleged taint from the 2011 purchase. Claimants moved to dismiss the FAC, but Judge Goodman issued an R&R recommending denial of Claimants' Motion.

### Standard of Review

Civil forfeiture actions are governed by "the Supplemental Rules of Certain Admiralty and Maritime Claims." *United States v. Two Parcels of Real Prop. Located in Russell Cnty., Ala.*, 92 F.3d 1123, 1126 (11th Cir. 1996). "These rules impose a more stringent obligation on the Government than the notice pleading requirements of the Federal Rules of Civil Procedure to set forth grounds for forfeiture." *Id*. Consequently, the United States must plead with "particularity" and "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. R. E(2), G(2)(f). To survive a motion to dismiss, a "plaintiff must plausibly allege all the elements of the claim for relief." *Feldman v. Am. Dawn, Inc.*, 849 F.3d 1333, 1339 (11th Cir. 2017). Courts evaluate whether the allegations in the complaint meet these burdens by "accepting the factual allegations in the complaint as true and construing

6

them in the light most favorable to the plaintiff." *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 856 F.3d 1338, 1339 (11th Cir. 2017).

Objections to a magistrate's report and recommendation regarding a dispositive motion trigger *de novo* review. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). "A district judge must give fresh consideration to those issues to which specific objection has been made by a party." *Rivera v. Equifax Info. Servs., LLC*, 341 F.R.D. 328, 334-35 (N.D. Ga. 2022) (quotations and citations omitted). The district court "retains ultimate adjudicatory power over dispositive motions and the widest discretion over how to treat a report and recommendation of a magistrate judge." *Gonzalez v. United States*, 981 F.3d 845, 851 (11th Cir. 2020) (quotations and citations omitted).

<u>**Argument**</u>

**I.       The R&R failed to apply the correct standard, or any analysis at all, to the "proceeds" theory of forfeiture.**

The Government's "proceeds" theory of forfeiture only applies to "property, real or personal, which constitutes or is derived from ***proceeds traceable to*** a violation." 18 U.S.C. § 981(a)(1)(C).[3] The R&R concludes that there is no requirement to prove a "substantial connection" to crime in a forfeiture action premised on a "proceeds" theory. Dkt. 241 at 16-17. As explained below, that conclusion is wrong as a matter of law.

Forfeitable "proceeds" are the *fruits* of crime and therefore, *by definition*, must be substantially connected to crime. The FAC itself acknowledges this definition when pleading its "proceeds" claim: "The Defendant Asset is property that constitutes, or is derived from, proceeds traceable to" criminal activity. FAC ¶ 169. Said differently, "[p]roperty is forfeitable as proceeds if it is 'derived from' or 'traceable to' the underlying charged offense." *Sperber*, 2023 WL 3562967, at *5. Courts use a "but for" test to determine whether property is "derived from" or "traceable to"

---

[3] All emphasis is added unless otherwise indicated.

a crime. *United States v. Hoffman-Vaile*, 568 F.3d 1335, 1344 (11th Cir. 2009) (finding proceeds traceable because "***but for*** [defendant's] Medicare fraud, [defendant] would not have been entitled to collect the[] sums" at issue); *see also United States v. Grant*, 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008). "[P]roperty 'traceable to' means property where the acquisition is attributable to the money laundering scheme ***rather than from money obtained from untainted sources***." *Bornfield*, 145 F.3d at 1135; *Sperber*, 2023 WL 3562967, at *5 ("Only funds used in or traceable to the illegal activity are subject to forfeiture, and not any commingled legitimate funds used in facilitating the scheme.") (citation omitted). "Property can only be forfeited as proceeds . . . where the Government establishes the requisite nexus between the property and the offense." *In re Rothstein*, 717 F.3d at 1212 ("money . . . obtained ***as a result of*** . . . criminal activity, and any property that can be traced to that money, is forfeitable" as proceeds).

The R&R simply failed to conduct this "but for" analysis and never explains how the $9 million in proceeds from the 2020 sale would only exist "but for" the alleged crime. It also ignores the "traceable to" requirement of section 981(a)(1)(c) and section 981(a)(2)'s definition of "proceeds," denying the motion to dismiss because, "Section 983(c)'s 'substantial connection' requirement does not apply" to "a proceeds theory, and so Claimants' dismissal argument based on a lack of alleged 'substantial connection' is inapplicable." R&R at 16-17.

But the statutory language between "proceeds" and "involved in" forfeiture cases is different because the mechanisms of establishing forfeitability are different. An "involved in" theory of forfeiture can be used to forfeit assets "involved in" crime even if the assets are not the actual proceeds. To be "involved in" crime, the defendant asset must facilitate the criminal activity by making the "underlying criminal activity less difficult" or "more or less free from obstruction or hindrance." *United States v. Certain Accts., Together With all Monies on Deposit Therein*, 795

F. Supp. 391, 397 (S.D. Fla. 1992). To illustrate the point, a getaway car can be forfeited under an "involved in" theory of forfeiture but cannot be forfeited under a "proceeds" theory of forfeiture. *See Bornfield*, 145 F.3d at 1135. Congress became concerned that courts "ha[d] been much too liberal in finding facilitation" because such theories "can quickly lead to unfair and disproportionate results," especially if the defendant asset has only an incidental or fortuitous connection to criminal activity.[4] For that reason, when Congress passed the Civil Asset Reform Act of 2000 ("CAFRA"), it enacted in 18 U.S.C. § 983(c) a statutory "substantial connection" requirement for "involved in" theories of forfeiture. Notably, Congress didn't have to create a statutory "substantial connection" requirement for the 981(a)(1)(C) "proceeds" theory of forfeiture because criminal proceeds are—***by definition***—substantially connected to crime. Such an addition would be redundant. *See Bornfield*, 145 F.3d at 1135; *In re Rothstein*, 717 F.3d at 1212 ("money . . . obtained ***as a result of*** . . . criminal activity, and any property that can be traced to that money, is forfeitable" as proceeds).

The R&R erroneously assumes that CAFRA's 18 U.S.C. § 983(c) is the only basis for a substantial connection requirement, and simply ignores Claimants' argument about the definition of proceeds and undisputed authority that "[t]he traceability inquiry has particular, and demanding, contours." *United States v. Wood*, 2016 WL 8131221, at *2 (E.D. Ky. Oct. 17, 2016). As the Claimants showed in their motion to dismiss, "the plain language of the relevant provisions indicates that the stated nexus—involved in, traceable to, and proceeds—is an element of the civil forfeiture claims," and "at a minimum, the Government must plausibly plead the requisite connection between the underlying offense and the seized property." *See* Dkt. 221 at 14-17. This

---

[4] *See* 146 Cong. Rec. at H2050 (Statement of Rep. Hyde regarding CAFRA).

standard has been recognized by district and circuit courts alike, and the R&R's failure to apply that standard, or frankly any standard, constitutes error.

For the $9.1 million in sale proceeds to be "proceeds traceable," the Government **must** allege facts that support a reasonable belief that the Government will be able to prove at trial that, "but for" the purported money laundering offense, the property sought by the forfeiture would not otherwise have been earned. That is impossible under the Government's own theory. All the value in PNC Plaza was lawfully purchased by Korf, Laber, and Firm A in 2018 from U.S. Bank with money the Government concedes, and the R&R recognizes, was completely unconnected to any purported criminal activity. *See, e.g.*, R&R at 8 ("Significantly, the FAC does not allege that the new funds were tainted."); Dkt. 222 at 17 ("The acquisition was funded by money that has not been traced to criminal activity"). Then, Firm A legally purchased PNC Plaza from Claimants. It is the proceeds of *that* sale, *i.e.,* the value earned from the indisputably legal purchase in 2020, that are the subject of this forfeiture action. The Defendant Asset cannot be traced to **any** tainted funds. The R&R's failure to engage in the "proceeds traceable to" analysis, which requires demonstrating substantial connection to criminal activity, is contrary to law. *See United States v. $38,000.00 Dollars in U.S. Currency*, 816 F.2d 1538 (11th Cir. 1987), and *Two Parcels*, 92 F.3d 1123 (explaining that establishing a substantial connection is a pleading requirement for "proceeds" forfeiture).[5]

---

[5] While these cases was handed down before CARFA, they have not been overturned or abrogated and require the Government to plead and ultimately establish a substantial connection in proceeds cases. In the *Two Parcels* case, the Eleventh Circuit applied a "substantial connection" pleading requirement to **all** properties at issue in that case, even though most of the properties were alleged to be "the proceeds of drug sales," with the exception of one parcel that was allegedly "used to facilitate the sale of controlled substances." 92 F.3d at 1127.

## II.     The R&R erred in holding the Government pled the Defendant Asset had a "substantial connection" and was "traceable to" to an offense.

As to the remaining counts brought under 18 U.S.C. § 981(a)(1)(A), there is no "substantial connection" between the $9.1 million sought by the government and any purported money laundering. Nor is the $9.1 million "traceable to" any property "involved in" an offense. The R&R posits that the fundamental question is whether

> [A] 2018 restructuring of the property (which did not involve tainted funds) somehow cleanse[d] the asset and sever[ed] the alleged substantial connection to criminal activity (thereby preventing the requested forfeiture) or does the property's substantial connection to the property remain (with Claimants able to assert an "innocent owner" affirmative defense and, if successful, to prevent the requested forfeiture).

R&R at 2. But Claimants did not and do not argue that the restructuring "cleanse[d]" the asset or that they are asserting a premature innocent owner affirmative defense; the Claimants argued that, even accepting the government's allegations as true, the government cannot establish that the $9.1 million at issue was "traceable to" equity "involved in" unlawful activity, nor could the Government establish that the $9.1 million at issue had any "substantial connection" to unlawful activity.

18 U.S.C § 981(a)(1)(A) allows forfeiture of "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of" money laundering statutes or "any property traceable to such property." Therefore, for an "involved in" theory, the Government has to either prove that: (1) the $9.1 million was itself "involved in" a money laundering transaction; or (2) the $9.1 million is "traceable to" property "involved in" a money laundering transaction. In addition, pursuant to 18 U.S.C. 983(c), the Government has to prove a "substantial connection" between the $9.1 million and the money laundering activity, which means a "connection to the underlying crime significantly greater than just incidental or fortuitous." 146 Cong. Rec. at H2050 (Statement of

11

Rep. Hyde regarding CAFRA); *see United States v. Seher*, 562 F.3d 1344, 1370 (11th Cir. 2009) (requiring "more than an incidental or fortuitous connection to criminal activity").

The R&R recognizes that, at the time of the 2018 acquisition by the Joint Venture, Optima 500 "owned PNC Plaza, with *negative* equity" on the existing mortgage—meaning the allegedly tainted Ukrainian equity was underwater and of no value. R&R at 35. While allegedly tainted money was used to partly fund Optima 500's purchase of PNC Plaza in 2011, all value from that purchase was lost because U.S. Bank could have seized the property and paid nothing to Optima 500.[6] A new Joint Venture between Claimants and Firm A purchased PNC Plaza from U.S. Bank with clean money, sold it, and now the government seeks to forfeit those proceeds because—at one point in PNC Plaza's history—two Ukrainians are alleged to have provided tainted funds to help purchase their partial ownership. That "incidental or fortuitous connection," is not enough to forfeit the $9.1 million in proceeds. It's just not "involved in" or "substantially connected" to a criminal activity. Instead, the 9.1 million dollars only has a "substantial connection" to the lawful purchase of PNC Plaza out of foreclosure in 2018. Nor can the $9 million be said to be "traceable to" property involved in money laundering, because the interest exists wholly independently of any alleged criminal conduct. *See Young*, 108 F.4th at 1331 ("traceable to" triggers the "but-for standard"); *Sperber*, 2023 WL 3562967, at *5; *Bornfield*, 145 F.3d at 1135.

The caselaw is in accord. Property purchased with untainted funds can only be forfeited under an "involved in" theory "if the government demonstrates that the defendant pooled the funds to facilitate or 'disguise' [the] illegal scheme." *See Sperber*, 2023 WL 3562967, at *9. The Eleventh

---

[6] "[H]ad the government attempted to forfeit the Defendant Asset before the restructuring, there would have been nothing to seize (because PNC Plaza's mortgage was 'underwater,' and so the mortgagee, a financial institution, would have recovered the entirety of the building's sale proceeds as an innocent owner)." R&R at 34.

Circuit's decision in *Puche*, 350 F.3d 1137, is instructive. In that case, a defendant convicted of money laundering drug proceeds appealed the forfeiture of untainted funds that had been comingled with drug proceeds. The Eleventh Circuit explained property is not "involved" in an offense simply because it is commingled with tainted funds. It said, "the mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture." *Puche*, 350 F.3d at 1153 (internal citations and quotations omitted). Instead, "[f]orfeiture of commingled funds . . . is proper when the government demonstrates that the defendant pooled the funds to facilitate or 'disguise' his illegal scheme." *Id.* In that case, the court affirmed the forfeiture determination based on evidence that demonstrated the defendant commingled legitimate funds with the drug proceeds "to conceal the nature and source of the narcotics proceeds." *Id.* at 1154.

Of course, the FAC does not claim that the 2018 purchase somehow facilitated the laundering of Optima 500's worthless equity. Nor could the Government try to make this claim; money launderers launder money, and in 2018, by the Government and the R&R's own admission, Optima 500 had **no money left** in PNC Plaza, tainted or otherwise.

Moreover, the Defendant Asset is not PNC Plaza, it is the $9.1 million in the U.S. Marshals' account, which represents the net proceeds payable to Claimants from the 2020 transaction. The $9.1 million is not (and was not) ever "involved in" money laundering, and "[n]either party argues [the $9.1 million] represented an unfair or below market price, or that the buyer purchased PNC Plaza unlawfully." R&R at 9 n.5. Accordingly, it is not enough to show that the $9.1 million is "traceable to" PNC Plaza, which allegedly was "at least at one point" purportedly involved in money laundering; the Government must show that the $9.1 million is "traceable to" PNC Plaza's

alleged involvement in laundering the $13 million of assets alleged to be tainted. The Third Circuit

illustrates this point in *United States v. Voigt*:

> For example, if the defendant receives $500,000 cash in a money laundering transaction and hides the cash in his house, the government may seize that money as property "involved in" the money laundering offense. If the defendant purchased a $250,000 item with that money, the government may seek the remaining cash as "involved in" the offense, **whereas the item purchased is subject to forfeiture as property "traceable to" property involved in the money laundering offense**.
>
> **Where the property involved in a money laundering transaction is commingled in an account with untainted property**, however, the government's burden of showing that money in the account or an item purchased with cash withdrawn therefrom is "traceable to" money laundering activity **will be difficult, if not impossible, to satisfy**.

89 F.3d at 1087[7]; *In re Rothstein*, 717 F.3d at 1213 (the Third Circuit's decision in *Voigt* "offer[s]

instructive guidance"). The $9.1 million at issue is not property "purchased" or acquired through

PNC Plaza's alleged involvement in money laundering. In fact, the $9.1 million owes not one of

its dollars to PNC Plaza's alleged prior involvement in laundering the $13 million in 2011 and

could not even have been commingled with tainted assets because there were no tainted assets left,

so the "traceable to" standard is not merely "difficult, if not impossible to satisfy"—it is actually

impossible.

PNC Plaza is akin to an "'account' . . . a routing device like the address of a building; the

money is the 'property' [for purposes of the forfeiture statute]. Once we distinguish the money

from its container, it also follows that the presence of one illegal dollar in an account does not taint

the rest—as if the dollar obtained from [money laundering activity] were like a drop of ink falling

into a glass of water." *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir.1992) (Easterbrook,

---

[7] The Third Circuit in *Voigt* was interpreting 18 U.S.C. § 982(a)(1), which the Eleventh Circuit has recognized "contains language nearly identical to § 981(a)(1)(A)." *United States v. $688,670.42 Seized from Regions Bank Acct. No. XXXXXX5028*, 449 F. App'x 871, 877 (11th Cir. 2011).

J.). The court in *Sperber* recognized this when it held that "the mere fact that untainted money was commingled with tainted funds (into the purchase of the home) does not mean—standing alone—the untainted money was involved in a money laundering offense." 2023 WL 3562967, at *10.

The three cases the R&R cites for the proposition that a "taint" lasts forever are factually inapposite. The first, *United States v. $131,551.03 Plus Accrued Int. from Sale of 10 Table Bluff Rd., Loleta, CA*, involved the forfeiture of a literal marijuana grow house after the drug dealer sold it to his mother two days after pleading guilty to an offense requiring forfeiture. 2010 WL 1135743 (N.D. Cal. Mar. 22, 2010). The property's owner was arrested, and law enforcement seized "1800 marijuana plants, 25 pounds of processed marijuana, half an ounce of concentrated cannabis, $8,300 in United States currency, and" other evidence of distribution, including scales, billing and pay statements, and grow equipment. *Id.* at *4. Two days after accepting his plea deal, the owner sold the grow house to his mother. *Id.* The property was integrally and actively involved in the crimes at issue and was transferred for the purpose of evading forfeiture. In contrast, the partial equity ownership interest purchased by Claimants in 2018 was never used to commit crimes and was not transferred to avoid forfeiture; if anything, the transaction completely divested any purportedly tainted interest.

In *United States v. 1309 Fourth St., La Grande, Union Cnty., Dist. of Or.*, the Government asserted a fraudulent transfer claim because

> (1) the transfer was to an insider ([the criminal defendant's] sister); (2) [defendant] intended that the transfer would be temporary and [defendant] ultimately would maintain possession of the property (as evidence by Claimant's failure to put the savings bonds in [sister's] name or change the beneficiary and his continued presence on the property); (3) before the transfer was made, [defendant] was charged with drug trafficking; (4) the consideration received at the time of the transfer was not reasonably equivalent to the value of the asset and was not "authentic." [Defendant] and Claimant exchanged fake consideration—first "love and affection" and then savings bonds which were of no value to [Defendant]; (5) it is likely that [Defendant] was insolvent at the time of the transfer because he had

no funds to pay for his defense; (6) the transfer occurred shortly after the property became subject to forfeiture.

2015 WL 670572, at *4 (D. Or. Feb. 17, 2015). The court's laundry-list of indicia of fraud makes clear that this was not a genuine transaction and was instead a sham attempt to hide a property. This says nothing about a situation, like here, where a partial equity interest in property is lawfully purchased out of foreclosure in a bona fide transaction, unconnected to any criminal activity, and consummated years before there was any indication (to anyone) that a different partial equity ownership had any possible taint.

Finally, *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) was "a criminal case [and only] addressed whether the government is required to trace the origin of the commingled funds to establish the elements of the crime of money laundering under 18 U.S.C. § 1956(a)(1)(B)(i)." *U.S. Commodity Futures Trading Comm'n v. Dinar Corp*, 2016 WL 814893, at *6 (M.D. Ala. Feb. 29, 2016). In other words, *Ward* stands for the unremarkable proposition that once a defendant has engaged in the substantive act of money laundering, it does not matter if money is later added to or subtracted from the account, because the defendant committed the offense regardless. In contrast, civil forfeiture inherently depends on the criminality of the ***property itself***, such that there must be tainted funds in an asset in order for it to be forfeited.

For this reason, it is unsurprising that *Ward* is inherently inconsistent with civil forfeiture authority. *See, e.g. Bornfield*, 145 F.3d at 1138 ("the funds contained in Bornfield's business account, which according to the record had no connection to the money laundering offense, are not forfeitable assets"); *Sperber*, 2023 WL 3562967, at *9 ("property is not 'involved' in a money laundering offense simply because it is commingled with tainted funds").[8] Indeed, *Ward*'s holding

---

[8] The R&R's parenthetical citation to *United States v. Long*, 2009 WL 10675289 (N.D. Ga. Sept. 10, 2009), is similarly irrelevant. The decision, relying on *Ward*, held that for purposes of a criminal

in the criminal context is contradicted by the Eleventh Circuit's decision in *Puche*, which holds that "the mere pooling or commingling of tainted and untainted funds in an account does not, without more, render the entire contents of the account subject to forfeiture." 350 F.3d at 1153. The Defendant Asset is ***not*** PNC Plaza—the asset sought is the proceeds from the sale of a partial equity ownership interest in PNC Plaza. Thus, even if the equity ownership of PNC Plaza is viewed as an "account" in which tainted funds from 2011 and untainted funds from 2018 were placed, we know that the "proceeds" from the 2020 sale are traceable only to the 2018 purchase—no "value" from the 2011 purchase remained after the 2018 transaction.

The mere commingling of clean assets with tainted assets does not permit the forfeiture of untainted funds, and the negative equity "curiosity" of this case means the $9 million in proceeds was never commingled with tainted funds at all, requiring the Court to dismiss this FAC. The negative equity is not a "curiosity," as the R&R repeatedly refers to it, but a fatal flaw in the FAC.

By failing to apply the standards set out by the statute, the upshot is that the R&R relies on—as the exclusive and sole limitation of the Government's authority—the fact that, "[a]s a practical matter, of course, if the Government had no evidence to successfully challenge a Claimant's innocent owner defense, then the Government would likely choose to not pursue an in rem civil forfeiture action against property which had been sold after the initial unlawful transaction." R&R at 28. But Congress provided more protection than the whims of the Government, and had Congress intended to enact a forfeiture statute providing that any purported taint is perpetual, it would have done so. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 454

---

charge for violation of 18 U.S.C. § 1957, "the law in the Eleventh Circuit does not require that the Government trace the funds in a commingled account." *Id.* The same can be said of *United States v. Abbell*, 271 F.3d 1286 (11th Cir. 2001). If anything, these cases further emphasizes that *Ward* is irrelevant to a civil forfeiture action.

(2002). The language of a "traceable to" and a "substantial connection" imposes limits on what property is forfeitable.  It is not in the hands of the Government to decide, limited only by the possibility of an expense; it is for the Court to determine by applying the statute.

Stripped of the three decisions it relies on, the only basis on which the R&R can uphold the forfeiture is the R&R's reasoning that "Claimants are not, as they argue, like a financial institution which later innocently purchased a tainted asset. They stood on both sides of the transaction." R&R at 35. But the R&R provides absolutely no legal authority for this position and, as Judge Goodman previously identified, there is a "sharp distinction between *in rem* civil *forfeitures* and *in personam* *civil penalties*[.]" Dkt. 164 at 69 (citing *United States v. Ursery*, 518 U.S. 267, 275 (1996) (emphasis in original)). Under the legal fiction of an *in rem* forfeiture, "the property is considered the 'offender,'" and to qualify as such, the asset must be traced to the purported illegal conduct under the tests set out by the civil forfeiture statute. *United States v. Carrell*, 252 F.3d 1193, 1199 n.5 (11th Cir. 2001). "Among its implications: the acquittal, or even non-prosecution, of the owner on criminal charges is irrelevant as to the forfeitability of the property." *United States v. One Parcel Prop. Located at 427 & 429 Hall St., Montgomery, Montgomery Cnty., Ala.*, 74 F.3d 1165, 1169 (11th Cir. 1996).

No Claimant has had a verdict or even an indictment entered against them; indeed, despite the Government's repeated requests for a stay to conduct its criminal investigation over the past four years, ██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████. An *in personam* theory of forfeiture is therefore unavailable and it is irrelevant who stood on what side of the transaction. The R&R's failure to hold otherwise is a manifest error of law. In essence, both the R&R and

Government rely on a singular allegation, which underscores that the alleged "substantial connection" is only Korf and Laber personally—

> The use of funds purportedly from Felman Trading Americas Inc. and Optima 1375 II allowed Korf and Laber to continue owning the property, which had been purchased using approximately $13.1 million in stolen money. The purpose of the restructuring transactions was to retain the asset constituting the proceeds of the misappropriation from PrivatBank, while also concealing and disguising the nature, location, source, ownership, and control of the misappropriated funds.

FAC ¶ 160. This allegation concedes that without any activity by Korf and Laber, there would otherwise be no substantial connection. But that is not a valid basis to find a civil forfeiture—a person cannot become tainted.

When "the government makes no specific allegations tying this property to any criminal activity" a motion to dismiss is properly granted. *United States v. 862 Zana Drive, Ft. Myers, Fla. 33905*, 2008 WL 4371354, at *3 (M.D. Fla. Sept. 22, 2008) (granting Claimants' motion to dismiss when funds were not alleged to derive from illegal sources); *see also United States v. Certain Accts., Together With all Monies on Deposit Therein*, 795 F. Supp. 391, 398 (S.D. Fla. 1992) ("There has been no allegation that the indirect accounts were used for money laundering," so the government's action seeking all the funds in the account was dismissed.).

Therefore, the United States can only proceed *in rem* against the asset, and the Government must prove the $9,105,221.62 has a substantial connection to the purported money laundering *violations*, not that the **same individuals** were involved. It has failed to do so.

### III.    The Court lacks jurisdiction.

The FAC also requires dismissal on jurisdictional grounds. Jurisdiction is measured at the time of filing. *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570-71, 582 (2004). To establish *in rem* jurisdiction, both a legally recognizable property and control over that property are necessary, and where a court lacks in rem jurisdiction from the outset, the case must be

dismissed. *See United States v. $389,820.00 in United States Currency*, 829 F. App'x 488, 491 (11th Cir. 2020) (if *in rem* jurisdiction is "lacking at the start of the case," dismissal is required). Here, there was no *in rem* jurisdiction to begin with because the original res was not legally cognizable. None of the cases cited by the R&R hold that a lack of jurisdiction can be cured by amendment to substitute a new defendant, because it cannot be. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 831 (1989); *Brandenburg v. Bd. of Regents of Univ. Sys. of Georgia*, 518 F. App'x 628, 631 (11th Cir. 2013). Consequently, dismissal cannot be avoided by amending the complaint to add a "proper" defendant; the Government needed to file a new suit against this "proper" defendant. It did not.

**IV.     Claimants have not waived their statute of limitations defense.**

The R&R appears to suggest that Claimants waived their 19 U.S.C. § 1621 statute of limitations defense by withdrawing that section of the motion to dismiss, an issue that was not before the Court for purposes of the motion to dismiss. *See* R&R at 21. Claimants object to that finding only to the extent the R&R is read to suggest that Claimant's statute of limitations defense is waived entirely and cannot be asserted as an affirmative defense in a responsive pleading. *See Mertiri v. Casa La Quinta Condo. Ass'n*, 2021 WL 10396230, at *2 (S.D. Fla. Feb. 3, 2021) ("[A] statute of limitations defense is an affirmative defense that should not be decided on a motion to dismiss where the viability of the defense does not appear on the face of the complaint.").

Dated: August 24, 2024                    Respectfully submitted,

                                          _/s/   Robert T. Dunlap_____
                                          Devin (Velvel) Freedman (FL Bar No. 99762)
                                          Robert T. Dunlap (FL Bar No. 119509)
                                          Niraj Thakker (FL Bar No. 1040169)
                                          Freedman Normand Friedland LLP
                                          1 SE 3rd Avenue, Suite 1250
                                          Miami, FL 33131
                                          Tel: (786) 924-2900
                                          vel@fnf.law
                                          rdunlap@fnf.law
                                          csmeryage@fnf.law

                                          Howard M. Srebnick (FL Bar No. 919063)
                                          Zaharah Markoe (FL Bar No. 504734)
                                          Black Srebnick
                                          201 South Biscayne Blvd., Suite 1300
                                          Miami, FL 33131
                                          Tel: (305) 371-6421
                                          HSrebnick@royblack.com
                                          Zmarkoe@royblack.com

                                          Marc E. Kasowitz
                                          Mark P. Ressler
                                          Joshua N. Paul
                                          Pro Hac Vice Anticipated
                                          Kasowitz Benson Torres LLP
                                          1633 Broadway
                                          New York, New York 10019
                                          Tel: (212) 506-1700
                                          MKasowitz@kasowitz.com
                                          MRessler@kasowitz.com
                                          JPaul@kasowitz.com

                                          *Attorneys for Claimants*

21